2023-1934

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

LYNK LABS, INC.,

Appellant,

v.

SAMSUNG ELECTRONICS CO., LTD.,

Appellee.

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in IPR2021-01300 for U.S. Pat. No. 11,019,697.

## BRIEF OF APPELLANT LYNK LABS, INC.

James T. Carmichael*
Stephen T. Schreiner
Stephen P. McBride
Mitch Yang*
CARMICHAEL IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons Corner, VA 22182
(703) 646-9255
jim@carmichaelip.com
schreiner@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com

*Counsel for Appellant Lynk Labs, Inc.*
*\*Not admitted in Virginia*                    September 22, 2023

## <u>PATENT CLAIMS AT ISSUE\*</u>

**U.S. Patent No. 11,019,697, Claim 1:**

1.     An apparatus comprising: [a]

at least one LED; [b]

a semiconductor device configured to emit a laser; [c]

a data receiver including an antenna, wherein the data receiver is configured

to transmit and receive data; [d]

a circuit configured to detect human touch via capacitive sensing; [e]

a battery ground capacitively coupled to at least one of the data receiver, the

circuit, the at least one LED, or the semiconductor device via a conductor, [f]

wherein the apparatus is portable, and [g]

wherein the at least one LED, the semiconductor device,

the data receiver, the circuit, and the battery ground are contained within a package

and connected to at least one circuit board within the package. [h]

\*  The letter annotations ([a], [b], etc.) identifying claim limitations correspond to

those identified by the parties in the IPR papers.

I

**U.S. Patent No. 11,019,697, Claim 7:**

7.      An apparatus comprising: [a]

an LED circuit comprising at least one LED; [b]

a first transmission conductor configured to receive first power and first data; [c]

a second transmission conductor configured to wirelessly receive second power and second data from an alternating electromagnetic field; [d]

at least one data receiver configured to receive the first and second data respectively from the first and second transmission conductor, or receive third data via an antenna; and [e]

a battery ground capacitively coupled to at least one of the at least one data receiver, the LED circuit, the first transmission conductor, or the second transmission conductor via a conductor, [f]

wherein the apparatus is portable, and [g]

wherein the LED circuit, the first transmission conductor, the second transmission conductor, the at least one data receiver, and the battery ground are contained within a package and connected to at least one circuit board within the package. [h]

II

**U.S. Patent No. 11,019,697, Claim 14:**

14.    An apparatus comprising: [a]

an LED circuit comprising at least one LED; [b]

a transmission conductor configured to wirelessly receive power and data

from an alternating electromagnetic field; [c]

a data receiver configured to receive the data from at least one of the

transmission conductor or an antenna; [d]

a battery ground capacitively coupled to at least one of the data receiver, the

transmission conductor, or the LED circuit via a conductor, [e]

wherein the apparatus is portable, and [f]

wherein the LED circuit, the transmission conductor, the at least one data

receiver, and the battery ground are connected to at least one circuit board within a

package. [g]

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**     23-1934

**Short Case Caption**     Lynk Labs, Inc. v. Samsung Electronics Co. Ltd.

**Filing Party/Entity**     Lynk Labs, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/26/2023

Signature:     /s/ Stephen Schreiner

Name:     Stephen Schreiner

**FORM 9. Certificate of Interest**

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Lynk Labs, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable            ☐  Additional pages attached

| | | |
|---|---|---|
| Carmichael IP, PLLC | James Carmichael | Stephen Schreiner |
| Stephen McBride | Minghui (Mitch) Yang | K&L Gates |
| Jason A. Engel | Katherine L. Allor | Erik J. Halverson<br>Dennis J. Majewski |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable            ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES..................................................................1

JURISDICTIONAL STATEMENT ...................................................................3

STATEMENT OF THE ISSUES.........................................................................3

STATEMENT OF THE CASE ............................................................................4

I. THE '697 PATENT ....................................................................................4

    A. The Invention Disclosed in the '697 Patent .................................4

        1. Battery ground coupled through a capacitor to other circuit components ...................................................5

        2. Integration of components into a "package"..........................7

        3. Transmission conductor for receiving power and data over wired connection; transmission conductor for receiving power and data over wireless connection...............7

    B. The Claims of the '697 Patent .........................................................9

II. THE REFERENCES ................................................................................10

    A. "Oba" (WO 03/009535 A1, PCT/JP02/07198) (Ex. 1053) .............10

    B. "Hara" (U.S. Pat. 6,600,243) (Ex. 1044) ........................................11

    C. "Zhang" (U.S. Pat. Pub. No. 2002/0080010) (Ex. 1072).................12

    D. "Gillespie" (U.S. Pat. Pub. No. 2002/0191029) (Ex. 1071).............12

    E. "Sato" (U.S. Pat. No. 6,891,786) (Ex. 1056) ..................................12

III. PROCEDURAL HISTORY....................................................................1274

SUMMARY OF THE ARGUMENT .................................................................15

ARGUMENT ......................................................................................................18

I. STANDARDS OF REVIEW....................................................................18

**II.    EACH OF INDEPENDENT CLAIMS 1, 7, AND 14 IS PATENTABLE BECAUSE A POSITA WOULD NOT MODIFY OBA's PC WITH HARA's CAPACITIVELY-CONNECTED BATTERY GROUND TO ADDRESS A BATTERY POWER NOISE PROBLEM THAT DOES NOT EXIST** ...................................20

**III.   INDEPENDENT CLAIMS 1, 7, AND 14 ARE PATENTABLE BECAUSE THE CAPACITOR-CONNECTED BATTERY GROUND IN THE PROPOSED OBA/HARA COMBINATION DOES NOT MEET THE FURTHER LIMITATION OF BEING COUPLED TO AT LEAST ONE OF "THE DATA RECEIVER, THE CIRCUIT, THE AT LEAST ONE LED, OR THE SEMICONDUCTOR DEVICE"** ................................30

**A.    The Board Failed to Demonstrate that the Battery Ground is Coupled Through a Capacitor to Any One of the Data Receiver, the Circuit to Detect Human Touch, the At Least One LED, or the Semiconductor Device, as Required by Claim 1** ........................................................................33

**1.    The capacitive battery ground is not coupled to the claimed "at least one LED"** ....................................33

**2.    The capacitive battery ground is not coupled to the claimed "semiconductor device configured to emit a laser"** ...........................................................................34

**3.    The capacitive battery ground is not coupled to the claimed "data receiver including an antenna configured to transmit and receive data"** ...........................34

**4.    The capacitive battery ground is not coupled to the claimed "circuit configured to detect human touch via capacitive sensing"** ................................................35

**B.    The Evidence Does Not Support a Finding that the Battery Ground is Coupled Through a Capacitor to At Least One of the Data Receiver, the Circuit to Detect Human Touch, the At Least One LED, or the Semiconductor Device as Required by Claim 1** ..........................................................36

**C.    Independent Claim 7 is Patentable Over the References** ..............39

**D.    Independent Claim 14 is Patentable Over the References** ............41

**IV. EACH OF INDEPENDENT CLAIMS 1, 7, AND 14 IS PATENTABLE BECAUSE THE COMBINATION FAILS TO MEET THE REQUIREMENT THAT THE RECITED COMPONENTS ARE CONTAINED WITHIN A "PACKAGE" IN AN "LED LIGHTING DEVICE OR SYSTEM"** ................................42

    **A. The Board Applied an Erroneous Claim Construction of "Package"** ...........................................................................42

    **B. The Board Erred By Finding the "Package" Limitation Is Met Based on District Court Papers and Accused Products Instead of the IPR References** ..............................................45

**V. INDEPENDENT CLAIM 7 IS PATENTABLE BECAUSE THE OBA/ZHANG/HARA COMBINATION DOES NOT MEET THE "FIRST TRANSMISSION CONDUCTOR" LIMITATION** .................50

    **A. The Board Applied an Erroneous Claim Construction of Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"** ......................50

    **B. Oba's PC with a USB Interface Does Not Inherently Receive Power In Addition to Data to Satisfy Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"** ................................53

    **C. Fischer Does Not Prove that Oba's PC with a USB Interface Inherently Receives Power to Meet Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"** ......................................58

    **D. Claim 7 is Patentable Because the Oba/Zhang Combination Does Not Satisfy Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"** ................................................................58

**CONCLUSION** ................................................................63

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*AC Technologies S.A. v. Amazon.com, Inc.,*
    912 F.3d 1358 (Fed. Cir. 2019)................................................................18

*Aqua Products, Inc. v. Matal,*
    872 F.3d 1290 (Fed. Cir. 2017)................................................................20

*ATD Corp. v. Lydall, Inc.,*
    159 F.3d 534 (Fed. Cir. 1998).................................................................29

*Belden Inc. v. Berk-Tek LLC,*
    805 F.3d 1064 (Fed. Cir. 2015)........................................................ 18, 19

*Chen v. Bouchard,*
    347 F.3d 1299 (Fed. Cir. 2003)................................................................19

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938).................................................................................18

*Cuozzo Speed Technologies, LLC v. Lee,*
    579 U.S. 261 (2016).................................................................................45

*Dickinson v. Zurbo,*
    527 U.S. 150 (1999).................................................................................19

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,*
    800 F.3d 1375 (Fed. Cir. 2015)................................................................45

*Game and Tech. Co., Ltd. v. Wargaming Group Ltd,*
    942 F.3d 1343 (Fed. Circ. 2019) ............................................................43

*In re Gartside,*
    203 F.3d 1305 (Fed. Cir. 2000)................................................................19

*In re IPR Licensing, Inc.,*
    942 F.3d 1363 (Fed. Cir. 2019)................................................................20

*In re NuVasive, Inc.,*
    841 F.3d 966 (Fed. Cir. 2016).................................................................20

*In re NuVasive, Inc.,*
    842 F.3d 1376 (Fed. Cir. 2016)................................................................35

*In re Robertson,*
    169 F.3d 743 (Fed. Cir. 1999).................................................................56

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) ........................................................ 18, 46, 49, 58

*In re Warsaw Orthopedics, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ........................................................ 35, 47

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ........................................................ 19, 55

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
383 F.3d 1295 (Fed. Cir. 2004) ........................................................ 51

*Knowles Elecs. LLC v. Iancu*,
886 F.3d 1369 (Fed. Cir. 2018) ........................................................ 51

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ........................................................ 33

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009) ........................................................ 43

*Maxwell v. J. Baker, Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) ........................................................ 33

*Motionless Keyboard Co. v. Microsoft Corp.*,
486 F.3d 1376 (Fed. Cir. 2007) ........................................................ 18

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ........................................................ 19

*Outdry Technologies Corporation v. Geox S.P.A.*,
859 F.3d 1364 (Fed. Cir. 2017) ........................................................ 18

*Par Pharm. v. TWI Pharm., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ........................................................ 26, 56

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 43, 51

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ........................................................ 51

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016) ........................................................ 20, 42

*Qualcomm Inc. v. Intel Corp.*,
6 F.4th 1256 (Fed. Cir. 2021) ........................................................ 20, 42

*SanDisk Corp. v. Kingston Tech. Co.*,
    695 F.3d 1348 (Fed. Cir. 2012)................................................................33

*Sinorgchem Co., Shandong v. International Trade Com'n*,
    511 F.3d 1132 (Fed. Cir. 2007)................................................................43

*TQ Delta, LLC v. Cisco Systems, Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019).........................................................*passim*

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed. Cir. 1991)................................................................33

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
    17 F.4th 155 (Fed. Cir. 2021)..................................................................18

*Vidstream LLC v. Twitter, Inc.*,
    981 F.3d 1060 (Fed. Cir. 2020)................................................................19

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................51

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)......................................................... 20, 42

*Wright Medical Technology, Inc. v. Osteonics Corp.*,
    122 F.3d 1440, 43 USPQ2d 1837 (Fed. Cir. 1997)..................................51

**Statutes and Other Authorities:**

5 U.S.C § 706..............................................................................................19

28 U.S.C. § 1295(a)(4)(A)............................................................................3

35 U.S.C. § 6.................................................................................................3

35 U.S.C. § 141(c).........................................................................................3

35 U.S.C. § 316(e).......................................................................................45

35 U.S.C. § 319.............................................................................................3

**STATEMENT OF RELATED CASES**

This is an appeal from the final written decision in *Samsung Electronics Co., Ltd. v. Lynk Labs, Inc.,* IPR2021-01300 (PTAB March 13, 2023; Paper 35) by the United States Patent and Trademark Office Patent Trial and Appeal Board ("PTAB" or "Board") for U.S. Pat. No. 11,019,697 ("the '697 Patent"). Appx1-54 [FWD]. No appeal in or from the same proceeding in this PTAB was previously before this Court or any other appellate court.

There are two district court ligations involving the '697 Patent.

Samsung Electronics Co., Ltd. ("Samsung" or "Petitioner") filed a declaratory judgment action on May 17, 2021, against Lynk Labs Inc. ("Lynk" or "Patent Owner") involving the '697 Patent, entitled *Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. v. Lynk Labs, Inc*., Case No. 1:21-cv-02665 (N.D. Ill.).

The Patent Owner filed a complaint for infringement of the '697 Patent in *Lynk Labs, Inc. v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*, 6:21-cv-00526 (W.D. Tex.) on May 25, 2021 ("Texas action").

On September 28, 2021, the Texas action was transferred to the Northern District of Illinois in *Lynk Labs, Inc. v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc*., Case No. 1:21-cv-05126 (N.D. Ill.).

1

The two pending actions (i.e., the -02665 and -05126 cases) were consolidated with the -02665 action being designated as the lead case. These two actions were stayed on March 21, 2023.

## JURISDICTIONAL STATEMENT

The PTAB had jurisdiction under 35 U.S.C. § 6 over IPR2021-01300 that is the subject of this appeal. The PTAB issued its Final Written Decision in IPR2021-01300 on March 13, 2023. Appx1-54. Lynk timely filed its notice of appeal on May 12, 2023. Appx684-689. This Court has jurisdiction under 35 U.S.C. §§ 141(c), 319 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1. Whether the Board erred by determining that a POSITA would have modified Oba according to Hara to incorporate a capacitively-coupled battery ground as set forth in each of independent Claims 1, 7, and 14 in view of the cited references.

2. Whether the Board erred in failing to establish the claim limitation was met requiring the battery ground be capacitively coupled to specifically recited components in the claim for each of independent Claims 1, 7, and 14 in view of the cited references.

3. Whether the Board erred in determining that the claim limitation providing the recited components are "contained within a package" in an "LED lighting device or system" was met for each of independent Claims 1, 7, and 14 in view of the cited references.

4.      Whether the Board erred in determining that the limitation of Claim 7 for a "first transmission conductor configured to receive first power and first data" was met in view of the cited references.

## STATEMENT OF THE CASE

This case is an appeal from the Board's decision that all challenged Claims 1-22 of the '697 Patent are unpatentable over certain references stated in Petitioner's grounds. The decision is *Samsung Electronics, Co., Ltd. v. Lynk Labs Inc.*, IPR2021-01300, Paper 35 (PTAB March 13, 2023). Appx1-54.

## I.    THE '697 PATENT

### A.    The Invention Disclosed in the '697 Patent

Patent Owner Lynk Labs, Inc. ("Lynk") is a practicing entity that manufactures and sells its patented products to LED lighting manufacturers for various applications.

The '697 Patent discloses an apparatus including an LED circuit, a data receiver, a circuit configured to detect human touch, and one or more transmission conductors. Appx59, Appx117 ['697 Patent, Figs. 1-3, 14:3-44] (LED circuit); Appx62, Appx118 [Figs. 11-13, 15:49-16:2] (LED circuits); Appx92, Appx122 [Figs. 52-53, 23:46-24:33] (data receivers 2078, 2088); Appx82-83, Appx120 [Figs. 37-38, 20:24-44] (circuits detecting human  touch including a first transmission conductor and second transmission conductor).

4

As discussed further below, the apparatus includes **a battery ground that is capacitively coupled to other circuit components including at least one of a data receiver, a circuit configured to detect human touch, at least one LED, and a semiconductor device**. In other words, the ground of the battery is coupled by a capacitor to at least one of the other recited circuit components.

### 1.    Battery ground coupled through a capacitor to other circuit components

Each of the independent claims at issue in this IPR references a battery ground capacitively coupled to other recited circuit components. The '697 Patent discloses a battery ground coupled by a capacitor to other LED circuit components. Appx8830 [Ex. 2001, Credelle Decl., ¶ 55]. Figure 53 discloses a battery ground coupled to other circuit components through a switch. Appx92, Appx122 ['697 Patent, Fig. 53, 24:31-33] ("the circuit 2090 would dissipate the excess energy to a … battery ground …). Elsewhere, the '697 Patent discloses the use of a capacitor to capacitively couple a ground to other LED circuit components, which can provide the benefit of increased current circulation and increased LED illumination:

> In preferred embodiments, the directional circuits, including directional circuit 2014, disclosed herein throughout this invention may be **connected to ground through capacitance 2039** at a point within the directional circuit … as shown in FIG. 49. This ground connection seems to provide increased circulation current, as it is noted that the LEDs get brighter for a given alternating electromagnetic source.

Appx122 ['697 Patent, 23:7-14] (emph. added).

Figure 49 of the '697 Patent depicts coupling a ground through capacitor 2039 to other LED circuit components (e.g., LED1), as annotated below:



FIG. 49

Appx90 ['697 Patent, Fig. 49] (annotated in red).

The '697 Patent elsewhere discloses using a capacitor to capacitively couple a ground to various LED circuit components, such as coupling a ground through a capacitor to a transmission conductor. Appx121 [21:18-21] ("the circuits disclosed in FIGS. 39-41 and 43 below may be connected to ground through capacitance at a point within the directional circuit such as transmission conductor 1185 (e.g. FIG. 41)"), Appx123 [26:17-20] ("In preferred embodiments, the circuits disclosed in

6

FIGS. 59-66 may be connected to ground through capacitance such as transmission conductor 2185 (e.g. FIG. 62)").

## 2.    Integration of components into a "package"

Each of the independent claims at issue in this appeal has a limitation providing that the recited components are contained within a "package." Appx124-125 ['697 Patent, Cl. 1, Cl. 7, Cl. 14]. The '697 Patent defines "package":

> It should be noted that "package" or "packaged" is defined herein as an integrated unit meant to be used as a discrete component in either of the manufacture, assembly, installation, or modification of an LED lighting device or system.

Appx113 [5:46-50].

In other words, a "package" is an integrated unit used as a discrete component in an "LED lighting device or system."

## 3.    Transmission conductor for receiving power and data over wired connection; transmission conductor for receiving power and data over wireless connection

The '697 Patent discloses LED circuits with transmission conductors that receive power and data over wired connections, as well as transmission conductors that receive power and data wirelessly. For example, Figure 37 illustrates an LED circuit with first transmission conductor 1106 for receiving power and data over a wired connection from signal generator 1102 and a second transmission conductor 1108 with an antenna for wirelessly receiving power and data:



**FIG. 37**

Appx82, Appx120 ['697 Patent, Fig. 37 (annotated in red), 20:24-33]. See Appx8827-8829 [Credelle Decl., ¶¶ 51-53].

Figure 51 depicts a transmission conductor 2062 receiving power and data wirelessly via an antenna 2060 or via wired connection from a signal generator 2061:



**FIG. 51**

Appx91, Appx122 ['697 Patent, Fig. 51 (annotated in red, yellow highlight),
23:33-45]; Appx8827-8828 [Credelle Decl., ¶ 51].

### B.    The Claims of the '697 Patent

Claim 1 of the '697 Patent recites an apparatus having LEDs for providing
illumination, a semiconductor device for emitting a laser, a circuit for detecting
human touch via capacitive sensing, and a data receiver with an antenna for
transmitting and receiving data. Appx124 [Cl. 1 (28:14-28)].

The apparatus of Claim 1 also includes "a battery ground capacitively
coupled" to at least one of the previously recited components. Specifically, the
battery ground is coupled by a capacitor to at least one of "the data receiver …
configured to transmit and receive data," the "circuit configured to detect human

touch via capacitive sensing," the "at least one LED," and the "semiconductor device configured to emit a laser." Appx124 [Cl. 1 (28:21-23)].

The apparatus of Claim 1 is integrated so that the five previously recited circuit components (i.e., the LED, the semiconductor device, the data receiver, the touch circuit, and the capacitively-coupled battery ground) are "contained within a package." Appx124 [Cl. 1 (28:25-28)]. As previously noted, the specification of the '697 Patent defines "package" to mean "an integrated unit meant to be used as a discrete component in … an LED lighting device or system." Appx113 [5:46-50].

Independent Claims 7 and 14 each recite an apparatus having certain limitations in common with Claim 1, including a capacitively-coupled battery ground limitation and a limitation for integrating claimed circuit components "within a package." Appx124-125 [Cl. 7 (28:51-60), Cl. 14 (29:15-21)].

Each of the independent Claims 1, 7 and 14 defines an apparatus that is novel and nonobvious over the prior art.

## II.  THE REFERENCES

### A.  "Oba" (WO 03/009535 A1, PCT/JP02/07198) (Ex. 1053)

Oba discloses a personal computer capable of establishing a Bluetooth connection with nearby devices, such as a mobile phone. Appx6591, Appx6600-6609, Appx6663, Appx6665-6666, Appx6670 [Ex. 1053 (Oba), 8:1-27, 17:22-

26:8, Fig. 4, Fig. 6, Fig. 7, Fig. 11]. Oba's personal computer (PC 51), depicted

below, has an LCD display 66, body 61, keyboard 64, and touch pad 65.



Appx6666, Appx6599-6600 [Oba, Fig. 7, 19:3-20:8]. See Appx8834-8841

[Credelle Decl., ¶¶ 65-75].

### B.   "Hara" (U.S. Pat. 6,600,243) (Ex. 1044)

Hara discloses a PC with a battery pack having a capacitor connected to the

battery ground to address the problem of "standing waves" and the associated

problem of the battery power leads functioning as an antenna to emit noise to the

external environment. Appx6261-6262, Appx6264, Appx6267, Appx6274-6276

[Ex. 1044 (Hara), Figs. 1-3, 7-8, 12, 1:28-67, 3:40-65, 4:8-57, 5:9-33]. See

Appx8845-8849 [Credelle Decl., ¶¶ 83-88].

### C.     "Zhang" (U.S. Pat. Pub. No. 2002/0080010) (Ex. 1072)

Zhang discloses "power line communications" ("PLC") modules that can be

incorporated into a PC to enable the receipt of power and data over the power

transmission lines. Implementing PLC connectivity requires modifications to the

PC and further modifications to the power supply used by the PC. Appx7794-7796,

7798-7799 [Ex. 1072 (Zhang), Figs. 1-2B, ¶¶ [0004], [0016]-[0019]]. See

Appx8899-8905 [Credelle Decl., ¶¶ 190-199].

### D.     "Gillespie" (U.S. Pat. Pub. No. 2002/0191029) (Ex. 1071)

Gillespie discloses a personal computer having a secondary display in the

form of a touch display replacing a conventional touch pad. Appx7764-7766 [Ex.

1071 (Gillespie), Figs. 1-4, Abstract, ¶¶ [0009]-[0010]].

### E.     "Sato" (U.S. Pat. No. 6,891,786) (Ex. 1056)

Sato discloses an optical disk drive with a laser diode emitting a laser.

Appx7502, Appx7516 [Ex. 1056 (Sato), Abstract, 5:21-32, 6:18-31].

## III.   PROCEDURAL HISTORY

The Petitioner filed the petition ("Pet.") for IPR2021-01300 on September 7,

2021, challenging all Claims 1-22. Appx129-223 [Pet., 1-83]. The Patent Owner

Preliminary Response ("POPR") was filed on December 20, 2021. Appx240-284

[POPR, 1-40]. The Board instituted IPR2021-01300 in its decision dated March

15, 2022. Appx285-313 [Instn. Dec., 1-29]. The Patent Owner Response ("POR") was filed on June 20, 2022. Appx359-437 [POR, 1-67]. The Petitioner filed a reply on October 5, 2022. Appx448-483 [Reply, 1-31]. The Patent Owner filed its sur-reply on November 9, 2022. Appx526-555 [Sur-reply, 1-23]. The oral hearing was conducted on December 13, 2022. Appx127 [Certified List, 2]. The Board issued its Final Written Decision on March 13, 2023. Appx128 [Certified List, 3]. The Patent Owner filed its appeal on May 12, 2023. Appx684-689.

Samsung's petition asserts that all Claims 1-22 of the '697 Patent are unpatentable under ten different grounds. Appx140-141 [Pet., 2-3].

This appeal addresses Grounds 1, 3, and 7, which challenge the three independent claims: Claims 1, 7, and 14. See Appx140-141 [Pet., 2-3]. A reversal on these grounds is dispositive of the other grounds, which pertain to dependent claims.

Ground 1 asserts that the four-part combination of Oba, Sato, Gillespie, and Hara renders independent Claim 1 and dependent Claims 2-5 obvious. Appx140 [Pet., 2].

Ground 3 asserts that the combination of Oba and Hara renders independent Claim 14 and dependent Claims 19-20 obvious. Appx141 [Pet., 3].

Ground 7 asserts that the combination of Oba, Zhang, and Hara renders independent Claim 7 and dependent Claims 8-9 obvious. Appx141 [Pet., 3].

The Final Written Decision issued by the Board on March 13, 2023, determined that the challenged claims are unpatentable. Appx52.

As for Ground 1, the Board determined that the combination of Oba, Sato, Gillespie, and Hara renders independent Claim 1 and dependent Claims 2-5 obvious. Appx8-32.

As for Ground 3, the Board found that the combination of Oba and Hara renders independent Claim 14 and dependent Claims 19-20 obvious. Appx34-38.

As for Ground 7, the Board found that the combination of Oba, Zhang, and Hara renders independent Claim 7 and dependent Claims 8-9 obvious. Appx38-47.

The Board found various dependent claims unpatentable under Grounds 2, 4-6, and 8-10, which the Court need not separately address for purposes of this appeal.

Ground 2 addresses Claim 6, which depends from Claim 1 challenged in Ground 1. Ground 1 is addressed herein. Accordingly, a reversal of the finding of unpatentability of Claim 1 under Ground 1 renders Claim 6 patentable.

Grounds 4-6 address Claims 15-16 and 22, each of which depends (directly or indirectly) from Claim 14 challenged in Ground 3. Ground 3 is addressed herein. Accordingly, a reversal of the finding of unpatentability of Claim 14 under Ground 3 renders Claims 15-16 and 22 patentable.

Grounds 8-10 address Claims 10-13 and 21, each of which depends (directly or indirectly) from Claim 7, which was challenged in Ground 7. Ground 7 is addressed herein. Accordingly, a reversal of the finding of unpatentability of Claim 7 under Ground 7 renders Claims 10-13 and 21 patentable.

## SUMMARY OF THE ARGUMENT

The Board committed several errors in this IPR proceeding. These errors led the Board to incorrectly find the claims of the '697 Patent unpatentable.

First, the Board committed an error in finding that the "battery ground capacitively coupled" limitation recited in independent Claims 1, 7 and 14 is met by combining Hara with Oba. The Board erroneously found that a POSITA would modify Oba's PC by adding a capacitor connected to the battery ground as taught by Hara. Hara addresses the problem of high frequency noise inside a PC creating "standing waves" that cause the battery leads to function as an antenna that radiates noise to the outside environment. Connecting a capacitor to the battery ground filters out this noise that would otherwise be radiated by the battery leads.

The Board found that the Oba PC would be modified to address a completely different problem from Hara that does not exist in Oba. The Board found that connecting a capacitor to the battery ground would address the non-existent problem of Oba's battery delivering noisy DC power to the PC. However, there is no evidence of record that Oba's battery has a problem with delivering

15

noisy DC power. The Board committed legal error in finding that Oba and Hara would be combined to address **a problem that does not exist in Oba and for which there is no foundation in the record**. The Board's decision regarding the combination of Oba and Hara is erroneous and should be reversed for each of Claims 1, 7, and 14.

Second, even if a POSITA would have reason to modify Oba to include a capacitively coupled battery ground per Hara (which is not the case), the combination fails to meet the remainder of the claim limitation. Specifically, the Board failed to establish that the capacitor-connected battery ground in the Oba/Hara combination is coupled "to at least one of the data receiver, the circuit, the at least one LED, or the semiconductor device," which are the required components recited in Claim 1. The Board did not demonstrate that the capacitive battery ground in the modified Oba PC is coupled to any of the other required circuit components recited in the claim. Thus, the proposed combination falls short of meeting the claim limitation. The Board committed legal error by failing to establish the full claim limitation is met, and thus its finding of unpatentability of Claims 1, 7, and 14 should be reversed.

Third, each of independent Claims 1, 7, and 14 has a limitation providing that the recited components of the claim are "contained within a package." "Package" is defined in the specification as a "discrete component meant to be

used in … an LED lighting device or system." For each of Claims 1, 7, and 14, the Board failed to demonstrate that the proposed prior art combination is contained within a package in "an LED lighting device or system." Instead of addressing whether the limitation is met in in the prior art, as it is required to do, the Board focused on accused products in a co-pending district court litigation. **The Board improperly relied upon irrelevant citations to a district court complaint and preliminary infringement contentions** to relieve the Petitioner from its statutory burden of proving the claim limitation is met. This is plainly improper and insufficient. Accordingly, the determination of unpatentability should be reversed for each of Claims 1, 7, and 14.

Fourth, independent Claim 7 of the '697 Patent recites a first transmission conductor "configured to receive first power and first data." The Board erroneously found that the USB port in Oba's PC inherently receives power and data. However, the record shows a USB port in Oba's PC may transmit power, but it ***does not receive power*** as required by the claim. The Board also erroneously found that Oba would be combined with Zhang as an alternative theory for meeting the first transmission conductor limitation. Accordingly, the Board's determination that Claim 7 is unpatentable is legal error and should be reversed.

# ARGUMENT

## I.    STANDARDS OF REVIEW

Obviousness is a legal question based on underlying findings of fact. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021). "We review the Board's legal determination of obviousness de novo and its factual findings for substantial evidence." *Outdry Technologies Corporation v. Geox S.P.A.*, 859 F.3d 1364, 1367 (Fed. Cir. 2017) (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015)); *TQ Delta, LLC v. Cisco Systems, Inc.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019) (legal determination reviewed de novo).

The Federal Circuit reviews legal conclusions *de novo*. *AC Technologies S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1364 (Fed. Cir. 2019) ("We consider de novo the Board's legal conclusions."); *In re Stepan Co.*, 868 F.3d 1342, 1345 (Fed. Cir. 2017). De novo review means the review is conducted anew, without deference to the Board. See *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1379 (Fed. Cir. 2007).

The substantial evidence standard for issues of fact is satisfied if a reasonable mind could arrive at the finding based on the evidence of record. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 216. The substantial

evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision.'" *OSI Pharms., LLC v. Apotex Inc*., 939 F.3d 1375, 1381–82 (Fed. Cir. 2019) (quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)).

Substantial evidence review is more than "simply rubber-stamping agency factfinding." *OSI Pharm.*, 939 F.3d at 1382 (quoting *Dickinson v. Zurbo*, 527 U.S. 150, 162 (1999)). It asks "whether a reasonable fact finder could have arrived at the agency's decision" and involves an "examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd*., 821 F.3d 1359, 1366 (Fed. Cir. 2016).

The Federal Circuit also reviews the Board's compliance with basic principles of administrative law pursuant to the standards set forth in 5 U.S.C § 706 (APA). *TQ Delta*, 942 F.3d at 1357. The PTAB's decisions are reviewed for abuse of discretion. *Vidstream LLC v. Twitter, Inc*., 981 F.3d 1060, 1064 (Fed. Cir. 2020) (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1078 (Fed Cir. 2015)). The Board violates the APA if its decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) follows from a record that contains no evidence on which the Board could rationally base its decision." *Vidstream*, 981 F.3d at 1064 (quoting *Chen v. Bouchard*, 347 F.3d 1299, 1307 (Fed. Cir. 2003)). The Court

reviews Board decisions to ensure they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." *Aqua Products, Inc. v. Matal*, 872 F.3d 1290, 1326 (Fed. Cir. 2017).

This Court "review[s] questions of claim construction de novo." *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1266 (Fed. Cir. 2021) (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015)); see, e.g., *PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*, 815 F.3d 734, 739 (Fed. Cir. 2016).

The Board may not rely on new evidence or new arguments outside of the Petitioner's grounds. *See In re IPR Licensing, Inc.*, 942 F.3d 1363 (Fed. Cir. 2019). Whether the Board improperly relied on new arguments during inter partes review is reviewed de novo. *Id.* at 1369 (citing *In re NuVasive, Inc.*, 841 F.3d 966, 970 (Fed. Cir. 2016)).

## II.   EACH OF INDEPENDENT CLAIMS 1, 7, AND 14 IS PATENTABLE BECAUSE A POSITA WOULD NOT MODIFY OBA's PC WITH HARA's CAPACTIVELY-CONNECTED BATTERY GROUND TO ADDRESS A BATTERY POWER NOISE PROBLEM THAT DOES NOT EXIST

Claim 1 is reproduced below with the annotations used by the parties:

1. (a) An apparatus comprising:

   (b) at least one LED;

   (c) a semiconductor device configured to emit a laser;

(d) a data receiver including an antenna, wherein the data receiver is configured to transmit and receive data;

(e) a circuit configured to detect human touch via capacitive sensing; and

(f) a battery ground capacitively coupled to at least one of the data receiver, the circuit, the at least one LED, or the semiconductor device via a conductor,

(g) wherein the apparatus is portable, and

(h) wherein the at least one LED, the semiconductor device, the data receiver, the circuit, and the battery ground are contained within a package and connected to at least one circuit board within the package.

Appx124 ['697 Patent, Cl. 1 (28:14-28)].

Limitation 1(f) of Claim 1 recites "a battery ground capacitively coupled to at least one of the data receiver, the circuit, the at least one LED, or the semiconductor device via a conductor." Appx124 [Cl. 1 (28:21-23)].[1] In other words, the battery ground is coupled by a capacitor to at least one of the other recited circuit components.

The Board determined that Oba's PC could be modified to incorporate Hara's teaching of a capacitor-connected battery ground.[2] Appx17 [FWD], ("Thus,

---

[1] Claim 7, recites a similar battery ground limitation. Appx124 [Cl. 7 (28:51-54)]. Claim 14 recites a similar battery ground limitation. Appx125 [Cl. 14 (29:15-17)].

[2] Patent Owner's reference in this brief to "capacitor-connected battery ground" or "capacitive battery ground" refers to the claimed "battery ground capacitively

we agree with Petitioner that Hara teaches or suggests capacitively coupling the battery ground and the circuit components of the laptop computer."), Appx19 ("Petitioner persuasively explains why one of ordinary skill in the art would have sought to combine Oba and Hara to arrive at a battery ground that is capacitively coupled to the circuit components of the laptop computer.").

Hara discloses connecting a capacitor to a battery ground to combat the problem of high frequency noise inside Hara's PC being picked up as "standing waves" by lengthy battery leads that function as an antenna to radiate the noise outside the PC to the external environment.[3] Appx381-388 [POR, 13-20]; Appx531-538 [Sur-reply, 1-8]; Appx6260 [Hara, Abstract, Fig. 1, Fig. 12, 1:27-51, 3:40-65]. See Appx8846-8849, Appx8852-8853, Appx8855-8856 [Credelle Decl., ¶¶ 84-88, 94, 100-101].

Figure 12 of Hara illustrates a PC 58 connected to a battery pack 50. The battery pack has power supply leads 51/52 connected on one end to the terminals of the battery and connected on the other end to terminals 53/54 of a power supply 57. The power supply receives DC power from the battery and delivers it to power

_____

coupled," that is, a battery ground coupled through a capacitor to the other circuit components.

[3] The problem of lengthy battery lead wires functioning as an antenna to radiate noise is the "standing wave" problem or the "standing wave/antenna noise" problem. Appx6274 [Hara, 1:28-47]; Appx379-387 [POR, 11-19]; Appx452, Appx454 [Reply, 2, 4]; Appx531-533 [Sur-reply, 1-3].

the PC electronics (CPU, display, memory, etc.). Appx6274 [Hara, 1:28-51, Fig.

12]; Appx8853-8856 [Credelle Decl., ¶¶ 97-102].



Appx6267 [Fig. 12 (annotated in red and blue)].

As illustrated in Figure 12 above, some PC configurations have high

frequency noise in the internal PC electronics that can be picked up by lengthy

battery leads, resulting in a phenomenon known as a "standing wave." The battery

leads unintentionally function as an antenna to radiate the noise outside the PC to

the external environment. This is the standing wave/antenna noise radiation

problem. Appx6274 [1:28-51, Fig. 12]; Appx8853-8856 [Credelle Decl., ¶¶ 97-

107].

Hara's solution to the standing wave/antenna noise radiation problem is to connect a capacitor to the battery ground, which causes the high frequency noise to be removed before it can be radiated to the external environment. Figure 12 of Hara illustrates the solution of connecting a capacitor to the battery ground:



Appx6261 [Fig. 1 (annotated in red)]. See Appx6274, Appx6275 [1:52-67, 3:40-65]; Appx8853-8859 [Credelle Decl., ¶¶ 97-107].

Thus, Hara teaches a capacitor-connected battery ground to address the standing wave/antenna noise problem. The Board did not find that Oba's PC has a battery with the standing wave/antenna noise radiation problem described in Hara. Appx17-18 ("The capacitive-coupling to battery ground, however, need not be used in Oba to solve the same problem identified in Hara").

Rather, the Board assessed that Hara's capacitor-connected battery ground could be incorporated to address a completely different problem not considered by Oba and not relevant to Oba.

Oba is generally concerned with Bluetooth synchronization between wireless devices. Appx6584 [Oba, 1:4-7 (Technical Field), Figs. 2-6]. Regarding the battery, Oba discloses that its PC has an internal battery. Appx383 [POR, 15] (citing Appx6670, Appx6608 [Oba, Fig. 11, 25:20-22]). Oba does not mention any concern for noise or noise sources, let alone battery leads acting as a standing wave antenna to radiate noise. In other words, Oba does not remotely suggest its configuration has the standing wave/antenna noise radiation problem addressed by Hara. Appx381-387 [POR, 13-19]; Appx531-539 [Sur-reply, 1-9].

The Board alludes to a fictional problem, which is that Oba's battery delivers noisy DC power to the PC electronics. Appx18 ("capacitively coupling Oba's battery ground … would 'smooth delivered power,' thereby 'facilitating a steady supply of power [from the battery to the PC electronics].'") (bracket added for clarity). In order to address that non-existent problem, the Board found that "the system of Oba would benefit from a capacitive coupling to battery ground,"

and therefore it is allegedly obvious to modify Oba pursuant to Hara to meet
limitation 1(f). Appx18-19.[4]

The premise of the Board's obviousness analysis is that the Oba's battery
(Appx6670 [Fig. 11 (battery 122)]) inherently produces and delivers noisy DC
power, and thus Oba's PC needs a capacitor connected to the ground of the battery
to filter out the noise. However, there is no evidence demonstrating that Oba's
battery inherently generates or delivers noisy DC power. *Par Pharm. v. TWI
Pharm., Inc.*, 773 F.3d 1186, 1194-1996 (Fed. Cir. 2014) (inherency cannot supply
a missing limitation in an obviousness analysis if the limitation at issue is not
necessarily present in the prior art).

Oba does not disclose or suggest that its battery has an issue with generating
or delivering noisy DC power. Appx382 [POR, 14]. At most, Oba states: "The
power-supply control circuit 121[5] is connected to a built-in battery 122 or to AC
power, supplying necessary power to each block, and controlling charging of the
built-in battery 122 and a secondary battery for a peripheral apparatus." Appx6608,

---

[4] For Claims 7 and 14, the Board refers back to its analysis for Claim 1. Appx35
(n.11) (Claim 14), Appx42 (Claim 7). The Patent Owner's arguments presented
herein for Claim 1 also apply to Claims 7 and 14.

[5] There is no evidence that Oba's battery delivers noisy DC power. Even if there
was (there is not), such noise would be resolved by Oba's power supply control
circuit that the Board never addressed in its decision. See Appx6670 [Fig. 11
(power supply circuit 121)]. See Appx383 [POR, 15].

Appx6670 [25:20-22, Fig. 11]; Appx382 [POR, 15]. Oba shows the battery (122) as a block element that provides DC power. As depicted in Figure 11 and described in Oba, the battery 122 supplies DC power through the power supply 121 to the PC electronics:



Appx6670, Appx6670 [Oba, Fig. 11 (annotated in red), 25:20-22]; Appx386 [POR, 18]; Appx536 [Sur-reply, 6].

In the final written decision, the Board did not make the predicate finding that Oba's battery delivers noisy DC power to support its rationale for

incorporating Hara's capacitor-connected battery ground. Appx16-19.[6] The Board

mentions that "AC power is a source of noise" (Appx19, citing Appx8143-8152

[Ex. 1090, Baker Reply Decl., ¶¶ 3-10]), but the Board did not explain what that

means. Significantly, the Board does not explain, much less establish, that AC

power would cause Oba's battery to deliver noisy DC power or otherwise radiate

noise to interfere with its operation. See Appx18-19. The Board cites paragraph 3

of the Petitioner's expert's reply declaration, which states: "Moreover, the AC

power connected to *Oba's* PC would have been known as a source of noise."

Appx8143-8144 [Baker Reply Decl., ¶ 3].[7] Notably, the Petitioner's expert does

not assert that the AC power connection would actually cause Oba's battery to

deliver noisy DC power.[8] The generic observation that AC power is "known as a

---

[6] The Board makes factual findings (1)-(3). Appx18. There is no factual finding that Oba's battery delivers noisy DC power.

[7] The Board also cites to the Petitioner's expert's original declaration for the general proposition that a capacitor can be used to smooth delivered power. Appx18 (citing Appx857-874 [Baker Decl., ¶¶ 103-106]). The expert does not assert that Oba's battery necessarily (or even likely) delivers noisy DC power in those or any other sections of the expert declaration addressing the battery ground limitation.

[8] More broadly, the expert's assertion that AC power was "known as a source of noise" is a conclusory assertion unsupported by any evidence. Appx8143-8144 [Baker Reply Decl., ¶ 3]. Accordingly, the expert testimony should be disregarded. *TQ Delta, LLC v. Cisco Systems, Inc*., 942 F.3d 1352, 1358 (Fed. Cir. 2019) (conclusory expert testimony).

source of noise" falls *far short* of establishing that the AC power input to Oba's
PC would interfere with the battery by causing it to deliver noisy DC power.

It is not surprising that the Petitioner's expert was unable to state that the
presence of an AC power input would cause Oba's battery to deliver noisy DC
power. Oba states: "The power-supply control circuit 121 is connected to a built-in
battery 122 *or* to AC power, supplying necessary power to each block, and
controlling charging of the built-in battery 122." Appx6608 [Oba, 25:20-22 (emph.
added)]; Appx383 [POR, 15]. Accordingly, when the battery powers Oba's PC, the
AC power is disconnected and could not not create noise in the DC power
delivered by the battery.

The Board's proposed application of Hara to Oba to incorporate the
capacitively-coupled battery ground is a solution in search of a problem. It is an
impermissible exercise in hindsight reconstruction, taking the Oba reference in one
hand, the claim in the other, and using the claim as a template to apply *ex post*
reasoning tainted by hindsight bias to reconstruct the invention. *See ATD Corp. v.
Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998). The Board correctly found in the
institution decision that the petition failed to establish that Oba had the standing
wave/antenna noise radiation problem of Hara that would provide a reason for a
POSITA to modify Oba. Appx302 [Instn. Dec., 18] ("On this point, Patent Owner
raises reasonable questions as to whether the same problems that Hara seeks to

resolve would exist in the combined system of Oba …"). In its final written decision, the Board improperly pivoted and based its determination on a different problem that does not exist in Oba.

In summary, the Board's determination of obviousness resides on a premise for which there is no basis. *TQ Delta*, 942 F.3d at 1357 (reversing because "Board's factfinding is based on conclusory testimony."). The Board must "show[] the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions." *Id.* at 1358. "A conclusory assertion with no explanation is inadequate." *Id.* at 1359.

Accordingly, this Court should reverse the Board and hold that Claims 1, 7, and 14 are patentable.

## III. INDEPENDENT CLAIMS 1, 7, AND 14 ARE PATENTABLE BECAUSE THE CAPACITOR-CONNECTED BATTERY GROUND IN THE PROPOSED OBA/HARA COMBINATION DOES NOT MEET THE FURTHER LIMITATION OF BEING COUPLED TO AT LEAST ONE OF "THE DATA RECEIVER, THE CIRCUIT, THE AT LEAST ONE LED, OR THE SEMICONDUCTOR DEVICE"

Each of independent Claims 1, 7, and 14 has a requirement that the battery ground be coupled by a capacitor *to at least one of the circuit components previously recited in the claim*. For example, limitation 1(f) in Claim 1 requires that the battery ground is coupled by a capacitor to at least one of "the data receiver, the circuit, the at least one LED, or the semiconductor device." Appx124 ['697 Patent, Cl. 1 (28:21-23)].

The Board erred by failing to address the requirement that the battery ground is capacitively coupled to at least one of the recited components 1(b)-1(e) of Claim 1 (i.e., "the data receiver," "the circuit," "the at least one LED," or the "semiconductor device"). Appx387-388 [POR, 19-20]; Appx124 ['697 Patent, 28:21-23].

The Patent Owner identified this deficiency in the Patent Owner Response. Appx387-388 [POR, 19-20] (the combination "does not disclose a battery ground being capacitively coupled to 'at least one of the data receiver, the circuit, the at least one LED, or the semiconductor device via a conductor.'"). The Patent Owner identified the same deficiency for independent Claims 7 and 14, which have similar limitations. Appx410, Appx414 [POR, 42, 46].

The Board's cursory analysis does not establish that the prior art combination of Oba, Sato, Gillespie, and Hara meets the limitation. The Board only states:

> Hara discloses providing an electrical conductor between the negative and positive poles of a battery and the circuit components of the laptop computer. Pet. 18–19; Ex. 1044, Figs. 1, 3, 8. In these embodiments, there is a direct electrical connection between the negative or positive pole of the battery, the circuit components of the laptop computer, and the capacitor coupled to the battery ground. Ex. 1044 [Hara], Figs. 1, 3, 8, 1:52–67 (noting that the capacitive element may be mounted "between the positive or negative pole of the battery and the circuit first connected by the battery"), 5:20–33. Thus, we agree with Petitioner that Hara teaches or suggests capacitively coupling the battery ground and **the circuit components of the laptop computer**.

Appx17 (emph. added).

The Board's reference regarding capacitively coupling the battery ground to "the circuit components of the laptop computer" does not come close to meeting the specific elements referenced in the claim language. Appx17. Specifically, the Board fails to establish that the capacitive battery ground found in the Oba/Hara combination would be coupled to any single one of "the data receiver, the circuit [to detect human touch], the at least one LED, or the semiconductor device," as claimed and *as applied to the prior art*. Thus, the proposed combination is missing a claimed limitation.

Additionally, assuming for the sake of argument that the Oba and Hara can be combined to render a capacitive battery ground, the Board does not articulate why a POSITA would be motivated to take the further step of coupling such capacitive battery ground to any one of "the data receiver, the circuit [to detect human touch], the at least one LED, or the semiconductor device" as applied to the prior art and allegedly found in the modified Oba PC of the combination. The claim is patentable when there is no showing that a POSITA would have reason to combine the references as proposed. *TQ Delta, LLC v. Cisco Systems, Inc.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019) (whether a person of ordinary skill in the art "would have been motivated to combine the prior art" in the manner proposed), 1359 (Board must provide articulated reasoning with rational underpinnings

showing all limitations are met); *see KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398,

406-407 (2007); *Maxwell v. J. Baker, Inc*., 86 F.3d 1098, 1105 (Fed. Cir. 1996)

(reversible error for the Board to ignore explicit limitations in the claims); *SanDisk*

*Corp. v. Kingston Tech. Co*., 695 F.3d 1348, 1368 (Fed. Cir. 2012) ("All the

limitations of a claim must be considered meaningful.") (quoting *Unique Concepts,*

*Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991)).

> ### A. The Board Failed to Demonstrate that the Battery Ground is Coupled Through a Capacitor to Any One of the Data Receiver, the Circuit to Detect Human Touch, the At Least One LED, or the Semiconductor Device, as Required by Claim 1

It is readily demonstrated that the Board failed to establish that the

capacitive battery ground in the prior art combination of Oba, Sato, Gillespie, and

Hara in Ground 1 is coupled to any of the circuit components recited in limitations

1(b) through 1(e).

> ### 1. The capacitive battery ground is not coupled to the claimed "at least one LED"

Starting with limitation 1(b), the Board found the recited "at least one LED"

reads on either the LED indicator lights of Oba's PC or the LED touch display of

the Oba/Gillespie combination. Appx22-23 (citing Oba (Ex. 1053) and Gillespie

(Ex. 1071); Appx146-147 [Pet., 8-9]. Yet, when it comes to limitation 1(f), there is

no analysis showing that the capacitive battery ground from Oba/Hara is coupled

to Oba's LED indicator lights or the Oba/Gillespie LED touch display as the Board

found for limitation 1(b). Appx16-19. The Board also failed to provide a reason why a POSITA would implement the capacitive battery ground by coupling it to Oba's LED lights or the Oba-Gillespie touch display. *Id.*

### 2. The capacitive battery ground is not coupled to the claimed "semiconductor device configured to emit a laser"

Turning to limitation 1(c), the claimed "semiconductor device configured to emit a laser" is allegedly met by modifying the Oba PC to incorporate a laser-driven optical disk drive according to Sato (Ex. 1056). Appx148-149 [Pet., 10-11]; Appx14-15 [FWD] (citing Sato). However, there is no showing under limitation 1(f) that the capacitive battery ground of Oba/Hara is coupled to the laser-driven optical disk drive identified for limitation 1(c). Appx16-19. The Board also failed to provide a reason why a POSITA would implement the capacitor-connected battery ground by coupling it to a laser-driven optical disk drive in Oba's modified PC. *Id.*

### 3. The capacitive battery ground is not coupled to the claimed "data receiver including an antenna configured to transmit and receive data"

For limitation 1(d), the claimed "data receiver including an antenna … configured to transmit and receive data" is allegedly met by the Bluetooth module of Oba. Appx14 (citing "the Bluetooth module of Oba having an antenna …"). For limitation 1(f), the Board does not demonstrate that the capacitive battery ground is coupled to Oba's Bluetooth module from limitation 1(d). Appx16-19. The Board

also failed to provide a reason why a POSITA would implement the capacitor-connected battery ground by coupling it to the Bluetooth module of Oba. *Id.*

### 4.    The capacitive battery ground is not coupled to the claimed "circuit configured to detect human touch via capacitive sensing"

Turning to limitation 1(e), the claimed "circuit configured to detect human touch via capacitive sensing" is allegedly met by Oba PC's touch pad implemented as a capacitive touch screen according to Gillespie. Appx21-22 (citing Gillespie (Ex. 1071)). Referring to limitation 1(f), the Board does not establish that the capacitive battery ground from Oba/Hara is coupled to a capacitive touch screen according to limitation 1(e). Appx18-21. The Board also failed to provide a reason why a POSITA would implement the capacitive battery ground by coupling it to the capacitive touch screen of Oba/Gillespie. *Id.*

The Court must be able to reasonably discern from the Board's decision how a reference discloses a claim limitation. The failure to provide an adequate explanation as to how a limitation is found in a reference or combination of references is an error of law. *See In re Warsaw Orthopedics, Inc.*, 832 F.3d 1327 (Fed. Cir. 2016); *In re NuVasive*, Inc., 842 F.3d 1376, 1383 (Fed. Cir. 2016) (it is not adequate to summarize arguments without explaining why the PTAB accepts the prevailing argument). Here, the Board (and the Petitioner) failed to provide any reasoned analysis demonstrating that the prior art meets the requirement that the

ground of the battery ground is capacitively coupled to "at least one of the data receiver, the circuit, the at least one LED, or the semiconductor device" under Claim 1. Appx124 [28:21-23]. The finding of unpatentability should be reversed without remand because there has been no showing that the prior art meets this limitation of Claim 1.

**B.    The Evidence Does Not Support a Finding that the Battery Ground is Coupled Through a Capacitor to At Least One of the Data Receiver, the Circuit to Detect Human Touch, the At Least One LED, or the Semiconductor Device as Required by Claim 1**

As discussed above, the Board's generalized statement that "Hara teaches or suggests capacitively coupling the battery ground and the circuit components of the laptop computer" (Appx17) does not establish that the prior art combination meets the limitation that the battery ground is coupled through a capacitor to at least one of "the data receiver, the circuit, the at least one LED, or the semiconductor device," as those recited components are purportedly found in the prior art.

The Board's statement is based on conclusory arguments and evidence from the petition. The Board referenced (but did not explain) passages from the petition, including:

> While Oba's battery provides power for components of personal computer 51, ***Oba does not expressly disclose capacitively coupling a battery ground to at least one of the above-described claim components***. ***However, it would have been obvious*** to configure the Oba-Sato-Gillespie combined apparatus to implement such features. (Ex. 1002, ¶102.)

Appx156 [Pet., 18] (emph. added).

> In view of Hara and the state of the art, a POSITA would have been
> motivated, and found obvious, to implement a battery ground in the
> combined Oba-Sato-Gillespie apparatus, which includes a battery, to be
> capacitively coupled to one or more of the data receiver (e.g., limitation
> 1(d)), touch circuit (limitation 1(e)), LED(s) (limitation 1(b)), and
> semiconductor device (limitation 1(c)). (Ex. 1002, ¶104.).

Appx158 [Pet., 20].

The Petitioner's statements relied on by the Board are conclusory and

inadequate.[9] They fail to provide a reasoned analysis explaining how the modified

Oba PC (Oba/Sato/Gillespie/Hara) has a battery ground that is coupled through a

capacitor to at least one of the "data receiver," "touch circuit," "the at least one

LED," or "semiconductor device" under Claim 1. They also fail to explain why a

POSITA would have a reason to take the capacitor-connected battery ground in the

once-modified Oba PC and take the further step of coupling it to any of the above-

recited circuit components. The conclusory assertion of the Petitioner, adopted by

the Board, fails to establish obviousness because it "tracks the *ex post* reasoning

---

[9] In response to the Patent Owner raising this deficiency (Appx387-388, Appx410,
Appx414 [POR, 19-20, 42, 46]), the Petitioner's reply merely restates the
conclusory assertion from the petition: "Rather the Petition demonstrates how the
teachings/suggestions of Hara … would have motivated a POSITA to configure the
modified Oba's system to capacitively couple battery ground … to the PC
components (including those mapped to claim 1) via the circuit path formed by
such configuration." Appx456-457 [Reply, 6-7].

*KSR* warned of" and fails to identify "any actual reason" a POSITA would have combined references in the manner claimed. *TQ Delta*, 942 F.3d at 1359.

The cited expert evidence is likewise conclusory. The Petitioner's expert concedes that "*Oba* does not expressly disclose capacitively coupling a battery ground to at least one of the above-described claim components (as modified above in view of Sato and Gillespie)." Appx852 [Baker Decl., ¶ 102]. In the very next sentence, the expert opines: "However, in my opinion, a person of ordinary skill in the art would have been motivated to configure the Oba-Sato-Gillespie combined apparatus to implement such features." *Id.* The expert does not provide any reasoning and does not cite any evidence in support of the assertion that a POSITA would further modify Oba's PC to couple the capacitor-connected battery ground to any of the components in limitations 1(b)-1(e)). Such a conclusory expert opinion unsupported by evidence is insufficient as a matter of law to meet a missing limitation. *TQ Delta*, 942 F.3d at 1359.

Similarly, the Petitioner's expert asserts in conclusory fashion that "a person of ordinary skill in the art would have been motivated to implement a battery ground in the combined Oba-Sato-Gillespie apparatus, which includes a battery, to be capacitively coupled to one or more (or all) of the data receiver (e.g., limitation 1(d)), touch circuit (limitation 1(e)), LED (limitation 1(b)), and/or the semiconductor device (limitation 1(c))." Appx869-870 [Baker Decl., ¶ 104]. The

expert does not provide any analysis explaining why a capacitor-connected battery ground would also be coupled to any one of the recited components in limitations 1(b)-1(e).[10]

In summary, independent Claim 1 is patentable over the references cited in Ground 1 (Oba, Sato, Gillespie, and Hara). Additionally, the patentability of Claim 1 renders moot the non-patentability arguments regarding dependent Claims 2-5 in view of the applied references.

### C.    Independent Claim 7 is Patentable Over the References

The language of Claim 7 differs from Claim 1. Claim 7 recites (a) an apparatus comprising (b) an LED circuit; (c) a first transmission conductor configured to receive first power and first data; (d) a second transmission conductor configured to wirelessly receiver second power and second data; and (e) at least one data receiver configured to receive the first and second data … or receive third data. Appx124 [Cl. 7 (28:40-50)].

Limitation 7(f) recites a battery ground capacitively coupled "to at least one of … the data receiver, the LED circuit, the first transmission conductor, or the

---

[10] The reference to filtering/smoothing of power is an alleged rationale for connecting a capacitor to a battery ground. Appx870 [Baker Decl., ¶ 104]. That alleged rationale is not used to establish (and does not establish) that the apparatus would be further modified so that the capacitor-connected battery ground is coupled to at least one of the claimed data receiver, touch circuit, the LED(s), and the semiconductor, as claimed.

second transmission conductor." Appx124 [28:51-54]. In other words, the battery ground is coupled through a capacitor to at least one of the recited components of limitations 7(b)-7(e).

> The Board's entire analysis is:

> Patent Owner contends Oba, Zhang, and Hara fail to disclose a battery ground capacitively coupled to any of the claimed components, for the same reasons set forth above with respect to claim 1 … [This argument is] not persuasive for the same reasons discussed above with respect to claims 1 and 14.

Appx42.

The Board does not establish that the combination of Oba, Zhang, and Hara for Ground 7 provides a battery ground that is coupled by a capacitor to at least one of "an LED circuit;" "a first transmission conductor configured to receive first power and first data;" "a second transmission conductor configured to wirelessly receiver second power and second data;" and "at least one data receiver." Appx38-47; Appx124 ['697 Patent, 28:40-54].

For example, the Board mapped the claimed "at least one data receiver" of limitation 7(e) to the Bluetooth module in Oba. Appx41. The Board did not establish that a capacitor-connected battery ground pursuant to limitation 7(f) would be coupled to the Bluetooth module of Oba per limitation 7(e). Appx34-37.

In summary, independent Claim 7 is patentable over the references cited in Ground 7 (Oba, Zhang, and Hara). Accordingly, dependent Claims 8-9 are also patentable over the applied references.

### D.    Independent Claim 14 is Patentable Over the References

Independent Claim 14 differs from Claim 1. Claim 14 recites an (a) apparatus comprising (b) an LED circuit; (c) a transmission conductor to wirelessly receive power and data; and (d) a data receiver. Appx125 [29:8-14].

Limitation 14(e) recites a battery ground capacitively coupled to "to at least one of the data receiver, the transmission conductor, or the LED circuit via a conductor." Appx125 [29:15-17]. In other words, limitation 14(e) provides that the battery ground is coupled by a capacitor to at least one of the circuit components of limitations 14(b)-14(d).

The Board just states that "[t]his argument is not persuasive for the reasons discussed above with respect to independent claim 1." Appx35 [FWD, n.11]. The Board does not address any of limitations 14(b)-14(d) in connection with limitation 14(e). Appx34-37.

For example, the Board mapped limitation 14(c) for "a transmission conductor configured to wirelessly receive power and data" to the "non-contact IC card 246" integrated into Oba's computer. Appx36-37. The Board never determined that a capacitor-connected battery ground pursuant to limitation 14(e) would be coupled to Oba's non-contact IC card from limitation 14(c). Appx34-37.

Thus, Claim 14 is patentable over the references cited in Ground 3 (Oba and Hara). Accordingly, dependent Claims 19 and 20 are also patentable over the applied references.

## IV.    EACH OF INDEPENDENT CLAIMS 1, 7, AND 14 IS PATENTABLE BECAUSE THE COMBINATION FAILS TO MEET THE REQUIREMENT THAT THE RECITED COMPONENTS ARE CONTAINED WITHIN A "PACKAGE" IN AN "LED LIGHTING DEVICE OR SYSTEM"

### A.    The Board Applied an Erroneous Claim Construction of "Package"

This Court "review[s] questions of claim construction de novo." *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1266 (Fed. Cir. 2021) (*citing Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015)); *see, e.g., PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 739 (Fed. Cir. 2016).

Claim 1 of the '697 Patent includes limitation 1(h): "wherein the at least one LED, the semiconductor device, the data receiver, the circuit, and the battery ground are contained within a package and connected to at least one circuit board within the package."[11] Appx124 ['697 Patent, 28:25-28].

The Board found that the term "package" encompasses "[t]he field of LED lighting systems." Appx24. The Board's claim construction is incorrect for multiple reasons.

---

[11] Claim 7 includes a similar limitation. Appx124 [28:56-60]. Claim 14 includes a similar limitation. Appx125 [29:19-21].

It is well established that a patentee may act as a lexicographer by defining a term in the specification. *Sinorgchem Co., Shandong v. International Trade Com'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007). The term package is expressly defined in the '697 Patent:

> It should be noted that "package" or "packaged" is defined herein as an integrated unit meant to be used as a discrete component in either of the manufacture, assembly, installation, or modification of **an LED lighting device or system**.

Appx113 [5:46-50] (emph. added). The Patent Owner cited this definition of "package." Appx399 [POR, 31] ("the specification states 'package' 'is defined herein as an integrated unit meant to be used as a discrete component in either of the manufacture, assembly, installation, or modification of an LED lighting device or system.'").[12] Thus, the construction of "package" is determined by the above definition from the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005); *Game and Tech. Co., Ltd. v. Wargaming Group Ltd*, 942 F.3d 1343, 1351 (Fed. Circ. 2019) (express definition is controlling); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) (same).

---

[12] Petitioner Samsung's district court Markman briefing had the identical construction for "package" that includes "an LED lighting device or system." See Appx8216-8217 [Ex. 1091, Samsung claim construction brief, 7/5/2022, 9-10].

The Board found that the term "package" encompasses "[t]he field of LED lighting systems." [13] Appx24. That is incorrect. The definition in the specification does not refer to "the field of LED lighting systems." See Appx113 [5:46-50]. The passage relied upon by the Board (see Appx111 ['697 Patent, 2:8-11]) does not purport to define "package." The Board's construction of "package" as encompassing the field of LED lighting systems is erroneous and should be reversed on *de novo* review.

The Board further held that "package" encompasses "general lighting, specialty lighting, signs, and decoration such as for Christmas tree lighting." Appx24 (citing '697 Patent, 2:8–11). The cited passage, which is providing technology background information, states that "LED based lighting may be used for general lighting, specialty lighting, signs and decoration such as for Christmas tree lighting." Appx111 [2:8-11]. This passage does not define "package."[14] The definition of "package" in the '697 Patent specification at column 5, lines 46-50

---

[13] The Board's construction of "package" as encompassing "the field of LED lighting systems" is a new construction. Appx24. Neither party argued for that construction. Neither party cited the evidence the Board relied on at column 2, lines 8-11 of the '697 Patent specification. See Appx399-400 [POR, 31-32] ("package"); Appx144 [Pet., 6].

[14] The passage at column 2, lines 8-11 is in the Background of the Invention section of the patent. The definitional passage at column 5, lines 46-50 is in the Summary of the Invention section. See Appx111, Appx113 ['697 Patent, 2:8-11, 5:46-50].

does not refer to "LED based lighting." The Board's construction of "package" should be reversed.

Under the proper construction of "package," this Court should reverse the finding of unpatentability of Claims 1, 7, and 14.

## B.    The Board Erred By Finding the "Package" Limitation Is Met Based on District Court Papers and Accused Products Instead of the IPR References

The finding of obviousness should be reversed because neither the Board nor the Petitioner met the burden of establishing that the proposed combination meets the "package" limitation. 35 U.S.C. § 316(e); *Cuozzo Speed Technologies, LLC v. Lee,* 579 U.S. 261, 279 (2016); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,* 800 F.3d 1375, 1378 (Fed. Cir. 2015) ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee."). See Appx23-24 [FWD]; Appx160-161 [Pet., 22-23]; Appx381, Appx399-400, Appx409-410, Appx414 [POR, 13, 31-32, 41-42, 46].

The Board erred by failing to demonstrate that limitation 1(h) of the '697 Patent is met by the proposed prior art combination comprising the modified Oba PC presented in the petition. Appx145-146 [Pet., 7-8].[15] In particular, the Board

---

[15] The Patent Owner pointed out that the "package" limitation was not met for any of independent Claims 1, 7, and 14. See Appx381, Appx399-400, Appx409-410 [POR, 13, 31-32, 41-42, 46].

did not establish that the modified Oba laptop constitutes "an LED lighting device or system" pursuant to the proper construction of "package." See Appx23-24.

Instead of analyzing the PC disclosed in the Oba reference, the Board concluded that limitation 1(h) is satisfied based entirely on infringement allegations from district court documents. The Board's *ipsi dixit* reasoning falls far short of the articulated reasoning an agency must provide in support of its decisions: "Patent Owner asserts in the district court litigation that a cell phone, tablet, and [smart]watch, constitute a 'package,' as that term is used in the '697 patent. … Thus, we find the laptop computer of Oba constitutes a 'package.'" Appx24. The Board relied on pleadings made in a district court complaint. Appx24 (citing Appx7821 [Ex. 1074, Complaint, 5/25/2021, ¶ 30]. The Board also relied on preliminary infringement contentions. Appx24 (citing Appx8093, Appx8111-8112, Appx8129-8130, Appx8136-8137 [Ex. 1088, Exemplary Infringement Charts, 8/31/2021, at 5, 23-24, 41-42, 48-49].

The Board thus improperly grounded its obviousness analysis in district court papers instead of the IPR references presented in the grounds. Most notably, the Board did not analyze the Oba reference and provide articulated reasoning demonstrating that Oba's laptop is an "LED lighting device or system" pursuant to the construction of "package." *In re Stepan Company*, 868 F.3d 1342, 1346 (Fed. Cir. 2017) (Board must provide articulated reasoning that explains its conclusions

as to why the prior art combination meets the limitations of the claim); *TQ Delta, LLC v. CISCO Systems, Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019) (decision must "show[] the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions."), 1359 ("there must be  some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness"); *In re Warsaw Orthopedics, Inc.*, 832 F.3d 1327, 1335 (Fed. Cir. 2016) (court must be able to "reasonably discern" from the Board's decision how a reference discloses a claim limitation). In *Warsaw Orthopedics*, the Court found that a single sentence explanation of how the reference allegedly satisfied the claim was inadequate. *Id.* In this IPR, the Board's analysis boils down to just two sentences directed to irrelevant documents. Appx24.

The infringement contentions in the various district court documents are not pertinent to the obviousness inquiry of this IPR. They do not provide a construction of "package" in an LED lighting device.[16] The infringement contentions do not address the Oba reference or the Oba laptop of this IPR. They are not evidence upon which a finding of obviousness based on the Oba reference can be sustained.

---

[16] For example, the infringement contentions cited by the Petitioner's reply (Appx465 [Reply, 15 n.6]) state they do not provide claim constructions: "Lynk's Infringement Contentions do not constitute admissions or adoptions of any particular claim scope or construction." Appx8386 [Ex. 1098, 2] (also noting "the Court has not yet made any claim construction ruling in this action.").

Indeed, the litigation documents referenced by the Board and the Petitioner (Appx7913-7964 [Ex. 1081, 7/21/2021]; Appx8089-8137 [Ex. 1088, 8/31/2021]; Appx8385-8432 [Ex. 1098, 4/1/2022]) were infringement contentions prepared *before* the parties established that the construction of "package" requires it be a component of "an LED lighting device or system." See Appx8178-8179 [Ex. 1091, Samsung Claim Construction Brief, 7/5/2022), 9-10]; Appx8211 [Ex. 1092, Lynk Claim Construction Brief, 8/22/2022, 8]. Thus, the infringement contentions are irrelevant because they do not reflect the updated and agreed-upon construction of "package." For this reason alone, these pre-Markman infringement contentions have no bearing on whether the Oba PC in this IPR is an "LED lighting device," and thus they cannot be the proper basis for the Board to find the prior art combination meets the claim limitation.

Even if, *arguendo*, they could have some relevance despite being pre-Markman, the infringement contentions contradict the Board's and Petitioner's argument. For example, the infringement contentions identify an accused device such as a smartphone having an LED "flashlight" used as a light source and for various needs. As such, the accused smartphone is an "LED lighting device." See Appx8406 [Ex. 1098 (infringement contentions), 4/1/2022, 22] (S21 Ultra 5G with "flashlight" functionality). Turning to the obviousness theory presented in this IPR, a POSITA would not consider the LED indicator lights on Oba's laptop PC to

enable the laptop PC to be used as an "LED lighting device." Indeed, neither the

Board nor the Petitioner provided evidence that Oba's laptop is an "LED lighting

device."

Instead, the Board improperly lumps the Oba laptop with a cell phone,

tablet, and a smartwatch. Appx24. The Board appears to reason that if a cell phone,

tablet, and smartwatch are accused in district court, then it follows that the Oba

laptop must render the claim obvious.[17] There is no basis for finding that Oba's

laptop equates to a cell phone, tablet, or smartwatch. Indeed, there is no basis for

presuming that Oba's circa-2003 laptop[18] would equate to any of the circa-2021

accused devices in the context of the claim. The Board's conclusion ("Thus, we

find that the laptop computer of Oba constitutes a 'package.'") (Appx24) is

unsustainable because it is not supported by articulated reasoning with rational

underpinnings. *In re Stepan*, 868 F.3d at 1346.

This Court should reverse the finding of unpatentability of Claims 1, 7, and

14 because neither the Board or the Petitioner met the burden of establishing that

---

[17] The fallacious reasoning would be equivalent to the Patent Owner arguing that because a smartphone infringes the claim, it follows that a tablet and other products infringe the claim, without the requisite proof.

[18] See Appx6582 [Oba, cover page, International Publication Date of January 30, 2003].

the proposed combination based on the Oba PC meets the "package" limitation for

"an LED lighting device or system."

## V. INDEPENDENT CLAIM 7 IS PATENTABLE BECAUSE THE OBA/ZHANG/HARA COMBINATION DOES NOT MEET THE "FIRST TRANSMISSION CONDUCTOR" LIMITATION

### A. The Board Applied an Erroneous Claim Construction of Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"

The Board's determination that the Oba reference meets limitation 7(c) is

founded on an erroneous construction of "a first conductor configured to receive

first power and first data."Appx44. Without conducting any claim construction

analysis, the Board asserted that "claim 7 does not require that the first

transmission conductor actually receive first power and first data … The first

transmission conductor must only be configured to receive power and data." *Id.*,

(citing Appx478 [Reply, 28]).[19]

The parties did not propose a special claim construction for "a first

conductor configured to receive first power and first data." See Appx144 [Pet., 6]

("no special constructions are necessary to assess whether the challenged claims

are unpatentable over the asserted prior art."); Appx374 [POR, 6]. Neither party

argued that the first conductor does not have to "actually receive" first power and

---

[19] The Patent Owner disagreed with this interpretation of limitation 7(c). Appx548 [Sur-reply, 18] ("Oba's USB port 115 is not disclosed as ***receiving power***.") (emph. added).

first data, or that the first conductor need only be capable of being configured to receive first power and first data. The Board's construction is erroneous and should be reversed by this Court.

The claim construction analysis starts with the ordinary and customary meaning of any term and the intrinsic evidence consisting of (1) the claim language; (2) the specification; and (3) the prosecution history. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1065 (Fed. Cir. 2018); *Knowles Elecs. LLC v. Iancu*, 886 F.3d 1369, 1373-74 (Fed. Cir. 2018).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Often, the specification is dispositive; it is the single best guide to the meaning of the disputed claim term. *Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 43 USPQ2d 1837 (Fed. Cir. 1997). "Even when guidance is not provided in explicit definitional format, the specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'" *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (cite omitted).

Claim 7 recites an "apparatus" that comprises "a first transmission conductor configured to receive first power and first data," along with other components in

the apparatus including an LED circuit, a second conductor configured to wirelessly receive power and data, a data receiver, and a battery ground. Appx124 [Cl. 7 (28:40-60)]. By its terms, this apparatus includes a first conductor that is specifically "configured to receive first power and first data." The claimed first conductor is not a component that is merely capable of receiving first power/data or capable of being configured to receive first power/first data. Rather, the first conductor is designed to receive first power/first data.

The specification supports this construction because it consistently describes transmission conductors as receiving power. Figure 37 depicts a first transmission conductor 1106 that receives power from an AC generator 1102:



Appx82 ['697 Patent, Fig. 37 (annotated in red)]. The '697 Patent states that "an alternating electric field is provided to a first transmission conductor by a signal generator 1102." Appx120 [20:25-27]. Figure 41 of the patent depicts a first

transmission conductor 1160 receiving power from an AC input. Appx85, Appx121 [Fig. 41, 21:9-13]. See Appx8827-8828 [Credelle Decl., ¶¶ 51-52].

Elsewhere, the specification describes a transmission conductor as receiving power. See, e.g., Appx89-90 [Fig. 46 (circuit with transmission conductor 2106 receiving power from signal generator 2012), Fig. 47 (circuit with transmission conductor 2030 receiving power from signal generator 2026), Fig. 48 (circuit with transmission conductor 2041 receiving power from signal generator 2040), Fig. 49 (circuit with transmission conductor 2041 receiving power from signal generator 2040)].

The Board's erroneous construction is material because its determination of unpatentability is founded on a USB interface being capable of being configured to receive power and data, i.e., that it does not actually need to receive power and data. Appx44. The Board's finding that Claim 7 is unpatentable should be reversed based on this erroneous claim construction.

**B.      Oba's PC with a USB Interface Does Not Inherently Receive Power In Addition to Data to Satisfy Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"**

The Board found that Oba's USB connection would inherently receive power in addition to data to meet limitation 7(c) for "a first transmission conductor configured to receive first power and first data." Appx43.

The Oba PC 51 includes a USB port 115 and a USB interface 111. The USB

connection in Oba is depicted in annotated Figure 11:



Appx6670 [Oba, Fig. 11] (annotated in red). See Appx415-416 [POR, 47-48].

Oba discloses that the USB connection 111/115 may receive *data* but makes

no mention of it receiving power. For example, the USB connection may receive

time/position data from a GPS device. Appx391 [Oba, 23:11-13]. The USB

connection 111/115 may receive data from memory devices, such as a magnetic

disk, optical disk, or semiconductor memory. Appx390 [Oba, 22:23-23:2]. See

Appx416 [POR, 48] (citing Appx390 [Oba] at 22:23-23:10). However, Oba does

not disclose or remotely suggest that the USB connection ***receives power***.

Appx415-416 [POR, 47-48]; Appx8894-8895 [Credelle Decl., ¶¶ 181-182].[20]

The Board and Petitioner do not dispute that the Oba reference fails to disclose that the Oba PC's USB connection receives power. Instead, the Board asserts that Oba's USB connection would ***inherently*** receive power. Appx44 ("inherent capabilities/structure of the USB interface in the relevant time period."); Appx198 [Pet., 60] ("*Oba* necessarily discloses a first transmission conductor to receive first power and first data" because "USB connectors … such as described by *Oba* [] were known to be configured to receive power and data over a conductor.").

The Board relies on the USB 2.0 Specification (Ex. 1055)[21] as demonstrating that the USB connection in Oba's PC inherently receives power.

---

[20] The Board's decision fails to explain why it accords no weight to Patent Owner's expert, who provides a detailed evidence-based explanation of why Oba's USB interface does not receive power. See Appx42-44; Appx8894-8895 [Credelle Decl., ¶¶ 181-182]. In fact, the Petitioner's expert submitted a reply declaration that ***did not dispute*** the Patent Owner's expert evidence that (1) Oba's USB connection does not receive power and (2) the USB Specification discloses that USB ports like Oba can transmit power but do not receive power. See Appx547-548 [Sur-reply, 17-18] (comparing Appx8894-8895 [Credelle Decl., ¶¶ 181-182] with Appx8140-8169 [Baker Reply Decl.]). The Board improperly failed to take into account the Patent Owner's uncontroverted expert evidence. *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016).

[21] Additionally, the USB 2.0 Specification was never established as prior art despite the Patent Owner's objections. Appx421-423 [POR, 53-55]. That said, the Patent Owner's argument does not turn on whether this reference is prior art.

Appx44 (the USB 2.0 Specification "show[s] the inherent capabilities/structure of the USB interface in the relevant time period."). However, the Board provides no evidence that Oba's PC implemented its USB connection pursuant to the USB 2.0 Specification. The Board does not suggest that Oba references the USB 2.0 Specification (it does not). Neither the Board nor Petitioner establishes that Oba implemented the USB 2.0 Specification. See Appx416-421 [POR, 48-53]. Accordingly, the Oba PC does not inherently disclose what is allegedly described in the USB 2.0 Specification. *Par Pharm. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1194-1996 (Fed. Cir. 2014) (inherency may supply a missing limitation in an obviousness analysis only if the limitation at issue is necessarily present in the prior art); *see In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999). For this reason alone, this Court should reverse the Board's conclusion that the Oba USB connection meets limitation 7(c) of Claim 7.

Moreover, even if Oba acknowledged the USB 2.0 Specification (it does not), that standard fails to prove that Oba's USB interface inherently receives power. See Appx422-423 [POR, 54-55] (citing Appx8896-8897 [Credelle Decl., ¶¶ 184-187]). The USB 2.0 Specification does not disclose that the USB interface on a PC receives power. Instead, the USB Specification describes that power can be transmitted on a USB cable from a "USB host" to a "USB device." The USB Specification states: "Power distribution over the USB deals with the issues of how

USB devices consume power provided by the [USB] host … The [USB] host supplies power for use by USB devices that are directly connected." Appx6897 [Ex. 1055, 18]. (brackets added) (cited by Appx423 [POR, 55]). Even if the USB 2.0 Specification was adopted by Oba (it is not), there is no evidence that Oba's PC is a ***USB device*** connected to a ***USB host*** to receive power. Appx8896-8897 [Credelle Decl., ¶¶ 184-187]. If anything, a POSITA would understand a PC in the relevant timeframe would ***act as a USB host*** (instead of being ***connected to a USB host***) using its USB connection to deliver power to other devices (e.g., peripherals such as the disk drive memory devices), not to receive power from other devices. Appx423 [POR, 55] (citing Appx8896-8897 [Credelle Decl., ¶¶ 184-187]).

The Board recognized there is no evidence that Oba's PC connects to a "USB host" to receive power. So the Board speculates that "if" Oba's PC had a connection to a USB host, it would receive power. Appx43. But such "if" speculation falls far short of the demanding standard to establish inherency. The Petitioner implies that Oba could be connected to a USB host because "*Oba's* PC 51 … can connect with a desktop PC (Appx478 [Reply, 28], citing Appx6663 [Oba, FIG. 4 (15)]), but that is irrelevant because the referenced connection in Figure 4 of Oba is a ***Bluetooth*** connection, not the ***USB*** connection that is at issue in Petitioner's inherency theory. Appx548-549 [Sur-reply, 18-19 n.9; Appx393-

394 [POR, 25-26]. Plainly, a Bluetooth connection does not establish Oba as being connected to a "USB host."

For these reasons, the Court should reverse the Board's finding that Oba meets limitation 7(c). *In re Stepan Company*, 868 F.3d 1342, 1346 (Fed. Cir. 2017).

### C.    Fischer Does Not Prove that Oba's PC with a USB Interface Inherently Receives Power to Meet Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"

The Board did not make a determination regarding the Petitioner's back-up position that Fischer (Ex. 1011) demonstrates that the Oba's USB connection inherently receives power in addition to data. Appx42-43. See Appx198 [Pet., 60] (referencing Fischer). However, it is undisputed that Fischer only teaches that a mobile phone—not a PC— can have a USB connection to receive power. Appx4013, Appx4017 [Fischer, Fig. 1, 1:65-2:30]; Appx198 [Pet., 60]; Appx424-425 [POR, 56-57] (citing Appx8897-8898 [Credelle Decl., ¶¶ 188-189]). Thus, Fischer does not prove that the PC of Oba inherently receives power to meet limitation 7(c).

### D.    Claim 7 is Patentable Because the Oba/Zhang Combination Does Not Satisfy Limitation 7(c) for "A First Transmission Conductor Configured to Receive First Power and First Data"

Alternative to its argument that Oba's USB connection inherently receives power and data, the Board determined that Oba could be modified according to

Zhang to meet limitation 7(c). Specifically, the Board found that a POSITA would modify Oba to include a Power Line Communications (PLC) connection pursuant to Zhang (Ex. 1072) that would carry power and data over the power lines to the Oba PC. Appx44-46.

The Board reasoned that "the advantages of using Zhang's *single-cord embodiment* are evident and there is no suggestion that there is any technological incompatibility that would prevent the combination of Oba and Zhang." Appx46 (emph. added). The Board relied on "the *benefits expressly set forth in Zhang* for such a system." Appx45 (emph. added). Accordingly, "one of ordinary skill in the art would have seen a benefit to adding Zhang's single cord configuration in Oba." Appx46.

The Board's finding that a POSITA would make the proposed modification to Oba is erroneous. Zhang identifies the benefits of its particular design for implementing a PLC power line connection *compared to other prior art designs for implementing PLC power line connections*. See Appx549-551 [Sur-reply, 19-21]. Zhang acknowledges prior systems for implementing PLC: "In power line communications (PLC), network data is transmitted on an existing power line along with the electrical AC line current already present for delivering electrical power." Appx7798 [Zhang, ¶ [0004]]. Zhang observes that these prior approaches to implementing PLC required a PLC device separate from the AC power supply,

which has the disadvantage of "requir[ing] two separate cables." Appx7798 [Zhang, ¶ [0006]]. In other words, they require multiple cords.

Thus, Zhang proposes an implementation (relied on by the Petitioner for its obviousness theory) whereby the PLC device is combined with the AC power supply to only require a single cord. See Appx7796, Appx7798-7799 [Zhang, Fig. 2B (PLC device 3 is integrated with AC/DC converter 4), ¶¶ [0008], [0019]]; Appx199-200 [Pet., 61-62]. According to Zhang, combining the PLC device with the AC power supply has the benefit of "eliminating extra hardware" and "requiring only a single main power cord" for the PC. Appx7798 [Zhang, ¶ [0008]] (cited by Appx550-551 [Sur-reply, 20-21]).

Plainly, the benefits cited by Zhang and relied upon by the Board are those compared to ***prior art PLC systems*** that implement a PLC device separate from the AC power supply so as to require multiple cords. Appx474 [Reply, 24] ("Zhang exemplifies a laptop configuration to receive power and data over a single conductor as an alternative to conventional designs involving multiple conductors."); Appx550-551 [Sur-reply, 20-21]. These benefits do not arise from implementing Zhang's PLC solution (a PLC device combined with the AC power supply using a single cord) into a PC such as Oba's not having an existing PLC connection.

Indeed, implementing Zhang's single cord configuration (Figure 2B) into Oba does not "eliminat[e] extra hardware installation by the end user." On the contrary, it is undisputed that Oba would have to be modified to include significant additional hardware and wiring. Oba's power supply must be modified to include a PLC Networking System and a data modulator/demodulator and associated new wiring. Appx7799 [Zhang, ¶ [0019], Fig. 2B]. See Appx428-431 [POR, 60-63] (citing Appx8902-8904 [Credelle Decl., ¶¶ 194-196)]). Oba's PC must be modified to include a data modulator/demodulator and associated new wiring. Appx550 [Sur-reply, 20] (citing Appx7796 [Zhang, Fig. 2B]); Appx8901-8904 [Credelle Decl., ¶¶ 192-196]. The Petitioner does not dispute that these modifications must be made to Oba. See Appx202-203 [Pet., 64-65]; Appx954-957 [Baker Decl., ¶ 175] ("Zhang discloses an arrangement … where a DC power and data modulator/demodulator is provided within the computer device 2") (citing Fig. 2B of Zhang). By "provided within," the Petitioner's expert means that the PC (computer device 2) is modified to add the DC power and data modulator/demodulator and wiring.

Zhang explicitly recognizes that its single-cord solution requires additional new hardware: "However, the [required addition of the] DC/data modulators 25 and 26 add more cost and complexity to both the PLC network system 3 and to computer device 2." Appx7799 [Zhang, ¶ [0019]]. See Appx431 [POR, 63].

Accordingly, the Board's conclusion that a POSITA would make the proposed modification because "the single-cord embodiment of Zhang would [] decrease the costs and complexity of the [Oba] laptop computer" (Appx46) is flatly contradicted by the record and cannot sustain a finding of unpatentability of Claim 7.

Ultimately, the Board found a reason to modify Oba according to Zhang's Figure 2B embodiment because it would provide a "reduce[d] wire count." Appx44. The Petitioner likewise argued a POSITA would make the combination because it would "reduce wire count." Appx201 [Pet., 63]. However, the reduced wire count is simply comparing Zhang's single cord embodiment of Figure 2B (one cord) to Zhang's multiple cord embodiment of Figure 2A (multiple cords with four or more wires) and prior art embodiments of PLC with multiple cords. Appx7799 [Zhang, ¶ [0019]]. There is no reduced wire count in introducing Zhang's Figure 2B embodiment to Oba's PC because, as explained above, it necessarily involves additional new hardware including additional wiring.

In summary, the Board's finding that Claim 7 is unpatentable based on the combination of Oba and Zhang should be reversed.

## CONCLUSION

For the reasons set forth above, the Board's decision and judgment should be reversed or vacated and remanded.

September 22, 2023                    Respectfully submitted,

                                     /s/ Stephen T. Schreiner
                                     Stephen T. Schreiner
                                     James T. Carmichael
                                     Stephen P. McBride
                                     Mitch Yang
                                     CARMICHAEL IP, PLLC
                                     8607 Westwood Center Drive, Suite 270
                                     Tysons, VA 22182
                                     (703) 646-9255
                                     jim@carmichaelip.com
                                     stevemcbride@carmichaelip.com
                                     mitch@carmichaelip.com

                                     *Counsel for Appellant Lynk Labs, Inc.*

# ADDENDUM

# TABLE OF CONTENTS

**VOLUME ONE**

Paper 35 PTAB Final Written Decision
     filed March 13, 2023.......................................................................... 1

Ex. 1001 US Patent No. 11,019,697 Miskin
     dated May 25, 2021 ........................................................................ 55

Trials@uspto.gov
571-272-7822

Paper 35
Date: March 13, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SAMSUNG ELECTRONICS CO. LTD.,
Petitioner,

v.

LYNK LABS, INC.,
Patent Owner.
_____

IPR2021-01300
Patent 11,019,697 B2
_____

Before JON B. TORNQUIST, STEPHEN E. BELISLE, and
SCOTT RAEVSKY, *Administrative Patent Judges.*

TORNQUIST, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-01300
Patent 11,019,697 B2

# I.    INTRODUCTION

## *A.    Background and Summary*

Samsung Electronics Co. Ltd. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1–22 ("Challenged Claims") of U.S. Patent No. 11,019,697 B2 (Ex. 1001, "the '697 patent"). Lynk Labs, Inc. ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 7.  On March 15, 2022, we instituted review of all Challenged Claims of the '697 patent.  Paper 8 ("Institution Decision" or "Inst. Dec.").

Patent Owner subsequently filed a Response (Paper 18, "PO Resp."), to which Petitioner filed a Reply (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 30, "Sur-Reply").

Petitioner relies, *inter alia*, upon the declaration and reply declaration of R. Jacob Baker, Ph.D. (Exs. 1002, 1090).  Patent Owner submits a declaration from Thomas L. Credelle (Ex. 2001).

An oral hearing was held on December 13, 2022, and a transcript of the hearing is included in the record (Paper 34, "Tr.").

For the reasons that follow, we conclude that Petitioner has proven by a preponderance of the evidence that claims 1–22 of the '697 patent are unpatentable.

## *B.    Real Parties-in-Interest*

Petitioner identifies itself and Samsung Electronics America, Inc. as the real parties-in-interest.  Pet. 1.

Patent Owner identifies itself as the real party-in-interest.  Paper 6, 1.

## *C.    Related Matters*

The parties identify *Samsung Electronics Co. v. Lynk Labs, Inc.*, No. 1:21-cv-02665 (N.D. Ill.) ("district court litigation"), *Lynk Labs, Inc. v.*

IPR2021-01300
Patent 11,019,697 B2

*Samsung Electronics Co.*, Ltd., No. 1:21–cv–05126 (N.D. Ill.), *Lynk Labs, Inc. v. Samsung Electronics Co.*, No. 1:21-cv-05021-MHC (N.D. Ga.) as related matters.  Pet. 1; Paper 6, 1; Paper 29, 2.

### D.   The '697 Patent

The '697 patent is directed to "alternating current ('AC') driven LEDs, LED circuits and AC drive circuits and methods." Ex. 1001, 1:46–48.  The '697 patent explains that "LEDs are intrinsically DC devices that only pass current in one polarity and historically have been driven by DC voltage sources." *Id.* at 1:67–2:2.  "With proper design considerations," however, the '697 patent reports that "LEDs may be driven more efficiently with AC than with DC drive schemes." *Id.* at 2:7–8.

In one aspect of the invention, a lighting system is provided having one or more LED circuits, with each LED circuit having at least two diodes connected to each other in opposing parallel relation. *Id.* at 4:27–31.  The diodes of the '697 patent may include "any type of diode capable of allowing current to pass in a single direction, including but not limited to, a standard diode, a schottky diode, a zener diode," and "a laser diode." *Id.* at 4:31–36.

Figure 48 of the '697 patent is reproduced below:



**FIG. 48**

3

IPR2021-01300
Patent 11,019,697 B2

Figure 48 is a schematic view of a preferred embodiment of the '697 patent and discloses circuit 2038, which includes generator 2040 producing an alternating electric field on transmission conductor 2041. *Id.* at 12:48–49, 22:54–56. Conductor 2041 is connected to directional circuit 2042 "having circuit elements causing an asymmetrical response to the alternating field and current flow." *Id.* at 22:57–59. The '697 patent notes that "[i]f light is desired, then each of" diodes LED 1, 2, and 3 "may be considered both loads and circuit elements which cause asymmetrical current flow." *Id.* at 22:66–23:3.

Figure 49 of the '697 patent is reproduced below:



**FIG. 49**

Figure 49 is a schematic view of a preferred embodiment of the '697 patent and discloses the same circuit 2038 as Figure 48, "with only the substitution of LEDs 1 and 3 by diodes D1 and D2." *Id.* at 12:50–51, 23:1–3. In this configuration, the '697 patent explains that "optimization of the light emitted by LED 2 [(labeled LED 1 in Figure 49)] is of paramount concern, whereas the diodes 1, 2, provide directionality and DC offset to the AC signal source." *Id.* at 23:3–6.

The '697 patent explains that directional circuits, such as those depicted in Figures 48 and 49, "may be connected to ground through

IPR2021-01300
Patent 11,019,697 B2

capacitance 2039 at a point within the directional circuit other than the
AC signal input point [2040] as shown" in Figure 49. *Id.* at 23:7–11.
According to the '697 patent, "[t]his ground connection seems to provide
increased circulation current, as it is noted that the LEDs get brighter for a
given alternating electromagnetic source." *Id.* at 23:12–14. Capacitor 2039
may alternatively be placed on the other side of the AC line 2041, and is
used to drop the voltage from the AC source. *Id.* at 23:14–17.

E.    *Illustrative Claims*

Petitioner challenges claims 1–22 of the '697 patent. Pet. 2–3.
Claim 1, reproduced below, is illustrative of the challenged claims:

1.  (a) An apparatus comprising:

(b) at least one LED;

(c) a semiconductor device configured to emit a laser;

(d) a data receiver including an antenna, wherein the data
receiver is configured to transmit and receive data;

(e) a circuit configured to detect human touch via capacitive
sensing; and

(f) a battery ground capacitively coupled to at least one of the
data receiver, the circuit, the at least one LED, or the
semiconductor device via a conductor,

(g) wherein the apparatus is portable, and

(h) wherein the at least one LED, the semiconductor device, the
data receiver, the circuit, and the battery ground are contained
within a package and connected to at least one circuit board
within the package.

Ex. 1001, 28:14–28 (sub-lettering added to reflect the parties'
arguments).

F.    *Prior Art and Asserted Grounds*

Petitioner contends claims 1–22 are unpatentable on the following
grounds (Pet. 2–3):

5

IPR2021-01300
Patent 11,019,697 B2

| Claim(s) Challenged | 35 U.S.C. §[1] | References/Basis |
|---|---|---|
| 1–5 | 103 | Oba[2], Sato[3], Gillespie[4], Hara[5] |
| 6 | 103 | Oba, Sato, Gillespie, Hara, Yang[6] |
| 14, 19, 20 | 103 | Oba, Hara |
| 22 | 103 | Oba, Hara, Jensen[7] |
| 15, 16 | 103 | Oba, Hara, Sontag[8] |
| 17, 18 | 103 | Oba, Hara, Sontag, Gillespie |
| 7–9 | 103 | Oba, Zhang[9], Hara |
| 10, 11 | 103 | Oba, Zhang, Hara, Sato |
| 12, 13 | 103 | Oba, Zhang, Hara, Sato, Gillespie |
| 21 | 103 | Oba, Zhang, Hara, Jensen |

## II.    ANALYSIS

### A.    Legal Standards

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the '697 patent claims priority to an application filed February 25, 2004, and because neither party argues otherwise, we apply the pre-AIA versions of §§ 102 and 103 in this Decision. *See* 35 U.S.C. § 100(i)(1)(B).

[2] WO 03/009535 A1, published January 30, 2003. Ex. 1053 ("Oba") (English-language translation).

[3] US 6,891,786 B2, issued May 10, 2005. Ex. 1056 ("Sato").

[4] US Patent Publication No. 2002/0191029 A1, published December 19, 2002. Ex. 1071 ("Gillespie").

[5] US 6,600,243 B1, issued July 29, 2003. Ex. 1044 ("Hara").

[6] US 6,844,675 B2, issued January 18, 2005. Ex. 1019 ("Yang").

[7] US 6,907,089 B2, issued June 14, 2005. Ex. 1063 ("Jensen").

[8] US 4,654,880, issued March 31, 1987. Ex. 1065 ("Sontag").

[9] US Patent Publication No. 2002/0080010 A1, published June 27, 2002. Ex. 1072 ("Zhang").

6

IPR2021-01300
Patent 11,019,697 B2

subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) if in the record, objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### B.    *Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Petitioner contends that a person of ordinary skill in the art "would have had at least a bachelor's degree in electrical engineering, computer engineering, computer science, physics, or the equivalent, and two or more years of experience with LED devices and/or related circuit design, or a related field." Pet. 4–5 (citing Ex. 1002 ¶¶ 20–21).

Patent Owner provides a very similar definition of the ordinarily skilled artisan, but removes the "and/or" qualifier for experience with LED devices, as well as the allowance for individuals to have experience in an unspecified "related field." PO Resp. 5. Patent Owner contends these modifications are appropriate because Petitioner's proposed definition would allow an individual with no experience with LEDs to be a person of ordinary skill in the art. *Id.*

7

IPR2021-01300
Patent 11,019,697 B2

Upon review of the parties' arguments, the '697 patent, and the prior art of record, we adopt Patent Owner's definition of the ordinarily skilled artisan as it is consistent with the disclosures of the '697 patent and with the prior art of record. We note, however, that neither party asserts that any arguments in this proceeding rise or fall based on the definition that is adopted.

## C.    Claim Construction

In this proceeding, the claims of the '697 patent are construed "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)." 37 C.F.R. § 42.100(b). Under that standard, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning the term would have had to a person of ordinary skill at the time of the invention in the context of the entire patent including the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

Neither party contends any terms of the '697 patent require construction. And, upon review of the parties' arguments and supporting evidence, we determine that no terms require construction for purposes of this Decision. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.")).

## D.    Claims 1–5 over Oba, Sato, Gillespie, and Hara

Petitioner contends the subject matter of claims 1–5 would have been obvious over the combined disclosures of Oba, Sato, Gillespie, and Hara. Pet. 7–32.

IPR2021-01300
Patent 11,019,697 B2

### 1.    Oba

Oba describes a communication system capable of easily "identifying a communication mate." Ex. 1053, code (57). Figure 6, reproduced below, shows an example structure of the communication system of Oba:



FIG. 6

*Id.* at 16:8–9. As shown in Figure 6, the system of Oba includes personal computer 51, portable telephone 52, and personal digital assistant (PDA) 53, each having a Bluetooth module therein. *Id.* at 17:24–25. Portable telephone 52 includes a non-contact IC card 246 (not shown in Figure 6) that communicates with non-contact-IC-card reader/writer 105 (not shown in Figure 6) of personal computer 51 via an electromagnetic wave. *Id.* at 17:28–18:1, 18:7–11, code (57). When an electromagnetic wave radiated from reader/writer 105 is received by the non-contact IC card 246, cellular telephone 52 reports the card ID set in the non-contact IC card to personal computer 51. *Id.* at 18:7–11. This card ID includes a Bluetooth address for cellular telephone 52. *Id.* at 18:12–16. When personal computer 51 fetches the Bluetooth address of cellular telephone 52 and PDA 53 upon query, personal computer 51 identifies cellular telephone 52 as a Bluetooth device

9

IPR2021-01300
Patent 11,019,697 B2

in order to establish synchronization according to the reported Bluetooth
address.  *Id.*

Figure 7 of Oba is reproduced below:

**FIG. 7**



Figure 7 is an example appearance of the personal computer of Oba.  *Id.* at
16:10.  As shown in Figure 7, the personal computer of Oba may have touch
sensitive pad 65.  *Id.* at 19:9–12.  At the upper right portion of display block
62, "a power lamp PL, a battery lamp BL, and, if necessary, other LED
lamps such as a message lamp ML, are provided."  *Id.* at 19:14–16.  Oba
notes that the computer may have an optional interface card 99 (not shown)
that is mounted to slot 68 and allows data to be sent to and received from an
external apparatus.  *Id.* at 22:18–19.  For example, interface card 99 can be

10

IPR2021-01300
Patent 11,019,697 B2

connected to an external drive, such as an optical disk drive. *Id.* at 22:20–22.

<div align="center">

*2.    Sato*

</div>

Sato discloses an optical disc drive that is used to access an optical disk. Ex. 1056, 1:9–10. Sato explains that the optical disk drive includes "a light source emitting a light beam to a recordable optical disk," such as a laser diode. *Id.* at 2:35–36, 3:43–45, 5:27–29.

<div align="center">

*3.    Gillespie*

</div>

Gillespie describes computer interface devices, including a computer touch pad with an integrated display device. Ex. 1071 ¶ 2. Figure 1 of Gillespie is reproduced below:



Figure 1 depicts notebook computer system 100, including main display 102, keyboard 104, and touch screen 106. *Id.* ¶¶ 13, 36. Touch screen 106 is mounted in palm rest 110 and includes left and right mouse buttons 108. *Id.* ¶ 36. According to Gillespie, touch screen 106 is integrated into computer system 100 in a similar way as a touch pad would be in a computer. *Id.*

<div align="center">

11

</div>

IPR2021-01300
Patent 11,019,697 B2

Touch screen 106 may contain a capacitive touch sensor, which Gillespie explains is "ideally suited for use in" the invention due to its "sensitivity, low cost, ruggedness, and suitability to small sensing areas." *Id.* ¶ 37. Gillespie further explains that the display can be a liquid crystal display (LCD), an organic light emitting diode (OLED) display, "or any other type of small display suitable for mounting in a portable computer." *Id.* ¶ 38.

Figure 5 of Gillespie is reproduced below:



**Figure 5**

Figure 5 is a diagram illustrating the touchscreen of Gillespie in "iconic" usage mode. *Id.* ¶¶ 16–17. As shown in Figure 5, the touch screen includes multiple icons, with dashed lines surrounding those icons that may be activated by a user's touch. *Id.* ¶¶ 17, 60.

Gillespie explains that the touch screen may advantageously include a backlight, but notes that such a light draws "more power than the other

12

components that make up a touch screen." *Id.* ¶ 112. Thus, Gillespie
discloses that "it is advantageous to switch the backlight off when it is not
needed." *Id.* Then the "backlight could be switched on whenever the touch
screen is in the activated state." *Id.* Gillespie explains that one possible
activation mechanism for the touch screen is to have a "region on the touch
screen that is always active, and in which finger taps are interpreted as a
signal to enter or toggle the activated state of the touch screen." *Id.* ¶ 69.

4.    *Hara*

Hara discloses the mounting and power-supply configuration of a
battery for a notebook computer. Ex. 1044, 1:9–12. Figure 1 of Hara is
reproduced below:



Figure 1 of Hara depicts an embodiment that includes battery 2 having
negative terminal 12 and positive terminal 13. *Id.* at 2:58–59, 3:42–44.
Power supply wire 3 runs from positive terminal 13 to power supply
terminal 5, and power supply wire 4 runs from negative terminal 12 to
power supply terminal 11. *Id.* at 3:45–48. Power supply terminals 5 and 11
are used to supply current from battery 2 to an electronic device. *Id.* at
3:48–49. Capacitors 8 are placed between negative terminal 12 and positive
terminal 13 of battery 2 and ground 10. *Id.* at 3:54–57.

13

Hara reports that if noise generated within the apparatus is transferred as high-frequency current to the power supply wires of the battery pack, "reflection occurs at the battery terminals" and, "by superimposing the reflected waves with the incident waves, a standing wave, whose wavelength is equal to double the length of the power-supply wire L55, is generated." *Id.* at 1:38–45. In this configuration, the power-supply wires "act as an antenna and make it easy to radiate noise to the outside." *Id.* at 1:45–47.

Hara explains that in the disclosed configuration, because battery current 14 is direct current, "it flows to the terminals without passing through the capacitors 8," whereas "high frequency current (noise component) 15 flows through the capacitors 8 to ground 10." *Id.* at 3:57–60. Thus, capacitors 8 are able to reduce the generation of standing waves within the system and there is "little radiation noise." *Id.* at 3:48–65.

### 5.    *Analysis: Claim 1*

Petitioner contends the combined disclosures of Oba, Sato, Gillespie, and Hara teach or suggest every limitation of claim 1, including: (1) a portable personal computer that constitutes an apparatus having at least one LED (Pet. 7–9, 21 (addressing portability) (citing Ex. 1053, 17:22–19:18, 20:9–26:8, Figs. 6, 7, 11, 14, 16; Ex. 1002 ¶¶ 88–91, 109)); (2) a semiconductor device (the laser diode of Sato) that is configured to emit a laser (*id.* at 10–11(citing 1056, 1:9–14, 2:35–52, 5:21–32, 6:18–26, 7:1–2, 14:32–41; Ex. 1002 ¶ 92–95)); (3) a data receiver (the Bluetooth module of Oba) having an antenna that is configured to transmit and receive data (*id.* at 11–13 (citing Ex. 1053, 29:1–20, 22:6–8, 26:19–21, 27:18–29:27, 38:3–5, 39:7–43:17, Figs. 11, 13, 20–21; Ex. 1002 ¶¶ 96–97)); (4) a circuit (the capacitive touch sensor of Gillespie) that is configured to detect human touch via capacitive sensing (*id.* at 14–17 (citing Ex. 1071 ¶¶ 14, 37, 50–58,

14

Figs. 1–2; Ex. 1002 ¶¶ 98–101)); (5) a battery ground capacitively coupled to at least one of a data receiver, circuit, LED, or semiconductor device via a conductor (the capacitively coupled circuit of Hara) (*id.* at 18–21 (citing Ex. 1044, 2:9–21, 2:24–34, 2:39–42, 3:54–65, 4:8–57, 5:9–33, 5:65–6:2, 7:10–36, Figs. 1–3, 7–8, 18)); and (6) at least one of the identified devices and the battery ground being contained within a package and connected to a circuit board (Oba's laptop computer) (*id.* at 22–23 (citing Ex. 1053, 19:2–6, Fig. 7; Ex. 1002 ¶¶ 110–113)).

Petitioner contends one of ordinary skill in the art would have found it obvious to modify Oba's computer 51 to include an internal optical disk drive with a semiconductor device configured to emit a laser because internal optical drives were known to be used in notebook computers, would maintain the portability of Oba's device, and Sato expressly discloses using a laser diode in an optical drive to perform access functions. Pet. 10–11 (citing Ex. 1002 ¶¶ 92–94) (asserting that "built-in" type optical drives would maintain the portability of Oba's device).

Petitioner contends one of ordinary skill in the art would have sought to configure Oba's touch pad as a capacitive touch display in view of Gillespie, which discloses that such devices were known to be ideal for use in small sensing areas like Oba's touch pad/panel 65. *Id.* at 16–17.

Petitioner contends one of ordinary skill in the art would have sought to capacitively couple a battery ground of Oba to a data receiver, circuit, LED, or semiconductor device in view of the known benefits of using a capacitor between a ground and circuit components. *Id.* at 18. First, Petitioner contends that one of ordinary skill in the art would have understood that Oba's "battery necessarily includes a battery ground because, consistent with known electronic circuits, Oba's circuit components

15

IPR2021-01300
Patent 11,019,697 B2

(including the battery) must include an electrical ground so that the circuit can have a reference node with respect to which the voltage of other circuit nodes can be expressed." *Id.* (emphasis omitted) (citing Ex. 1057, 5:37–41, 6:21–26, 6:31–46, Figs. 1–2; Ex. 1002 ¶ 102).  Second, Petitioner contends one of ordinary skill in the art would have sought to implement a battery ground capacitively coupled to one or more of the data receiver, touch circuit, LED, or semiconductor device of the modified Oba device because it was understood in the art that such a capacitively coupled connection would "promote the provision of smoothed (noise-reduced) power to those components." *Id.* at 18–19, 21.

Patent Owner contends Petitioner's arguments fail because Oba, Sato, Gillespie, and Hara do not disclose: (a) a battery ground that is capacitively coupled to the devices set forth in limitation 1(f); (b) at least one LED; (c) a circuit configured to detect human touch via capacitive sensing; and (d) a package that contains the recited circuitry.  PO Resp. 13, 19–21, 30–32. Petitioner further argues that Petitioner fails to set forth a persuasive reason to combine Oba with Hara and/or Gillespie (section e below).  *Id.* at 21–30. We address these arguments in turn.

a)    *"a battery ground capacitively coupled . . ."*

Claim 1 requires "a battery ground capacitively coupled to at least one of the data receiver, the circuit, the at least one LED, or the semiconductor device via a conductor." Ex. 1001, 28:21–23.  Patent Owner contends Hara does not disclose this limitation, as asserted by Petitioner, because "Hara only discloses a battery ground with a capacitive coupling to the battery." PO Resp. 19–20.

Petitioner argues in Reply that Hara discloses a battery ground capacitively coupled to the standard circuit components powered by the

16

IPR2021-01300
Patent 11,019,697 B2

battery, as shown, for example, in Figures 3 and 8 of Hara, which both depict a capacitor coupled between battery ground and the terminal used to power notebook circuitry.  Pet. Reply 7–8.

Hara discloses providing an electrical conductor between the negative and positive poles of a battery and the circuit components of the laptop computer.  Pet. 18–19; Ex. 1044, Figs. 1, 3, 8.  In these embodiments, there is a direct electrical connection between the negative or positive pole of the battery, the circuit components of the laptop computer, and the capacitor coupled to the battery ground.  Ex. 1044, Figs. 1, 3, 8, 1:52–67 (noting that the capacitive element may be mounted "between the positive or negative pole of the battery and the circuit first connected by the battery"), 5:20–33.  Thus, we agree with Petitioner that Hara teaches or suggests capacitively coupling the battery ground and the circuit components of the laptop computer.

b)    *Reason to Combine*

As noted above, Petitioner contends that Oba's battery necessarily has a battery ground because "circuit components (including the battery) must include an electrical ground so that the circuit can have a reference node with respect to which the voltage of other circuits can be expressed." Pet. 18 (citing Ex. 1002 ¶ 102; Ex. 1057, 5:37–41, 6:21–26, 6:31–46, Figs. 1, 2). Petitioner further contends that one of ordinary skill in the art would have sought to capacitively couple the battery ground of Oba to its circuit components in order "to serve as a filter, e.g., to smooth delivered power." *Id.* at 18–19 (citing Ex. 1002 ¶ 103).

Patent Owner contends that Hara capacitively couples its circuit components to battery ground in order to avoid the problem of standing waves (and the resulting radiated noise) that occur when the power supply

lines coupled between the battery terminals and the circuit components are of an extended length. PO Resp. 16–17 (noting that the problem of standing waves tends to increase as the length of the power supply wires increases). Patent Owner further contends that there is no evidence that the standing wave issue addressed in Hara would exist in the configuration of Oba. *Id.* at 15–16. Indeed, Patent Owner contends Oba's internal battery would be connected in such a way that "there is little to no distance between it and the [PC's] circuitry." *Id.* at 18–19. And, given the lack of any evidence that the issue of standing waves and radiation noise is present in Oba's computer, Patent Owner contends a person of ordinary skill in the art would have no reason to refer to Hara. *Id.* at 19 (citing Ex. 2001 ¶ 107).

Petitioner provides uncontroverted testimony from Dr. Baker, which we credit, that: (1) Oba's laptop computer necessarily has a battery ground (Ex. 1002 ¶ 102); (2) it was known in the art, for example as disclosed in Hara, that a capacitor could be coupled between a battery ground and the circuit elements powered by the device in order to serve as a filter for noise (*id.* ¶¶ 103, 108; Ex. 1090 ¶ 3 (asserting that AC power is a known source of noise)); and (3) capacitively coupling Oba's battery ground to the conductor connecting the battery poles and the circuit components of the laptop computer would "smooth delivered power," thereby "facilitating a steady supply of power" (Ex. 1002 ¶¶ 104–106).

As argued by Patent Owner, Hara uses a capacitive coupling to battery ground in order to mitigate standing waves caused by the extended length of the conductors connecting the laptop battery to circuit components. PO Resp. 15. The capacitive-coupling to battery ground, however, need not be used in Oba to solve the same problem identified in Hara, and Dr. Baker persuasively explains why the system of Oba would benefit from a

18

IPR2021-01300
Patent 11,019,697 B2

capacitive coupling to battery ground.  Pet. Reply 2; Pet. 18–19; Ex. 1002
¶¶ 103–104; Ex. 1090 ¶ 3–10 (asserting that AC power is a known source of
noise).  As such, Petitioner persuasively explains why one of ordinary skill
in the art would have sought to combine Oba and Hara to arrive at a battery
ground that is capacitively coupled to the circuit components of the laptop
computer.

   c)    *"a circuit configured to detect human touch via capacitive sensing"*

      Claim 1 requires "a circuit configured to detect human touch via
capacitive sensing."  Ex. 1001, 28:19–20.  Petitioner contends that Oba has a
touch pad/panel 65 that includes touch detecting circuitry, but does not
provide details as to how touch detecting is accomplished.  Pet. 14–15.
Petitioner asserts, however, that Gillespie discloses the use of capacitive
touch sensors and describes these sensors as "ideally suited for use in the
present invention due to their sensitivity, low cost, ruggedness, and
suitability to small sensing areas."  *Id.* at 16 (citing Ex. 1071 ¶ 37).  Thus,
Petitioner contends one of ordinary skill in the art would have "appreciated
the benefits in implementing Oba's touch pad/panel 65 as a capacitive touch
screen" and understood that this was a "known and foreseeable way to
implement Oba's touch pad/panel features."  *Id.* at 17 (citing Ex. 1053,
19:9–12, 25:12–19; Ex. 1002 ¶ 100).

      Patent Owner contends Petitioner's arguments related to replacing
Oba's touchpad with a capacitive sensing touch screen do not withstand
scrutiny.  PO Resp. 24–29.  Patent Owner notes that Oba's touchpad already
has robust user input capabilities and that jog dial 63 of Oba can be used to
control application programs and select operations displayed on the main
display.  PO Resp. 25–27 (citing Ex. 1053, 6:20–23, 19:10–11, 19:19–20:2,
7:1–3, 7:15–19, Figs. 4–5; Ex. 2001 ¶¶ 122–123).  Given these established

19

IPR2021-01300
Patent 11,019,697 B2

functions, Patent Owner contends the capacitive touch screen of Gillespie would merely provide similar, redundant features to those already provided by Oba's touchpad and jog dial. *Id.* at 24, 27.

Patent Owner also argues that the minimal added benefit of Gillespie's capacitive touch screen is offset by the multiple drawbacks associated with its use. *Id.* at 27. For example, Patent Owner contends Gillespie's touch screen would "significantly" increase power consumption of the notebook computer, which was a known consideration in the design of notebook computers in the relevant time period. *Id.* at 27–28. Patent Owner also asserts that Gillespie's touchscreen would add unnecessary complexity to Oba's computer, requiring additional electronics and wiring/soldering. *Id.* at 28–29. Patent Owner further asserts that Gillespie's touchscreen would also add weight to the computer, increase costs, and reduce reliability. *Id.* at 29–30.

Patent Owner's counter-arguments are not persuasive. First, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. 398, 416 (2007). Here, Petitioner proposes to substitute one known user input method for another—a substitution that is expressly disclosed in Gillespie (Ex. 1071 ¶ 43)—and there is no dispute that such a substitution would yield a predictable result. Pet. 17.

Second, as noted by Petitioner, Gillespie expressly discloses that capacitive touch sensors are ideally suited for use in a laptop computer due to "their sensitivity, low cost, ruggedness, and suitability to small sensing areas." Ex. 1071 ¶¶ 36–37. Gillespie's touch screen also provides numerous advantages beyond simply acting as a pointer for the main screen. Pet. Reply 10–11. For example, Gillespie indicates that the touch screen can

IPR2021-01300
Patent 11,019,697 B2

be used "as a fully interactive input/output device to enhance the user interface of the computer system" (Ex. 1071 ¶ 48), including providing the ability to display advertisements and auxiliary information/pop-ups (*id.* ¶¶ 80–87), provide a pop-up calculator (*id.* ¶¶ 99–100), and provide a magnification tool for the visually impaired (*id.* ¶ 101).[10]  These disclosures provide ample reason for one of ordinary skill in the art to implement Gillespie's capacitive touch screen in Oba.  *See* Ex. 1071 ¶¶ 36, 37, 48–57, 79–80, 84, 89, 99–101 (identifying the advantages of Gillespie's touch screen).

Patent Owner's counter-arguments related to trade-offs are not particularly persuasive because they involve the same substitution—a touchpad for a capacitively-coupled touch screen—that Gillespie expressly suggests making.  Ex. 1071 ¶¶ 36–38, 43 (noting that the touch screen replaces a conventional touch pad).  If the drawbacks were as significant as Patent Owner suggests, it is unclear why Gillespie would expressly suggest making the proposed substitution.  In any event, Dr. Baker persuasively testifies that one of ordinary skill in the art would have been aware of, and had the skills and capabilities to use, known form factors that would have minimized any weight, power consumption, costs, complexity, and reliability issues.  Ex. 1090 ¶ 16.

---

[10] Patent Owner contends Petitioner's reply arguments related to the specific capabilities of Gillespie's touch screen are improper as they were not set forth in the Petition.  Sur-Reply 9–10.  We disagree.  The Petition clearly indicated that Gillespie's touch screen would be used to "implement useful touch features," such as accepting user touch input and controlling computer functions and display information.  Pet. 29.  Petitioner's reply arguments simply appropriately respond to Patent Owner's arguments to the contrary, pointing out specific examples of "useful touch features" in Gillespie.

IPR2021-01300
Patent 11,019,697 B2

Moreover, as explained by the United States Court of Appeals for the Federal Circuit, "the fact that the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevented their combination. Only the latter is telling on the issue of obviousness." *Orthopedic Equip. Co.* v. *United States*, 702 F.2d 1005, 1013 (Fed. Cir. 1983). Here, Patent Owner identifies several reasons why a computer manufacturer seeking increased profits or longer laptop battery life might not have wanted to add the touch screen of Gillespie in Oba, but Patent Owner does not assert that any technological incompatibility exists that would have prevented the use of Gillespie's touch screen in Oba. Indeed, as noted above, Petitioner's proposed use of Gillespie's capacitive touch screen in a laptop computer is precisely the combination that Gillespie suggests making. Ex. 1071 ¶¶ 5, 8, 37, 43.

In view of the foregoing, we credit the testimony of Dr. Baker that one of ordinary skill in the art would have seen multiple benefits to using Gillespie's capacitive touch sensor in Oba's laptop computer and would have had a reasonable expectation of success in so doing. Ex. 1002 ¶¶ 50, 98–100; Ex. 1090 ¶¶ 12–13, 16–17.

<div align="center">

d)    *"at least one LED"*

</div>

Claim 1(b) requires "at least one LED." Ex. 1001, 28:15. Petitioner contends that Oba discloses that its computer has LED lamps that "illuminate in accordance with certain operations." Pet. 8 (citing Ex. 1053, 19:14–18, 24:9–11, 25:6–10, 25:16–19). Petitioner further argues that, for the reasons discussed below with respect to dependent claim 5, one of ordinary skill in the art would have sought to provide an OLED touch

<div align="center">

22

</div>

display or LED backlight touch display in Oba as this combination would allow, among other things, for the removal of special dedicated LEDs that indicate the status of various components. *Id.* at 9, 27.

Patent Owner argues that Petitioner's arguments with respect to dependent claim 5 indicate that Petitioner's proposed combination for claim 1 would remove the status indicators of Oba. PO Resp. 31 n.2 (citing Pet. 27–28). Patent Owner further argues that one of ordinary skill in the art would not have sought to modify Oba to provide an OLED touch display or LED backlight touch display, for the reasons set forth below with respect to claim 5. *Id.* at 30–31.

In its arguments related to independent claim 1, Petitioner does not advocate for the removal of Oba's LED indicator lights, or rely on this benefit for its reason to combine the references. Pet. 8–9. As such, Patent Owner's arguments related to this potential benefit of the combination are not persuasive.

Regardless, even if the indicator lights of Oba were removed, we find persuasive Petitioner's argument set forth below with respect to claim 5 that one of ordinary skill in the art would have sought to implement Oba's capacitive touch screen in Oba and that this touch screen would have taken the form of either an OLED touch display or an LED backlit touch display. In this configuration, Petitioner demonstrates that the proposed combination of Oba, Sato, Gillespie, and Hara teaches or suggests "at least one LED," as well as every other limitation of independent claim 1. Pet. 8–9, 27. Accordingly, Patent Owner's counter-arguments are not persuasive.

     *e)*    *Package*

Claim 1(h) requires that at least one of the claimed components of the apparatus "are contained within a package and connected to at least one

IPR2021-01300
Patent 11,019,697 B2

circuit board within the package." Ex. 1001, 28:25–28. Petitioner contends that, consistent with Patent Owner's arguments in the district court litigation, the housing of Oba's computer is a "package" and each of the claimed components discussed above for claim 1 would be housed in this "package." Pet. 22 (citing Ex. 1002 ¶¶ 110–113; Ex. 1053, 19:2–6, Fig. 7). Petitioner further contends that it was well known in the art that components of portable computers would be coupled using a circuit board. *Id.* at 23.

Patent Owner contends the term "package" is defined in the '697 patent as "an integrated unit meant to be used as a discrete component in either the manufacture, assembly, installation, or modification of an **LED lighting device or system**." PO Resp. 31 (quoting Ex. 1001, 5:46–50). According to Patent Owner, "Petitioner fails to show that the prior art combination of Ground 1 is an 'LED lighting device or system.'" *Id.*

The field of LED lighting systems is broad and includes "general lighting, specialty lighting, signs, and decoration such as for Christmas tree lighting." Ex. 1001, 2:8–11. Consistent with the broad understanding of the field of "LED lighting," Patent Owner asserts in the district court litigation that a cell phone, tablet, and watch, constitute a "package," as that term is used in the '697 patent. Ex. 1074 ¶ 30; Ex. 1088, 5, 23–24, 41–42, 48–49; Pet. Reply 14–15. Thus, we find that the laptop computer of Oba constitutes a "package." We also find persuasive Petitioner's uncontested argument that the circuit components of the laptop computer of Oba would have been coupled using a circuit board. Pet. 23.

> f)    *Conclusion: Claim 1*

For the reasons discussed above, Petitioner demonstrates that Oba, Sato, Gillespie, and Hara teach or suggest every limitation of claim 1. Petitioner also provides a reasoned explanation, supported by rational

IPR2021-01300
Patent 11,019,697 B2

underpinnings, as to why one of ordinary skill in the art would have
combined these references to arrive at the subject matter of claim 1 with a
reasonable expectation of success. Accordingly, Petitioner demonstrates by
a preponderance of the evidence that claim 1 would have been obvious over
Oba, Sato, Gillespie, and Hara.

> 6.    *Analysis: Dependent Claim 3*

Claim 3 depends from claim 1 and further requires that "the
semiconductor device is a laser diode." Ex. 1001, 28:31–32. As discussed
above with respect to claim 1, Petitioner persuasively demonstrates that
Oba's computer would have been configured by one of ordinary skill in the
art to include a semiconductor laser diode, in view of Sato. Pet. 10–11.

Patent Owner does not dispute that the combination of Oba and Sato
teaches or suggests an optical drive with a semiconductor laser diode, but
contends claim 3 would not have been obvious in view of its previous
arguments related to independent claim 1. PO Resp. 32.

For the reasons set forth above for claim 1, Petitioner demonstrates by
a preponderance of the evidence that claim 3 would have been obvious over
Oba, Sato, Gillespie, and Hara.

> 7.    *Analysis: Dependent Claim 4*

Claim 4 depends from claim 1 and further requires "a three-way
switch." Ex. 1001, 28:33–34. Petitioner contends that three-way switches
"were known for controlling circuits/signals" and that one of ordinary skill
in the art "would have been motivated to consider and use known three-way
switch design concepts in the *Oba-Sato-Gillespie-Hara* computer." Pet. 24–
25; Ex. 1002 ¶ 37 (Dr. Baker testifying that three-way switches "were
known mechanisms to control circuits and related features, including
components of portable devices"), ¶ 116. In particular, Petitioner contends

25

IPR2021-01300
Patent 11,019,697 B2

one of ordinary skill in the art would have "recognized advantages of using a three-way switch to control the LED lamps and their illumination based on signals from, for example, LED control program 118B, or with drive 100 to selectively control signals for accessing/using various memory devices." Pet. 24–25. Petitioner further contends that a three-way switch could be used to control how power is provided to computer 51 or to selectively control the distribution of power. *Id.* (citing Ex. 1012, 2:51–61, Fig. 2, code (57); Ex. 1053, 25:20–23; Ex. 1002 ¶ 116).

Patent Owner argues that Oba's LED indicator lights are independent indictors that would not require or benefit from a three-way switch, and that there is no suggestion in Oba that drive 100 switches between the four insertable memory devices. PO Resp. 32–33. Patent Owner further argues that Petitioner's arguments with respect to switching how power is provided in Oba are conclusory and vague. *Id.* at 33. For example, Patent Owner contends Petitioner fails to identify which components of Oba/Gillespie would be coupled to power or ground or why such a coupling would have been beneficial. *Id.* at 33–34.

Petitioner argues in its Reply that the '697 patent, and claim 4 in particular, do not specify any purpose or criticality for the three-way switch, and the use of a known switching component—without more—"weighs heavily in favor of obviousness." Pet. Reply 16. Petitioner further argues that just because Oba's indicator lamps are independent indicators does not mean that switching would not have allowed selective control of the LEDs, and further argues that just because Oba has four exemplary memory devices does not mean that a three-way switch would not have aided in controlling signals to such devices. *Id.*

26

IPR2021-01300
Patent 11,019,697 B2

Patent Owner argues in its Sur-Reply that the rationale to "promote[] component protection, power control, and/or lighting-element control" is generic, "and is not specifically linked to a three-way switch" or the proposed combination of the modified Oba-Gillespie PC 51 with its touchscreen display.  Sur-Reply 12.

Claim 4 is quite broad.  It does not require that the three-way switch be connected to any particular element of the claimed apparatus or perform any function in the apparatus.  Ex. 1001, 28:33–34 ("The apparatus of claim 1, further comprising a three-way switch.").  Nor does the written description of the '697 patent describe the use of a three-way switch or explain its function in the claimed apparatus.

Here, Petitioner presents evidence that three-way switches were well known in the art and had previously been used in portable devices, including laptop computers, to switch between circuit elements.  Ex. 1046, Fig. 8, ¶ 30 (noting that the wireless communication device that uses a three-way switch may be a laptop computer); Ex. 1002 ¶¶ 37, 115–116.  Petitioner also provides a persuasive explanation as to why one of ordinary skill in the art would have seen a benefit to using a three-way switch in Oba, e.g., to control the selection of memory devices.  Pet. 24; Pet. Reply 16.

As noted by Patent Owner, Oba discloses a connection to at least four potential memory devices.  PO Resp. 33.  We agree with Petitioner, however, that this does not mean that one of ordinary skill in the art would not have seen a benefit to using a three-way switch to control signals provided to three of the memory devices.  Pet. Reply 16; Pet. 25 (asserting that adding a three-way switch in Oba "would have involved usage of known technologies and techniques to produce predictable results").

27

IPR2021-01300
Patent 11,019,697 B2

In view of the foregoing, we determine that Petitioner demonstrates by a preponderance of the evidence that claim 4 would have been obvious over Oba, Sato, Gillespie, and Hara. *See KSR*, 550 U.S. at 416 ("[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the art, the combination must do more than yield a predictable result.").

### 8. *Analysis: Dependent Claim 5*

Claim 5 depends from claim 1 and requires that the apparatus further comprise "a power supply configured to increase power supplied to the at least one LED when the circuit detects a touch." Ex. 1001, 28:35–37. Petitioner contends that one of ordinary skill in the art would have sought to implement Gillepie's touch screen in Oba as an OLED touch screen or an LED backlit touch screen and that this configuration would teach or suggest the limitations of both independent claim 1 and dependent claim 5. Pet. 25.

Petitioner contends that Gillespie expressly discloses that its touch screen 106 can include a display that is either an OLED display or an LED backlit display and that one of ordinary skill would have sought to implement a capacitive touch display in Oba for the same reasons discussed above with respect to claim 1. *Id.* at 26, 29 (citing Ex. 1071 ¶¶ 14, 37, 38).

Petitioner contends that when Gillespie's capacitive touch screen is implemented in Oba, this combination would "include a power supply to increase power to at least one of [the LED displays] in response to the touch detection circuit detecting a user touch," for at least two reasons. *Id.* at 29–30. First, Petitioner contends that Gillespie instructs that its touch display can display icons that allow a user to control various notebook computer functions using a touch, including the brightness of the main screen and "touch screen." *Id.* at 29 (citing Ex. 1071 ¶¶ 49–60). Second, Petitioner

28

IPR2021-01300
Patent 11,019,697 B2

contends that the touch screen of Gillespie can be activated, or turned on, by a finger tap (a touch) and that turning on a touch screen (LED backlit or OLED-based) "requires increasing power to the light sources that provide the illumination." *Id.* at 29–30 (citing Ex. 1071 ¶¶ 112–113; Ex. 1002 ¶ 125).

Patent Owner contends Petitioner's arguments relating to claim 5 fail because (1) Petitioner has failed to demonstrate that one of ordinary skill in the art would have sought to implement Gillespie's touch screen in Oba, and (2) one of ordinary skill in the art would not have further modified Oba to add "a power supply configured to increase power supplied to the at least one LED when the circuit detects a touch." PO Resp. 33–41.

*a)    Reason to Combine*

Generally repeating its arguments discussed above with respect to claim 1, Patent Owner contends that one of ordinary skill in the art would not have sought to implement an OLED or backlit LED touch screen in Oba because Oba already has robust user input controls, and implementation of such a touch screen in Oba would come with considerable drawbacks, including "power consumption, complexity, weight, cost, and reliability." PO Resp. 34–37.

For the reasons set forth above for claim 1, we find that one of ordinary skill in the art would have sought to implement Gillespie's touch screen in Oba, in the form of a backlit LED display or OLED display, in view of the numerous benefits of using such displays outlined in Gillespie. Patent Owner's counter-arguments are not persuasive for the same reasons discussed above with respect to claim 1.

29

IPR2021-01300
Patent 11,019,697 B2

> b)     *"increase power supplied to the at least one LED when the circuit detects a touch"*

Petitioner contends that Gillespie discloses increasing the power supplied to an LED when the capacitive circuit detects a touch for two reasons. First, Petitioner contends that the touch screen of Gillespie has "slider controls" that adjust "the brightness and contrast of the main screen or touch screen." Pet. 26, 29 (citing Ex. 1071 ¶ 57, Figs. 4–5). Second, Petitioner contends that Gillespie expressly discloses that the back light of the touch screen can be turned off when it is not needed and then switched on and into the activated state using, among other things, "finger taps." *Id.* at 29–30 (citing Ex. 1071 ¶ 69).

Patent Owner contends Petitioner's arguments related to a brightness slider fail because claim 5 requires that the power is increased **when** the circuit detects a touch. PO Resp. 38. In contrast to the language of claim 5, Patent Owner contends increasing power to the at least one LED in Gillespie does not happen immediately when the touch screen detects a touch. *Id.* Rather, according to Patent Owner, the screen must be touched to select "slider-thumb controller 424" before the "thumb" of the slider control can be moved left or right to decrease or increase brightness. *Id.* (citing Ex. 1071 ¶ 57).

This argument is not persuasive as Patent Owner does not identify, and we do not discern, any temporal requirement in claim 5 that would require that power is increased only when the touch is first, or initially, detected. Pet. Reply 18 n.9. And there is no dispute that when a user touches the touch screen of Gillespie, and moves his or her finger to activate the slider, power is either increased or decreased to the LEDs based on this touch. Ex. 1071 ¶¶ 38, 49, 57 (noting that slider controls may be used to

IPR2021-01300
Patent 11,019,697 B2

adjust "the brightness and contrast of the main screen or touch screen"). Thus, we determine that Gillespie teaches or suggests the disputed claim limitation.

With respect to Petitioner's argument that entering the activated state in Gillespie involves increasing power supplied to the at least one LED, Patent Owner argues that Petitioner misconstrues the "activated state" of Gillespie and improperly seeks to combine disclosures of different embodiments to arrive at the conclusion that finger taps can be used to illuminate the touch screen display. PO Resp. 39–40. Patent Owner reasons that in Gillespie the touch screen is illuminated whether the icons are inactive or active, and Gillespie's disclosure of turning off the touch screen and subsequently activating the touch screen relate to different embodiments. Id. at 39–41.

Gillespie's use of "inactive" and "active" to refer to both the touch screen and the icons displayed on the touch screen is a source of some confusion. PO Resp. 39; Ex. 1071 ¶¶ 62, 69, 71–72. It is evident, however, that the backlight of Gillespie can be switched off when it is not needed. Ex. 1071 ¶ 112. It is also evident that the backlight can be switched on whenever the touch screen is placed in the activated state, and that the activated state may be entered based on numerous actions, including finger taps. Id. ¶¶ 69, 113. Thus, we agree with Petitioner that Gillespie teaches or suggests the disputed claim limitation. Pet. Reply 20–21.

In view of the foregoing, we agree with Petitioner that Gillespie discloses at least two different methods of increasing power to the at least one LEDs when the capacitive touch screen detects a touch. Pet. 30; Pet. Reply 17–18.

31

IPR2021-01300
Patent 11,019,697 B2

> c)    *Conclusion*

For the reasons set forth above, Petitioner demonstrates that Oba, Sato, Gillespie, and Hara teach or suggest every limitation of claim 5. Petitioner also persuasively explains why one of ordinary skill in the art would have combined these references to arrive at the subject matter of claim 5 with a reasonable expectation of success. Accordingly, Petitioner demonstrates by a preponderance of the evidence that claim 5 would have been obvious over Oba, Sato, Gillespie, and Hara.

> 9.    *Analysis: Claim 2*

Claim 2 depends from claim 1 and further requires that "the at least one LED includes an organic light emitting diode." Ex. 1001, 28:29–30. Petitioner contends Gillespie teaches or suggests an OLED touch screen and that one of ordinary skill in the art would have implemented such a touch screen in Oba for the reasons discussed above for claim 5. Pet. 32.

Patent Owner does not address Petitioner's arguments with respect to dependent claim 2, apart from its arguments set forth above with respect to independent claim 1. PO Resp. 41.

Based on the full trial record, we agree with Petitioner that Gillespie teaches or suggests an OLED touch screen. Ex. 1071 ¶ 38 ("Similarly, display 204 can be a liquid crystal display (LCD), organic light emitting diode (OLED) display, . . . or any other type of small display suitable for mounting in a portable computer."). We also find persuasive, for the reasons set forth above with respect to claims 1 and 5, Petitioner's argument that one of ordinary skill in the art would have sought to use Gillespie's OLED touch screen in Oba. Accordingly, Petitioner demonstrates by a preponderance of the evidence that claim 2 would have been obvious over Oba, Sato, Gillespie, and Hara.

Appx32

### E. Claim 6 over Oba, Sato, Gillespie, Hara, and Yang

Claim 6 depends from claim 1 and further requires that "the at least one LED is mounted on a glass substrate." Ex. 1001, 28:38–39. Petitioner contends the subject matter of claim 6 would have been obvious over the combined disclosures of Oba, Sato, Gillespie, Hara, and Yang. Pet. 32–34.

### 1. Yang

Yang discloses an organic light emitting diode (OLED) display and a method of making such a device. Ex. 1019, 1:9–10. Yang further discloses that "[c]onventional OLED display structures are built on glass substrate in a manner such that a two-dimensional OLED array for image manifestation is formed." *Id.* at 1:27–29.

### 2. Analysis

Petitioner contends that one of ordinary skill in the art would have implemented the OLED display of Gillespie in Oba for the reasons discussed above, and would have found it obvious to mount the OLEDs on a glass substrate in view of Yang. Pet. 33.

Patent Owner does not address Petitioner's arguments with respect to claim 6, apart from its arguments addressed above with respect to independent claim 1. PO Resp. 41.

Upon review of the prior art and the parties' arguments, we determine that Oba, Sato, Gillespie, Hara, and Yang teach or suggest every limitation of claim 6. Petitioner also persuasively explains why one of ordinary skill in the art would have sought to use the "conventional" glass substrate of Yang when implementing the OLED touch screen of Gillespie. Accordingly, Petitioner demonstrates by a preponderance of the evidence that claim 6 would have been obvious over Oba, Sato, Gillespie, Hara, and Yang.

33

IPR2021-01300
Patent 11,019,697 B2

### F.    Claims 14, 19, and 20 over Oba and Hara

Independent claim 14 is similar to independent claim 1, but further requires "a transmission conductor configured to wirelessly receive power and data from an alternating electromagnetic field." Ex. 1001, 29:10–12. Claim 19 depends from claim 14 and further requires that "the data receiver comprises digital logic circuitry." *Id.* at 30:11–12. Claim 20 depends from claim 19 and further requires that "the digital logic circuitry includes TTL circuitry." *Id.* at 30:13–14.

#### 1.    Claim 14

With respect to the limitations of claim 14 that are similar to claim 1, Petitioner contends that Oba and Hara teach or suggest "an LED circuit comprising at least one LED," "a data receiver configured to receive the data from at least one of the transmission conductor or an antenna," "a battery ground capacitively coupled to at least one of the data receiver, the transmission conductor, or the LED circuit via a conductor," a portable apparatus in the form of a notebook computer, and a package that houses all of the electrical components of the notebook computer, which are connected to at least one circuit board within the notebook computer. Pet. 34–35, 41–45.

With respect to the requirement for "a transmission conductor configured to wirelessly receive power and data from an alternating electromagnetic field," Petitioner contends that Oba discloses non-contact IC card reader/writer 105 that operates to wirelessly transfer power and data to non-contact IC card 246 on portable telephone 52. *Id.* at 35. Petitioner asserts that non-contact IC card 246 has a transmission conductor that is configured to wirelessly receive power and data from an alternating electromagnetic field, with the power required to operate non-contact IC

IPR2021-01300
Patent 11,019,697 B2

card 246 provided by the electromagnetic wave emitted by card
reader/writer 105. *Id.* at 35–38 (citing Ex. 1053, 17:28–18:6, 18:7–11, 22:1–
5, 26:9–27:17, 36:11–15, 46:17–20, 47:8–10, Figs. 11–12; Ex. 1002 ¶ 142).

Although in the primary embodiment discussed in Oba reader/writer
105 is located in the computer and non-contact IC card 246 is located in the
portable telephone, Petitioner contends that Oba describes an alternate
embodiment wherein the functions of both devices may be provided in a
single unit that is then placed in personal computer 51. *Id.* at 36–37;
Ex. 1053, 55:23–24 ("A device having the functions of both of these devices
may be respectively provided to the personal computer 51 and the portable
telephone 52."). In this embodiment, Petitioner contends non-contact IC
card 246 would include "a transmission conductor configured to wirelessly
receive power and data from an alternating electromagnetic field." Pet. 38–
40.

Patent Owner contends Petitioner presents an "implausible argument"
that a person of ordinary skill in the art would somehow combine IC card
246 from Oba's phone into Oba's computer 51, which already has IC
card/reader 105. PO Resp. 42.[11] Patent Owner contends one of ordinary
skill in the art would not have modified Oba to provide power from IC card
246 because computer 51 already receives ample power via power supply
121 and battery 122, and this modification would increase costs. *Id.* at 44.

Petitioner contends it is not arguing that one of ordinary skill in the art
would have sought to remove IC card 246 from Oba's phone and place it in

---

[11] Patent Owner also argues that Oba and Hara fail to disclose a battery
ground capacitively coupled to at least one of the claimed components.
PO Resp. 42. This argument is not persuasive for the reasons discussed
above with respect to independent claim 1.

IPR2021-01300
Patent 11,019,697 B2

computer 51, but rather that Oba already expressly discloses an embodiment in which PC 51 can include both reader/writer 105 and IC card 246 functionalities. Pet. Reply 22–23. Petitioner contends that in this disclosed embodiment, integrated card 246 may receive power required for its component functionality and related wireless communications, but not necessarily power sufficient to power the entire computer 51. *Id.* at 22.

Patent Owner asserts that Petitioner is relying on a single sentence at the end of Oba's "lengthy twenty-page discussion of its core embodiment" disclosing how a Bluetooth connection is established between PC 51 and portable phone 52. Sur-Reply 15. Patent Owner contends this single sentence is "common boilerplate language found in patent applications at the end of the embodiment, which essentially states that everything from the embodiment can be combined in any way." *Id.* at 15–16 (citing Ex. 1053, 55:22–24).

Patent Owner also argues that Petitioner and Oba fail to describe how such a combined device would work, and that incorporating IC card 246 with its power-induction functionality into Oba's PC 51 makes no sense because PC 51 has ample power from AC mains and its battery 122. *Id.* at 16 (asserting that one of ordinary skill in the art would not design a system wherein a low-power phone powers electronics on PC 51).

Petitioner's proposed combination starts with Oba's laptop computer. Pet. 7, 34. Oba expressly discloses that IC card 246 may be either located in the phone 52 or, in the alternative, a device having the functions of both reader/writer 105 and non-contact IC card 246 may be provided to personal computer 51. Ex. 1053, 55:22–24. In this configuration, Petitioner persuasive demonstrates that Oba's device would include "a transmission

36

IPR2021-01300
Patent 11,019,697 B2

conductor configured to wirelessly receive power and data from an alternating electromagnetic field," as recited in claim 14. Pet. 35–41.

Patent Owner's counter-arguments are not persuasive here because Petitioner is not asserting that one of ordinary skill in the art would have modified Oba, only that Oba expressly discloses a device that is capable of performing the recited functionality/limitations. Arguments that one of ordinary skill in the art would not do what Oba, the base reference in the proposed combination, expressly discloses doing are not persuasive. And, in any event, Oba demonstrates, at a minimum, that it would have been obvious to add the functionality of non-contact IC card 246 in a laptop computer.

In view of the foregoing, we determine that Petitioner demonstrates by a preponderance of the evidence that claim 14 would have been obvious over Oba and Hara.

### 2.    *Claims 19 and 20*

With respect to claim 19, Petitioner contends that CPU 261 of Oba is a microprocessor that comprises "digital logic circuitry." Pet. 46. With respect to claim 20, Petitioner contends that transistor-transistor logic (TTL) circuitry was a well-known example of digital logic circuit design and that one of ordinary skill in the art would have sought to use this well-known technology in any of the identified data receivers of the combined Oba-Hara apparatus. *Id.* at 48–49.

Patent Owner contends claims 19 and 20 are patentable for the "reasons set forth above for independent Claim 14." PO Resp. 45.

Upon review of the parties' arguments and supporting evidence, we find that Petitioner demonstrates by a preponderance of the evidence that the subject matter of claims 19 and 20 would have been obvious over Oba and Hara.

Patent Owner's counter-arguments are not persuasive for the reasons discussed above with respect to independent claim 14.

### G.    Claims 7–9 over Oba, Zhang, and Hara

Independent claim 7 is similar to claim 1, but further requires "a first transmission conductor configured to receive first power and first data," "a second transmission conductor configured to wirelessly receive second power and second data from an alternating electromagnetic field," and "at least one data receiver configured to receive the first and second data respectively from the first and second transmission conductor, or receive third data via an antenna." Ex. 1001, 28:42–50.

Petitioner contends the subject matter of claims 7–9 would have been obvious over Oba, Zhang, and Hara. Pet. 59–71.

### 1.    Zhang

Zhang discloses "an apparatus for providing a data networking capability to a DC powered computer device[] via an AC power line." Ex. 1072 ¶ 2. Zhang notes that computers and devices connected to a computer network are often linked together by dedicated wires. *Id.* ¶ 3. This dedicated wiring, however, "has many drawbacks, such as high cost, inconvenience and installation difficulty, especially when expanding or reconfiguring the network system." *Id.* Zhang also notes that power line communications (PLC) systems were known in the art that transmit network data over the electrical AC line current already present for delivering electrical power. *Id.* Zhang explains that this method of "[u]sing the power line as a medium for communications is particularly convenient because a power line will always be present to provide AC power to the various devices on a network." *Id.*; *see also id.* ¶ 8 (noting that by combining the

IPR2021-01300
Patent 11,019,697 B2

PLC networking system with an AC adapter, the separate power cord and data cable may be eliminated).

Figure 1A of Zhang is reproduced below:



FIG. 1A

Figure 1A is a functional block diagram depicting a PLC network system for a DC powered computer device having separate DC and data connectors. *Id.* ¶¶ 4, 9. Figure 1A shows PLC network system 3 and AC/DC converter module 4 secured within power-network module 1. *Id.* ¶ 17. PLC network system 3 is connected to power line 10 through AC power cord 12 and AC power outlet box 11. *Id.* PLC network system 3 also connects to DC powered computer device 2 via DC/data cable 17, which splits into data cable 18 and DC power cable 19. *Id.* Data cable 18 is connected to a data bus connector in the computer device, such as a universal serial bus (USB) connector, and DC cable 19 is plugged into a DC input socket. *Id.*

39

IPR2021-01300
Patent 11,019,697 B2

Figure 2B of Zhang is reproduced below:



FIG. 2B

Figure 2B of Zhang is a functional block diagram depicting a second PLC
network system. *Id.* ¶ 14. In contrast to the PLC network system depicted
in Figure 1A, the PLC network system of Figure 2B includes a single cord
configuration with reduced wire count that connects module 1 and computer
device 2. *Id.* ¶ 19. The use of a single cord, however, necessitates the use of
DC/Data modulators 25 and 26 in the laptop computer to modulate/
demodulate the data onto the DC power wires. *Id.* (noting the benefits of a
lower cost cable, but also the added cost and complexity from the use of
DC/data modulators 25 and 26).

<div align="center">

*2.    Analysis: Claim 7*

</div>

Pointing to its discussion of claim 1, above, Petitioner contends Oba,
Zhang, and Hara teach or suggest: (1) an LED circuit comprising at least one
LED (Pet. 59); (2) a battery ground capacitively coupled to at least one of a
data receiver, LED circuit, first transmission conductor, or second

<div align="center">

40

</div>

IPR2021-01300
Patent 11,019,697 B2

transmission conductor (*id.* at 70); (3) a laptop computer that is portable (*id.* at 70); and (4) a laptop that is a package within which all of the electrical components of the laptop are housed and connected to at least one circuit board (*id.* at 71).

Petitioner further contends Oba and Zhang both teach or suggest a first transmission conductor configured to receive first power and first data. Pet. 60–61. In particular, Petitioner contends that USB connectors, such as those described by Oba, "were known to be configured to receive power and data over a conductor." *Id.* at 60. Petitioner further contends that Zhang discloses a method of using a single conductor to transmit both power and data to a computer. *Id.* at 61 (citing Ex. 1072 ¶¶ 7, 18–19).

Petitioner contends IC card 246 of Oba includes a "second transmission conductor" that is configured to wirelessly receive second power and second data from an alternating electromagnetic field, and the Bluetooth module of Oba is a data receiver that is configured to receive "third data via an antenna." *Id.* at 65–69.

Petitioner contends one of ordinary skill in the art would have sought to use Zhang's interface capable of receiving power and data in Oba in order to "reduce wire count and provide an alternative mechanism for receiving such signals over a wired connection." *Id.* at 63. According to Petitioner, this combination is consistent with the disclosures of Oba, which provides for an AC power input and describes the use of "various mechanisms for receiving power and/or data." *Id.* at 63–64.

Patent Owner contends Petitioner's arguments fail: (1) for the same reasons discussed above with respect to claims 1 and 14; and (2) because Oba, Zhang, and Hara fail to disclose "a first transmission conductor

41

configured to *__receive__* first power and first data." PO Resp. 46–65. We address these arguments below.

> a)    *Previous Arguments*

Patent Owner contends Oba, Zhang, and Hara fail to disclose a battery ground capacitively coupled to any of the claimed components, for the same reasons set forth above with respect to claim 1. PO Resp. 46. Patent Owner further contends that Oba, Zhang, and Hara fail to disclose "a second transmission conductor configured to wireless *__receive__* second power and second data from an alternating electromagnetic field," for the same reasons discussed above with respect to claim 14. *Id.* at 47. These arguments are not persuasive for the same reasons discussed above with respect to claims 1 and 14.

> b)    *USB Power and Data*

Petitioner contends that the USB interface of Oba "necessarily included connections to carry power and data." Pet. 60 (citing Ex. 1055, 85–94; Ex. 1002 ¶¶ 174–175). Petitioner's argument is supported by the testimony of Dr. Baker, who provides multiple citations to prior art that indicate that a USB connection can be used to transfer both power and data. Ex. 1002 ¶ 174 (citing to Exhibits 1011 and 1055). These citations include Revision 2.0 of the Universal Serial Bus Specification. *Id.* (citing Ex. 1055, 85–94).

Patent Owner contends Petitioner's citations to Oba fail to disclose that Oba's USB 115/USB interface 11 receives power, and Mr. Credelle testifies that in 2004 USB ports on a computer were not used to receive power. PO Resp. 48, 54–57; Ex. 2001 ¶ 182. Patent Owner further contends that Exhibits 1055 and 1011 are extraneous references to the ground that should not be considered, and that Petitioner is improperly

42

IPR2021-01300
Patent 11,019,697 B2

relying on "common knowledge" to supply a missing limitation, which is only permissible under very limited circumstances. *Id.* at 50–51 (citing *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016)). Finally, Patent Owner contends Petitioner has failed to demonstrate that Revision 2.0 for the USB Specification was a printed publication as of the date of the invention. *Id.* at 53–54.

Petitioner argues in Reply that claim 7 only requires that a first conductor be "*configured to* receive" power and data and it was known that a USB interface/port/conductor at the time "was *configured* to receive data/power." Pet. Reply 28 (citing Pet. 60; Ex. 1002 ¶ 39; Ex. 1011, 3:43–57, 5:56–7:2, 11:41–45, 11:57–12:2; Ex. 1055, 17–18, 85–91, 102, 150, 196). Petitioner further argues that it is undisputed that Oba's PC 51 includes a USB port/interface and that PC 51 can connect to a desktop PC, which would act as a USB host for the laptop computer if connected through the USB port/interface. *Id.* at 28–29 (citing Ex. 1053, Fig. 4; Ex. 1102, 106:17–107:7).

It is undisputed that Oba discloses a laptop computer having a USB port and interface. Ex. 1053, 23:7, Fig. 11; Pet. 59–60; PO Resp. 48. Dr. Baker persuasively testifies that in the relevant time frame USB interfaces were configured to receive power and data. (Ex. 1002 ¶ 174; Ex. 1055, 17–18). If the device in which the USB interface is installed is connected to a "host," it would receive power over the USB interface. Ex. 1055, 18 (noting that "the host supplies power for use by USB devices that are directly connected"). Thus, Petitioner persuasively demonstrates that Oba teaches or suggests "a first transmission conductor configured to receive first power and first data," as recited in claim 7.

43

Appx43

IPR2021-01300
Patent 11,019,697 B2

Patent Owner's counter-arguments are not persuasive. First, claim 7 does not require that the first transmission conductor actually receive first power and first data, or that the system use first data or first power in any way. The first transmission conductor must only be *configured* to receive power and data. Pet. Reply 28. Petitioner persuasively demonstrates that a USB interface, such as the USB interface of Oba, was configured to receive both power and data.

Second, contrary to Patent Owner's arguments, Petitioner is not relying upon the USB Specification (Ex. 1055) or common sense to supply a missing claim limitation. Rather, Petitioner relies on Oba's disclosure of a USB interface for this limitation, and points to the USB Specification and Exhibit 1011 only to show the inherent capabilities/structure of the USB interface in the relevant time period. Thus, Patent Owner's citation to *Arendi* and questions as to whether revision 2.0 of the USB Specification (Ex. 1055) was publicly available in the relevant time period are not persuasive. *See Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329 (Fed. Cir. 2020) ("Extrinsic evidence can be used to demonstrate what is 'necessarily present' in the prior art embodiment even if the extrinsic evidence is not itself prior art."); *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1345 (Fed. Cir. 2018) ("Moreover, extrinsic evidence need not antedate the critical date of the patent at issue" to demonstrate an inherent property in the prior art).

<div align="center">

*c)*     *Zhang's Interface*

</div>

Petitioner contends that one of ordinary skill in the art would have been motivated to configure Oba's "computer 51 to include an interface," such as the one disclosed in Zhang, that is configured to receive first power and first data in order to reduce wire count and provide an alternate

<div align="center">44</div>

<div align="center">Appx44</div>

IPR2021-01300
Patent 11,019,697 B2

mechanism for receiving such signals over a wired connection." Pet. 63 (citing Ex. 1002 ¶ 176). Petitioner contends one of ordinary skill in the art would have sought to implement Zhang's system in view of the benefits expressly set forth in Zhang for such a system and because Oba expresses a desire for multiple mechanisms for receiving power and data. *Id.* at 63–64 (citing Ex. 1002 ¶ 177). Petitioner further contends that this combination would have been within the skill of the ordinarily skilled artisan and "would have involved the use of known data/power communication circuit technologies." *Id.* at 64.

Patent Owner contends Petitioner's arguments fail when examined under close examination because the computer of Oba already has a reliable source of power from AC mains (power supply 121) as well as multiple mechanisms to receive data, including a modem, USB port, disk drives, a Bluetooth module, a GPS receiver, an IEEE-1394 port, and IC card 105. PO Resp. 58 (citing Ex. 1053, Fig. 11; Pet. 64; Ex. 1002 ¶ 176).

Patent Owner further contends that modifying Oba's computer 51 for PLC communications would "involve significant modifications to the power supply and to the computer," and modifying Oba to work with a single cord would require the "already-modified" power supply of Oba to be further modified to include a modulator/demodulator, changes that Patent Owner contends were not necessary in view of Oba's existing, reliable power supply. *Id.* at 59–62 (citing Ex. 2001 ¶ 219).

As noted by Petitioner and Patent Owner, Oba discloses that its computer has multiple methods of communicating data. Pet. 64; PO Resp. 53. Zhang discloses, however, that its method of using the power line to deliver both power and data is particularly advantageous. Ex. 1072 ¶¶ 3, 8.

45

IPR2021-01300
Patent 11,019,697 B2

Thus, we agree with Petitioner that one of ordinary skill in the art would have seen a benefit to adding Zhang's single cord configuration in Oba.

As Patent Owner and Zhang both note, the single-cord embodiment of Zhang would simultaneously decrease the costs of cables and of networking the various devices, but increase the costs and complexity of the laptop computer by requiring the installation a DC/data modulator. Ex. 1072 ¶¶ 3, 8, 19 (noting that DC/data modulators 25 and 26 would add additional cost and complexity to both the PLC network system and to the computer). But "[a] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *General Electric Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1349, 1351 (Fed. Cir. 2020).

Moreover, "the fact that the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevented their combination. Only the latter is telling on the issue of obviousness." *Orthopedic Equip.*, 702 F.2d at 1013. Here, the advantages of using Zhang's single-cord embodiment are evident and there is no suggestion that there is any technological incompatibility that would prevent the combination of Oba and Zhang. Thus, general arguments about increased costs or complexity due to the combination, without more, are not persuasive.

Accordingly, we find persuasive Petitioner's argument that one of ordinary skill in the art would have found it obvious to implement Zhang's single-cord embodiment in Oba and that this combination would result in "a first transmission conductor configured to receive first power and first data," as recited in claim 7.

46

IPR2021-01300
Patent 11,019,697 B2

> *d)*    *Conclusion: Claim 7*

For the reasons set forth above, Petitioner demonstrates that Oba, Zhang, and Hara teach or suggest every limitation of claim 7.  Petitioner also provides a reasoned explanation as to why one of ordinary skill in the art would have sought to combine these references to arrive at the subject matter of claim 7 with a reasonable expectation of success.  Thus, Petitioner demonstrates by a preponderance of the evidence that claim 7 would have been obvious over Oba, Zhang, and Hara.

> *3.*    *Analysis: Claims 8 and 9*

Claim 8 depends from claim 7 and further requires that "the at least one data receiver further comprises digital logic circuitry." Ex. 1001, 28:61–62.  Claim 9 depends from claim 8 and further requires that "the digital logic circuitry includes transistor-transistor ("TTL") circuitry." *Id.* at 28:63–65.

Petitioner contends Oba, Zhang, and Hara teach or suggest every limitation of claims 8 and 9.  Pet. 72–74.

Patent Owner contends claims 8 and 9 would not have been obvious over Oba, Zhang, and Hara for the reasons set forth above with respect to claim 7.  PO Resp. 65.

Upon review of the evidence of record, we determine that Petitioner demonstrates by a preponderance of the evidence that claims 8 and 9 would have been obvious over Oba, Zhang, and Hara.

> *H.*    *Claims 15 and 16 over Oba, Hara, and Sontag*

Claim 15 depends from independent claim 14 and further requires "an inductor coupled to the transmission conductor." Ex. 1001, 30:1–2.  Claim 16 depends from claim 15 and further requires "a capacitor coupled to the inductor." *Id.* at 30:3–4.

47

IPR2021-01300
Patent 11,019,697 B2

Petitioner contends that the subject matter of claims 15 and 16 would have been obvious over the combined disclosures of Oba, Hara, and Sontag. Pet. 52–56. In particular, Petitioner contends that Sontag discloses the use of an inductor coupled to a transmission conductor (and a capacitor) to facilitate wireless transmission and that one of ordinary skill in the art would have sought to implement this circuit design because Sontag discloses circuitry relating to wireless signal transmission systems that operate within "close proximity between transmitting and receiving apparatus." *Id.* at 53–54.

Patent Owner contends claims 15 and 16 "are patentable for at least the same reasons as Claim 14." PO Resp. 45.

Upon review of the parties' arguments and evidence, and also for the reasons set forth above with respect to claim 14, we determine that Petitioner demonstrates by a preponderance of the evidence that claims 15 and 16 would have been obvious over Oba, Hara, and Sontag.

I.    *Claim 22 over Oba, Hara, and Jensen*

Claim 22 depends from claim 14 and further requires "DC offset circuitry" that "is coupled to the transmission conductor." Ex. 1001, 30:16–17.

Petitioner contends the subject matter of claim 22 would have been obvious over the combined disclosures of Oba, Hara, Jensen. Pet. 49–52. In particular, Petitioner contends that "DC offset was a known characteristic in circuit design" and one of ordinary skill in the art would have understood from the disclosures of Jensen that "DC offset is needed to 'ensure accurate extraction of data'" in circuitry that is used to receive wireless communications. *Id.* at 50–51 (citing Ex. 1063, 1:8–11, 1:23–41, 2:4–13, 3:66–4:15, 5:3–20,).

48

IPR2021-01300
Patent 11,019,697 B2

Patent Owner contends claim 22 "is patentable for at least the same reasons" as those set forth for claim 14. PO Resp. 45.

Upon review of the parties' arguments, and also for the reasons set forth above with respect to claim 14, we determine that Petitioner demonstrates by a preponderance of the evidence that claim 22 would have been obvious over Oba, Hara, and Jensen.

### J.    Claims 17 and 18 over Oba, Hara, Sontag, and Gillespie

Claim 17 depends from claim 16 and further requires "a circuit configured to detect human touch via capacitive sensing." Ex. 1001, 30:5–6. Claim 18 depends from claim 17 and further requires "a power supply configured to increase power supplied to the at least one LED when the circuit detects a touch." *Id.* at 30:7–10.

Petitioner contends the subject matter of claims 17 and 18 would have been obvious over the combined disclosures of Oba, Hara, Sontag, and Gillespie. Pet. 56–58. In particular, Petitioner contends the references teach or suggest the limitations of claim 17 for the same reasons as set forth above with respect to limitation 1(e) and claim 16. *Id.* Petitioner further contends that the references teach or suggest the limitations of claim 18 for the same reasons as set forth above with respect to claims 5 and 17. *Id.* at 57–58.

Patent Owner contends the limitations of claim 17 are not met for the same reasons discussed above with respect to limitation 1(e), and the limitations of claim 18 are not met for the same reasons set forth above for claim 5. PO Resp. 45–46.

Upon review of the parties' arguments, and also for the reasons set forth above with respect to limitation 1(e) and claims 5, 16, and 17, we determine that Petitioner demonstrates by a preponderance of the evidence

that claims 17 and 18 would have been obvious over Oba, Hara, Sontag, and Gillespie.

> K.    *Claims 10 and 11 over Oba, Zhang, Hara, and Sato*

Claim 10 depends from claim 7 and further requires "a semiconductor device configured to emit a laser." Ex. 1001, 28:66–67. Claim 11 depends from claim 10 and further requires that "the semiconductor device comprises a laser diode." *Id.* at 29:1–2.

Petitioner contends the subject matter of claims 10 and 11 would have been obvious over the combined disclosures of Oba, Zhang, Hara, and Sato for the same reasons discussed above with respect to limitation 1(c). Pet. 74–75.

Patent Owner contends claim 10 and 11 are patentable for the same reasons discussed above with respect to claim 7. PO Resp. 65.

Upon review of the parties' arguments, and also for the reasons set forth above with respect to claims 1 and 7, we determine that Petitioner demonstrates by a preponderance of the evidence that claims 10 and 11 would have been obvious over Oba, Zhang, Hara, and Sato.

> L.    *Claims 12 and 13 over Oba, Zhang, Hara, Sato, and Gillespie*

Claim 12 depends from claim 10 and further requires "a circuit configured to detect human touch via capacitive sensing." Ex. 1001, 29:3–4. Claim 13 depends from claim 12 and further requires "a power supply configured to increase power supplied to the at least one LED when the circuit detect a touch." *Id.* at 29:5–7.

Petitioner contends the subject matter of claims 12 and 13 would have been obvious over the combined disclosures of Oba, Zhang, Hara, Sato, and Gillespie. Pet. 75–77.

50

IPR2021-01300
Patent 11,019,697 B2

Patent Owner contends the subject matter of claim 12 is not taught by the recited references for the same reason as set forth for limitations 1(b) and 1(e), and the subject matter of claim 13 is not taught by the recited references for the same reasons as set forth for claim 5. PO Resp. 65–66.

Upon review of the parties' arguments, and also for the reasons set forth above with respect to claims 1 and 5, we determine that Petitioner demonstrates by a preponderance of the evidence that claims 12 and 13 would have been obvious over Oba, Zhang, Hara, Sato, and Gillespie.

###### M.    *Claim 21 over Oba, Zhang, Hara, and Jensen*

Claim 21 depends from claim 7 and further requires that "the data receiver includes DC offset circuitry." Ex. 1001, 30:14–15.

Petitioner contends that subject matter of claim 21 would have been obvious over the combined disclosures of Oba, Zhang, Hara, and Jensen. Pet. 78–79. Petitioner contends one of ordinary skill in the art would have sought to use a "data receiver" in Oba for the same reasons set forth above for claim 7, and that one of ordinary skill in the art would have sought to use the DC offset circuitry disclosed in Jensen in Oba, Zhang, and Hara for the same reasons discussed above with respect to claim 22. *Id.*

Patent Owner contends Claim 21 is patentable for the same reasons set forth above with respect to claim 7. PO Resp. 66.

Upon review of the parties' arguments, and also for the reasons set forth above with respect to claims 7 and 22, we determine that Petitioner demonstrates by a preponderance of the evidence that claim 21 would have been obvious over Oba, Zhang, Hara, and Jensen.

51

IPR2021-01300
Patent 11,019,697 B2

### III.    CONCLUSION[12]

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5 | 103 | Oba, Sato, Gillespie, Hara | 1–5 | |
| 6 | 103 | Oba, Sato, Gillespie, Hara, Yang | 6 | |
| 14, 19, 20 | 103 | Oba, Hara | 14, 19, 20 | |
| 22 | 103 | Oba, Hara, Jensen | 22 | |
| 15, 16 | 103 | Oba, Hara, Sontag | 15, 16 | |
| 17, 18 | 103 | Oba, Hara, Sontag, Gillespie | 17, 18 | |
| 7–9 | 103 | Oba, Zhang, Hara | 7–9 | |
| 10, 11 | 103 | Oba, Zhang, Hara, Sato | 10, 11 | |
| 12, 13 | 103 | Oba, Zhang, Hara, Sato, Gillespie | 12, 13 | |
| 21 | 103 | Oba, Zhang, Hara, Jensen | 21 | |
| | | **Overall Outcome** | 1–22 | |

---

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

Appx52

IPR2021-01300
Patent 11,019,697 B2

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–22 of the '697 patent are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

53

IPR2021-01300
Patent 11,019,697 B2

PETITIONER:

Naveen Modi
Joseph Palys
Mark Consilvio
PAUL HASTINGS LLP
naveenmodi@paulhastings.com
josephpalys@paulhastings.com
markconsilvio@paulhastings.com


PATENT OWNER:

Stephen T. Schreiner
James T. Carmichael
Stephen McBride
Minghui Yang
CARMICHAEL IP, PLLC
schreiner@carmichaelip.com
jim@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com

Katherine L. Allor
Dennis Majewski
Jason Engel
K&L GATES LLP
katy.allor@klgates.com
dennis.majewski@klgates.com
jason.engel.ptab@klgates.com

54



US011019697B2

(12) **United States Patent**
Miskin et al.

(10) Patent No.: **US 11,019,697 B2**
(45) Date of Patent: **May 25, 2021**

(54) **AC LIGHT EMITTING DIODE AND AC LED DRIVE METHODS AND APPARATUS**

(71) Applicant: **Lynk Labs, Inc.**, Elgin, IL (US)

(72) Inventors: **Michael Miskin**, Sleepy Hollow, IL (US); **James N. Andersen**, Elmwood Park, IL (US); **Robert L. Kottritsch**, Shefford (GB)

(73) Assignee: **LYNK LABS, INC.**, Elgin, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/740,225**

(22) Filed: **Jan. 10, 2020**

(65) **Prior Publication Data**
US 2020/0154546 A1    May 14, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/443,759, filed on Jun. 17, 2019, now Pat. No. 10,575,376, which is a continuation of application No. 16/407,076, filed on May 8, 2019, now Pat. No. 10,492,252, which is a continuation of application No. 16/148,945, filed on (Continued)

(51) **Int. Cl.**
*H05B 45/37* (2020.01)
*H05B 45/10* (2020.01)
*H05B 45/40* (2020.01)
*H05B 45/50* (2020.01)

(52) **U.S. Cl.**
CPC ............. *H05B 45/37* (2020.01); *H05B 45/10* (2020.01); *H05B 45/40* (2020.01); *H05B 45/50* (2020.01); *Y02B 20/30* (2013.01)

(58) **Field of Classification Search**
CPC .... H05B 2203/036; H05B 3/34; H05B 3/342; H05B 45/10; H05B 45/12; H05B 45/20; H05B 45/37; H05B 45/40; H05B 45/50; H05B 47/19; H05B 6/065; H05B 6/1209
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,869,641 A | 3/1975 | Goldberg | |
| 4,218,627 A | 8/1980 | Kiesel | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 44 42 677 | 11/1994 | |
| DE | 19500694 | 8/1996 | |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 15/797,806, filed Oct. 30, 2017, inventors: Michael Miskin and James N. Andersen, 59 pages.

(Continued)

*Primary Examiner* — Monica C King
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

An LED device for use with an AC voltage power source configured such that at least one LED emits light during a positive phase of power provided from an AC power supply and at least one LED emits light during the negative phase of power provided from an AC power supply. The LED device includes a first power connection lead and a second power connection lead, both leads capable of being connected to and receiving power from an AC power supply.

**22 Claims, 52 Drawing Sheets**



SAMSUNG EXHIBIT 1001

Appx55

US 11,019,697 B2
Page 2

### Related U.S. Application Data

Oct. 1, 2018, now Pat. No. 10,492,251, which is a continuation of application No. 15/334,029, filed on Oct. 25, 2016, now Pat. No. 10,091,842, which is a continuation-in-part of application No. 14/948,635, filed on Nov. 23, 2015, now Pat. No. 9,615,420, which is a division of application No. 13/697,646, filed as application No. PCT/US2011/036359 on May 12, 2011, now Pat. No. 9,198,237, which is a continuation-in-part of application No. PCT/US2010/062235, filed on Dec. 28, 2010, which is a continuation-in-part of application No. 12/287,267, filed on Oct. 6, 2008, now Pat. No. 8,179,055, and a continuation-in-part of application No. 12/364,890, filed on Feb. 3, 2009, now Pat. No. 8,148,905, which is a continuation of application No. 11/066,414, filed on Feb. 25, 2005, now Pat. No. 7,489,086, said application No. PCT/US2010/062235 is a continuation-in-part of application No. PCT/US2010/001597, filed on May 28, 2010, which is a continuation-in-part of application No. 12/287,267, filed on Oct. 6, 2008, now Pat. No. 8,179,055, said application No. PCT/US2010/062235 is a continuation-in-part of application No. PCT/US2010/001269, filed on Apr. 30, 2010, which is a continuation-in-part of application No. 12/287,267, filed on Oct. 6, 2008, now Pat. No. 8,179,055.

(60) Provisional application No. 61/333,963, filed on May 12, 2010, provisional application No. 61/284,927, filed on Dec. 28, 2009, provisional application No. 61/335,069, filed on Dec. 31, 2009, provisional application No. 60/997,771, filed on Oct. 6, 2007, provisional application No. 60/547,653, filed on Feb. 25, 2004, provisional application No. 60/559,867, filed on Apr. 6, 2004, provisional application No. 61/217,215, filed on May 28, 2009, provisional application No. 61/215,144, filed on May 1, 2009.

(56) References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,271,408 | A | 6/1981 | Teshima et al. |
| 4,298,869 | A | 11/1981 | Okuno |
| 4,380,721 | A | 4/1983 | Bullock et al. |
| 4,506,318 | A | 3/1985 | Nilssen |
| 4,535,203 | A | 8/1985 | Jenkins et al. |
| 4,751,398 | A | 6/1988 | Ertz, III |
| 5,180,952 | A | 1/1993 | Nilssen |
| 5,309,062 | A | 5/1994 | Perkins et al. |
| 5,442,258 | A | 8/1995 | Shibata |
| 5,469,020 | A | 11/1995 | Herrick |
| 5,559,681 | A | 9/1996 | Duarte |
| 5,575,459 | A | 11/1996 | Anderson |
| 5,600,225 | A | 2/1997 | Goto |
| 5,621,913 | A | 4/1997 | Tuttle et al. |
| 5,636,303 | A | 6/1997 | Che et al. |
| 5,640,061 | A | 6/1997 | Bornhorst et al. |
| 5,675,485 | A | 10/1997 | Seong |
| 5,699,218 | A | 12/1997 | Kadah |
| 5,739,639 | A | 4/1998 | Johnson |
| 5,790,013 | A | 8/1998 | Hauck |
| 5,803,579 | A | 9/1998 | Turnbull et al. |
| 5,821,699 | A | 10/1998 | Moisin |
| 5,936,599 | A | 8/1999 | Reymond |
| 5,963,012 | A | 10/1999 | Garcia et al. |
| 6,016,038 | A | 1/2000 | Mueller et al. |
| 6,028,694 | A | 2/2000 | Schmidt |
| 6,040,663 | A | 3/2000 | Bucks et al. |
| 6,072,475 | A | 6/2000 | van Ketwich |
| 6,107,744 | A | 8/2000 | Bavaro et al. |
| 6,113,248 | A | 9/2000 | Mistopoulos et al. |
| 6,118,426 | A | 9/2000 | Albert et al. |
| 6,127,783 | A | 10/2000 | Pashley et al. |
| 6,127,799 | A | 10/2000 | Krishnan |
| 6,157,551 | A | 12/2000 | Barak et al. |
| 6,183,104 | B1 | 2/2001 | Ferrara |
| 6,234,648 | B1 | 5/2001 | Borner |
| 6,292,901 | B1 | 9/2001 | Lys et al. |
| 6,357,889 | B1 | 3/2002 | Duggal et al. |
| 6,362,789 | B1 | 3/2002 | Trumbull et al. |
| 6,380,693 | B1 | 4/2002 | Kastl |
| 6,412,971 | B1 | 7/2002 | Wojnarowski et al. |
| 6,430,064 | B1 | 8/2002 | Tsuchimoto et al. |
| 6,528,954 | B1 | 3/2003 | Lys et al. |
| 6,541,919 | B1 | 4/2003 | Roach et al. |
| 6,548,967 | B1 | 4/2003 | Dowling et al. |
| 6,559,802 | B2 | 5/2003 | Goto et al. |
| 6,577,072 | B2 | 6/2003 | Saito et al. |
| 6,580,228 | B1 | 6/2003 | Chen et al. |
| 6,611,297 | B1 | 8/2003 | Akashi et al. |
| 6,614,103 | B1 | 9/2003 | Durocher et al. |
| 6,636,003 | B2 | 10/2003 | Rahm et al. |
| 6,697,130 | B2 | 2/2004 | Weindorf et al. |
| 6,714,348 | B2 | 3/2004 | Dunn |
| 6,762,562 | B2 | 7/2004 | Leong |
| 6,781,570 | B1 | 8/2004 | Arrigo et al. |
| 6,861,658 | B2 | 3/2005 | Fiset |
| 6,936,968 | B2 | 8/2005 | Cross et al. |
| 6,949,772 | B2 | 9/2005 | Shimizu et al. |
| 6,961,190 | B1 | 11/2005 | Tamaoki et al. |
| 7,014,336 | B1 | 3/2006 | Ducharme et al. |
| 7,019,662 | B2 | 3/2006 | Shackle |
| 7,038,399 | B2 | 5/2006 | Lys et al. |
| 7,038,400 | B2 | 5/2006 | Rimmer et al. |
| 7,053,560 | B1 | 5/2006 | Ng |
| 7,061,188 | B1 | 6/2006 | Katyl et al. |
| 7,067,992 | B2 | 6/2006 | Leong et al. |
| 7,144,131 | B2 | 12/2006 | Rains |
| 7,186,003 | B2 | 3/2007 | Dowling et al. |
| 7,204,607 | B2 | 4/2007 | Yano et al. |
| 7,218,527 | B1 | 5/2007 | Jaconsen |
| 7,288,902 | B1 | 10/2007 | Melanson |
| 7,344,279 | B2 | 3/2008 | Mueller et al. |
| 7,350,936 | B2 | 4/2008 | Ducharme et al. |
| 7,365,718 | B2 | 4/2008 | Tsuchida et al. |
| 7,462,997 | B2 | 12/2008 | Mueller et al. |
| 7,489,086 | B2 | 2/2009 | Miskin et al. |
| 7,521,872 | B2 | 4/2009 | Bruning |
| 7,583,901 | B2 | 9/2009 | Nakagawa et al. |
| 7,646,029 | B2 | 1/2010 | Mueller et al. |
| 7,808,189 | B2 | 10/2010 | Hollnberger et al. |
| 7,859,196 | B2 | 12/2010 | Lee et al. |
| 7,936,132 | B2 | 5/2011 | Quek et al. |
| 8,033,686 | B2 | 10/2011 | Recker et al. |
| 8,148,905 | B2 | 4/2012 | Miskin et al. |
| 8,179,055 | B2 | 5/2012 | Miskin et al. |
| 8,237,581 | B2 | 8/2012 | Ries, II |
| 8,272,757 | B1 | 9/2012 | Fan et al. |
| 8,314,571 | B2 | 11/2012 | Jonsson |
| 8,531,118 | B2 | 9/2013 | Miskin et al. |
| 8,613,997 | B2 | 12/2013 | Day |
| 8,648,539 | B2 | 2/2014 | Miskin et al. |
| 8,841,855 | B2 | 9/2014 | Miskin |
| 9,184,497 | B2 | 11/2015 | Chen et al. |
| 9,198,237 | B2 | 11/2015 | Miskin et al. |
| 9,247,597 | B2 | 1/2016 | Miskin et al. |
| 9,249,953 | B2 | 2/2016 | Miskin |
| 9,516,716 | B2 | 12/2016 | Miskin et al. |
| 9,615,420 | B2 | 4/2017 | Miskin |
| 9,693,405 | B2 | 6/2017 | Miskin |
| 9,750,098 | B2 | 8/2017 | Miskin et al. |
| 9,807,827 | B2 | 10/2017 | Miskin et al. |
| 2001/0054005 | A1 | 12/2001 | Hook et al. |
| 2002/0008973 | A1 | 1/2002 | Boys et al. |
| 2002/0030455 | A1 | 3/2002 | Ghanem |
| 2002/0047646 | A1 | 4/2002 | Lys et al. |
| 2002/0048169 | A1 | 4/2002 | Dowling et al. |
| 2002/0060526 | A1 | 5/2002 | Timmermans et al. |

**US 11,019,697 B2**

Page 3

| (56) | | References Cited | | | |
|---|---|---|---|---|---|

U.S. PATENT DOCUMENTS

| 2002/0089305 | A1 | 7/2002 | Park et al. |
| 2002/0090983 | A1 | 7/2002 | Chen |
| 2002/0113246 | A1 | 8/2002 | Nagai et al. |
| 2002/0114155 | A1 | 8/2002 | Katogi et al. |
| 2002/0159270 | A1 | 10/2002 | Lynam et al. |
| 2002/0167488 | A1 | 11/2002 | Hinckley et al. |
| 2002/0180344 | A1 | 12/2002 | Lichtfuss |
| 2002/0181208 | A1 | 12/2002 | Credelle et al. |
| 2002/0181231 | A1 | 12/2002 | Luk |
| 2002/0190689 | A1 | 12/2002 | Nakamura et al. |
| 2003/0001657 | A1 | 1/2003 | Worley, Sr. et al. |
| 2003/0043611 | A1 | 3/2003 | Bockle et al. |
| 2003/0057886 | A1 | 3/2003 | Lys et al. |
| 2003/0071259 | A1 | 4/2003 | Yoshida |
| 2003/0100837 | A1 | 5/2003 | Lys et al. |
| 2003/0109286 | A1 | 6/2003 | Hack et al. |
| 2003/0122502 | A1 | 7/2003 | Clauberg et al. |
| 2003/0137258 | A1 | 7/2003 | Piepgras et al. |
| 2003/0156422 | A1 | 8/2003 | Tatewaki et al. |
| 2003/0169014 | A1 | 9/2003 | Kadah |
| 2003/0173408 | A1 | 9/2003 | Mosher, Jr. et al. |
| 2003/0175004 | A1 | 9/2003 | Garito et al. |
| 2003/0179585 | A1 | 9/2003 | Lefebvre |
| 2003/0219035 | A1 | 11/2003 | Schmidt |
| 2004/0041800 | A1 | 3/2004 | Daniels |
| 2004/0070520 | A1 | 4/2004 | Sharp et al. |
| 2004/0077953 | A1 | 4/2004 | Mednik et al. |
| 2004/0080941 | A1 | 4/2004 | Jiang et al. |
| 2004/0105264 | A1 | 6/2004 | Spero |
| 2004/0130909 | A1* | 7/2004 | Mueller |
| 2004/0140771 | A1 | 7/2004 | Kim et al. |
| 2004/0183380 | A1 | 9/2004 | Otake |
| 2004/0189218 | A1 | 9/2004 | Leong et al. |
| 2004/0196636 | A1 | 10/2004 | Kim |
| 2004/0201988 | A1 | 10/2004 | Allen |
| 2004/0206970 | A1 | 10/2004 | Martin |
| 2004/0218387 | A1 | 11/2004 | Gerlach |
| 2004/0256467 | A1 | 12/2004 | Clemens et al. |
| 2004/0264193 | A1 | 12/2004 | Okumura |
| 2005/0040773 | A1 | 2/2005 | Lebens et al. |
| 2005/0110426 | A1 | 5/2005 | Shao |
| 2005/0122062 | A1 | 6/2005 | Hsu |
| 2005/0128751 | A1 | 6/2005 | Roberge et al. |
| 2005/0151511 | A1 | 7/2005 | Chary |
| 2005/0162096 | A1 | 7/2005 | Bertrand |
| 2005/0168156 | A1 | 8/2005 | Li et al. |
| 2005/0173990 | A1 | 8/2005 | Anderson et al. |
| 2005/0195600 | A1 | 9/2005 | Porchia et al. |
| 2005/0218838 | A1 | 10/2005 | Lys |
| 2005/0230600 | A1 | 10/2005 | Olson et al. |
| 2006/0038542 | A1 | 2/2006 | Park et al. |
| 2006/0087843 | A1 | 4/2006 | Setomoto et al. |
| 2006/0103913 | A1 | 5/2006 | Handschy et al. |
| 2006/0138971 | A1 | 6/2006 | Uang et al. |
| 2006/0158130 | A1 | 7/2006 | Furukawa |
| 2006/0176692 | A1 | 8/2006 | Lee et al. |
| 2006/0238136 | A1 | 10/2006 | Johnson, III et al. |
| 2007/0069663 | A1 | 3/2007 | Burdalski et al. |
| 2007/0228999 | A1 | 10/2007 | Kit |
| 2007/0258231 | A1 | 11/2007 | Koemer et al. |
| 2007/0273299 | A1 | 11/2007 | Miskin et al. |
| 2008/0094005 | A1 | 4/2008 | Rabiner et al. |
| 2008/0094837 | A1 | 4/2008 | Dobbins et al. |
| 2008/0116816 | A1 | 5/2008 | Neuman et al. |
| 2008/0116818 | A1 | 5/2008 | Shteynberg et al. |
| 2008/0136347 | A1 | 6/2008 | Lin et al. |
| 2008/0158915 | A1 | 7/2008 | Williams |
| 2008/0198613 | A1 | 8/2008 | Cruickshank |
| 2008/0203405 | A1 | 8/2008 | Rooymans |
| 2008/0203936 | A1 | 8/2008 | Mariyama et al. |
| 2008/0211421 | A1 | 9/2008 | Lee et al. |
| 2008/0218098 | A1 | 9/2008 | Lee et al. |
| 2008/0252197 | A1 | 10/2008 | Li et al. |
| 2009/0021185 | A1 | 1/2009 | Ng |
| 2009/0079362 | A1 | 3/2009 | Shteynberg et al. |

| 2009/0295300 | A1 | 12/2009 | King |
| 2010/0039794 | A1 | 2/2010 | Ghanem et al. |
| 2010/0109564 | A1 | 5/2010 | Shin et al. |
| 2010/0163890 | A1 | 7/2010 | Miskin |
| 2010/0207536 | A1 | 8/2010 | Burdalski et al. |
| 2010/0259183 | A1 | 10/2010 | Leshniak |
| 2010/0308738 | A1 | 12/2010 | Shteynberg et al. |
| 2011/0115407 | A1 | 5/2011 | Wibben et al. |
| 2011/0148327 | A1 | 6/2011 | Van de Ven et al. |
| 2011/0210670 | A1 | 9/2011 | Sauerlander et al. |
| 2011/0234114 | A1 | 9/2011 | Miskin et al. |
| 2012/0043897 | A1 | 2/2012 | Miskin et al. |
| 2012/0206050 | A1 | 8/2012 | Spero |
| 2012/0268008 | A1 | 10/2012 | Miskin et al. |
| 2012/0293083 | A1 | 11/2012 | Miskin et al. |
| 2014/0239809 | A1 | 8/2014 | Miskin |
| 2014/0301073 | A1 | 10/2014 | Miskin |
| 2014/0301074 | A1 | 10/2014 | Miskin |
| 2016/0095180 | A1 | 3/2016 | Miskin |
| 2017/0105256 | A1 | 4/2017 | Miskin |
| 2017/0188426 | A1 | 6/2017 | Miskin et al. |
| 2017/0208656 | A1 | 7/2017 | Miskin et al. |
| 2017/0273154 | A1 | 9/2017 | Miskin |
| 2017/0295616 | A1 | 10/2017 | Miskin |
| 2017/0354005 | A1 | 12/2017 | Miskin et al. |

FOREIGN PATENT DOCUMENTS

| DE | 100 32 864 | 1/2002 |
| EP | 0 243 411 | 6/1992 |
| EP | 0 770 896 | 5/1997 |
| EP | 0 798 650 | 10/1997 |
| EP | 0 837 406 | 4/1998 |
| EP | 0 940 903 | 9/1999 |
| EP | 1 050 793 | 11/2000 |
| EP | 1 191 608 | 3/2002 |
| EP | 1 215 944 | 6/2002 |
| EP | 1 331 666 | 7/2003 |
| JP | S6230386 | 2/1987 |
| JP | 07283848 | 10/1995 |
| JP | 08-137429 | 5/1996 |
| JP | 10111333 | 4/1998 |
| JP | 3049746 | 6/1998 |
| JP | 3057488 | 8/1998 |
| JP | 3053498 | 10/1998 |
| JP | 11-016683 | 1/1999 |
| JP | 10164659 | 3/1999 |
| JP | 3067620 | 9/1999 |
| JP | 11-330561 | 11/1999 |
| JP | 3064160 | 12/1999 |
| JP | 3068444 | 5/2000 |
| JP | 2000156526 | 6/2000 |
| JP | 2000174857 | 6/2000 |
| JP | 2000260212 | 9/2000 |
| JP | 2001-297622 | 10/2001 |
| JP | 2001-351789 | 12/2001 |
| JP | 2002008409 | 1/2002 |
| JP | 2002057376 | 2/2002 |
| JP | 2003-086384 | 3/2003 |
| JP | 2001291406 | 4/2003 |
| JP | 2003-150074 | 5/2003 |
| JP | 2003132708 | 5/2003 |
| JP | 2003-223994 | 8/2003 |
| JP | 2003264090 | 9/2003 |
| JP | 2003-282283 | 10/2003 |
| JP | 2003298118 | 10/2003 |
| JP | 2004039415 | 2/2004 |
| JP | 2004111104 | 4/2004 |
| JP | 2005222750 | 8/2005 |
| JP | 2007059260 | 3/2007 |
| JP | 3162876 | 9/2018 |
| WO | WO 88/05213 | 7/1988 |
| WO | WO 96/02970 | 2/1996 |
| WO | WO 99/14705 | 3/1999 |
| WO | WO 99/20085 | 4/1999 |
| WO | 9922338 | 5/1999 |
| WO | 0215320 | 2/2002 |
| WO | WO 02/31406 | 4/2002 |
| WO | WO 02/093542 | 11/2002 |

**US 11,019,697 B2**

Page 4

(56)    **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | 2003019072 | 3/2003 |
| WO | WO 03/027970 | 4/2003 |
| WO | 0245467 | 7/2003 |
| WO | 03055273 | 7/2003 |
| WO | WO 03/103157 | 12/2003 |
| WO | 2004094896 | 11/2004 |
| WO | WO 2005048658 | 5/2005 |
| WO | WO 2008124701 | 10/2008 |
| WO | WO 2010/106375 | 9/2010 |
| WO | WO 2016164928 | 10/2016 |

OTHER PUBLICATIONS

Master Thesis of Srinivasa M. Baddela titled "High Frequency AC Operation of LEDs to Resolve the Current Sharing Problem When Connected in Parallel".
Srinivasa M. Baddela and Donald S. Zinger, "Parallel Connected LEDs Operated at High Frequency to Improve Current Sharing," IAS 2004, pp. 1677-1681.

M. Rico-Secades, et al., "Driver for high efficiency LED based on flyback stage with current mode control for emergency lighting system," Industry Applications Conference, Oct. 2004, pp. 1655-1659.
Patent Owners Preliminary Response under 37 CFR 42.107 for Case IPR2016-01116 for Inter Partes Review of U.S. Pat. No. 8,531,118, 66 pages.
Lynk Labs, Inc.'s Initial Response to Invalidity Contentions, Northern District of Illinois Civil Action No. 15-cv-04833, 88 pages.
Decision on Institution of Inter Partes Review under 37 CFR 42.108 for U.S. Pat. No. 8,531,118, 47 pages.
Written Opinion and International Search Report for International App. No. PCT/US2005/006146, 12 pages.
Robert W. Erickson & Dragen Maksimovic, "Fundamentals of Power Electronics" (Kluwer Academic Publishers, 2nd ed.), p. 576.
Office Action, U.S. Appl. No. 16/460,790, dated Sep. 26, 2019, 22 pages.
Office Action, U.S. Appl. No. 16/460,790, dated Aug. 5, 2019, 17 pages.

* cited by examiner

Appx58



*FIG. 1*



*FIG. 2*



*FIG. 3*

Appx59



FIG. 4



FIG. 5

PACKAGED AC LED



FIG. 6

PACKAGED AC LED



FIG. 7

PACKAGED AC LED

Appx60

*FIG. 8*



*FIG. 9*



*FIG. 10*

Appx61

*FIG. 11*



*FIG. 12*



*FIG. 13*



Appx62

*FIG. 14*



*FIG. 15*

*FIG. 16*



*FIG. 17*



Appx63





FIG. 21

*FIG. 22*





*FIG. 23*

Appx67





FIG. 26



*FIG. 27*

Appx70

FIG. 28

FIG. 29

Appx71



*FIG. 30A*

Appx72



*FIG. 30B*



216
214
VOLTAGE SOURCE
LM317/TO220
VIN VOUT
ADJ
U3
LM337/TO220
U7
LM7805/TO220
GND
U8
D5 1N4007
D6 1N4007
D10 1N4007
D11 1N4007
D13 1N4007
D14 1N4007
D7 1N4007
D12 1N4007
C8 1000uF/ 250V
C9 1000uF/ 250V
R16 240
R17 240
R18 2.2k
R19 2.2k
1 POT4 3 1K 2
1 POT5 3 1K 2
C10 10 uF/ 50V
C11 10 uF/ 50V
C12 1.0 uF/ 50V
C13 1.0 uF/ 50V
C14 1.0 uF/ 50V
C15 1.0 uF/ 50V
C3 47uF/ 250V
C4 47uF/ 250V
D1C
D2 1N4007
D1 1N4007
D3C
D3 1N4007
D4 1N4007
LF3
LF1 E20
CLF1 0.1 uF/ 275V X2
20V 200mA AC ADAPTER
120VAC AC1 TO AC4
240VAC AC1 TO AC3
AC1 LINE1
AC2 EARTH GND
AC3 LINE 2
AC4 NEUTRAL
AC1 1 L1
AC2 1 EARTH GND
AC3 1 L1
AC4 1 L1

FIG. 30C



*FIG. 30D*

AC VOLTAGE REGULATOR WITH AC VOLTAGE MEASUREMENT



*FIG. 30E*

Appx76



*FIG. 31*

VOLTAGE SOURCE



*FIG. 32*



*FIG. 33*

AC VOLTAGE REGULATOR WITH VOLTAGE MEASUREMENT



*FIG. 34*

*FIG. 36*

Appx80



*FIG. 35*

Appx81



FIG. 37

Appx82



FIG. 38



**FIG. 39**



**FIG. 40**



**FIG. 41**

Appx85

1226



FIG. 42



FIG. 43

Appx87



**FIG. 44**



**FIG. 45**



**FIG. 46**



**FIG. 47**

Appx89



**FIG. 48**



**FIG. 49**

Appx90



**FIG. 50**



**FIG. 51**

Appx91



**FIG. 52**



**FIG. 53**

Appx92



**FIG. 54**



**FIG. 55**



**FIG. 56**



2118

**FIG. 57**



**FIG. 58**



FIG. 59



**FIG. 60**

Appx98

SINGLE WIRE OLED



**FIG. 61**



**FIG. 62**

2186

ORGANIC LIGHT EMITTING DIODE MATRIX



FIG. 63

Appx101



FIG. 64



**FIG. 65**



**FIG. 66**

Single Wire LED



**FIG. 67**

Single Wire LED

**FIG. 68**

Appx105

FIG. 70



FIG. 69



**FIG. 71**



**FIG. 72**



**FIG. 73**



**FIG. 74**

Appx110

US 11,019,697 B2

1

# AC LIGHT EMITTING DIODE AND AC LED DRIVE METHODS AND APPARATUS

## RELATED APPLICATIONS

The present application is a continuation of U.S. patent Ser. No. 16/443,759 filed Jun. 17, 2019, which is continuation of U.S. patent application Ser. No. 16/407,076 filed May 8, 2019, which is a continuation of U.S. patent application Ser. No. 16/148,945 filed Oct. 1, 2018, which is a continuation of U.S. patent application Ser. No. 15/334,029 filed Oct. 25, 2016, which is continuation-in-part of U.S. patent application Ser. No. 14/948,635 filed Nov. 23, 2015, which is a divisional application of U.S. patent application Ser. No. 13/697,646 filed Nov. 13, 2012 which is a 371 National Phase Application of International Application No. PCT/US2011/0363359 filed May 12, 2011 which claims priority to U.S. Provisional Application 61/333,963 filed May 12, 2010 and is a continuation-in-part of International Application No. PCT/US2010/062235 filed Dec. 28, 2010 which claims priority to U.S. Provisional Application No. 61/284,927 filed Dec. 28, 2009 and U.S. Provisional Application No. 61/335,069 filed Dec. 31, 2009 and is a continuation-in-part of U.S. patent application Ser. No. 12/287,267, filed Oct. 6, 2008, which claims priority to U.S. Provisional Application No. 60/997,771, filed Oct. 6, 2007; U.S. patent application Ser. No. 12/364,890 filed Feb. 3, 2009 which is a continuation of U.S. application Ser. No. 11/066,414 (now U.S. Pat. No. 7,489,086) filed Feb. 25, 2005 which claims priority to U.S. Provisional Application No. 60/547,653 filed Feb. 25, 2004 and U.S. Provisional Application No. 60/559,867 filed Apr. 6, 2004; International Application No. PCT/US2010/001597 filed May 28, 2010 which is a continuation-in-part of U.S. Application Ser. No. 12/287,267, and claims priority to U.S. Provisional Application No. 61/217,215, filed May 28, 2009; International Application No. PCT/US2010/001269 filed Apr. 30, 2010 which is a continuation-in-part of U.S. application Ser. No. 12/287,267, and claims priority to U.S. Provisional Application No. 61/215,144, filed May 1, 2009; the contents of each of these applications are expressly incorporated herein by reference.

## TECHNICAL FIELD

The present invention generally relates to light emitting diodes ("LEDs") and LED drivers. The present invention specifically relates to alternating current ("AC") driven LEDs, LED circuits and AC drive circuits and methods.

## FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

None.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention generally relates to light emitting diodes ("LEDs") and LED drivers. The present invention specifically relates to alternating current ("AC") driven LEDs, LED circuits and AC drive circuits and methods.

### 2. Description of the Related Art

LEDs are semiconductor devices that produce light when a current is supplied to them. LEDs are intrinsically DC

2

devices that only pass current in one polarity and historically have been driven by DC voltage sources using resistors, current regulators and voltage regulators to limit the voltage and current delivered to the LED. Some LEDs have resistors built into the LED package providing a higher voltage LED typically driven with 5V DC or 12V DC.

With proper design considerations LEDs may be driven more efficiently with AC than with DC drive schemes. LED based lighting may be used for general lighting, specialty lighting, signs and decoration such as for Christmas tree lighting. For example, U.S. Pat. No. 5,495,147 entitled LED LIGHT STRING SYSTEM to Lanzisera (hereinafter "Lanzisera") and U.S. Pat. No. 4,984,999 entitled STRING OF LIGHTS SPECIFICATION to Leake (hereinafter "Leake") describes different forms of LED based light strings. In both Lanzisera and Leake, exemplary light strings are described employing purely parallel wiring of discrete LED lamps using a step-down transformer and rectifier power conversion scheme. This type of LED light string converts input electrical power, usually assumed to be the common U.S. household power of 110 VAC, to a low voltage, rectified to nearly DC input.

Pat. Pending Application No. 0015968A1 entitled PREFERRED EMBODIMENT TO LED LIGHT STRING to Allen (hereinafter "Allen") discloses AC powered LED-based light strings. Allen describes LED light strings employing series parallel blocks with a voltage matching requirement for direct AC drive placing fundamental restrictions on the number of diodes (LEDs) on each diode series block, depending on the types of diodes used. Allen discloses that for the forward voltage to be "matched," in each series block, the peak input voltage must be less than or equal to the sum of the maximum forward voltages for each series block in order to prevent over-driving.

LEDs can be operated from an AC source more efficiently if they are connected in an "opposing parallel" configuration as shown by WO98/02020 and JP11/330561. More efficient LED lighting systems can be designed using high frequency AC drivers as shown by Patent Publication Number 20030122502 entitled Light Emitting Diode Driver ("Clauberg et. al.") Clauberg et. al. discloses that higher frequency inverters may be used to drive an opposing parallel LED pair, an opposing parallel LED string and/or an opposing parallel LED matrix by coupling the LEDs to a high frequency inverter through a resonant impedance circuit that includes a first capacitor coupled in series to one or more inductors with the impedance circuit coupled in series to opposing parallel LEDs with each set of LEDs having a second series capacitor in series to the impedance circuit. In this system additional opposing parallel configurations of LEDs with capacitors may not be added to or removed from the output of the driver without effecting the lumens output of the previously connected LED circuits unless the driver or components at the driver and/or the opposing parallel LED capacitors were replaced with proper values. By adding or removing the opposing parallel LED circuits the voltage would increase or drop at the inductor and the current would increase or drop through the first series capacitor as the load changed therefore the inductor and all capacitors or entire driver would need to be replaced or adjusted each time additional LEDs were added to or removed from the system.

High frequency AC voltage power supplies and/or transformers can be used to drive LEDs by interfacing a bridge between the power supply and a DC driven LED circuit(s) or having no bridge between the high frequency transformer and an AC driven LED circuit(s).

US 11,019,697 B2

3

High frequency AC transformers can be made smaller and more cost effectively than constant current or constant voltage DC drivers or power supplies currently being used to power LEDs.

The higher the frequency, the smaller the transformer can be made. With proper design consideration and based on the wattage and the frequency of the AC voltage output, a high frequency AC voltage transformer can be made small enough to be mounted directly onto a LED lighting PCB assembly.

Patent application number US2004/0080941 entitled Light Emitting Diodes For High AC Voltage Operation And General Lighting discloses that a plurality of opposing parallel series strings of LEDs can be integrated into a single chip and driven with high voltage low frequency mains AC power sources as long as there are enough LEDs in each opposing parallel series string of LEDs to drop the total source voltage across the series LEDs within the chip. Patent numbers WO2004023568 and JP2004006582 disclose that a plurality of opposing parallel series strings or opposing parallel series matrix of LEDs can be integrated into a single chip and mounted on an insulating substrate and driven with a high drive voltage and low drive current as long as there are enough LEDs in each opposing parallel series string of LEDs to drop the total source voltage across the series LEDs within the chip. These patents and application disclose that for single chip or packaged LED circuits a plurality of opposing parallel series strings are required with the total number of LEDs in each series string needing to be equal to or greater than the AC voltage source in order to drop the total forward voltage and provide the required drive current when driven direct with low frequency AC mains power sources.

The present invention addresses the above-noted shortcomings of the prior art while providing additional benefits and advantages

This invention continues the line of inventions of Nikola Tesla, and Stanislav and Konstantin Avramenko. It is possible to transfer power through one wire, even to operate an electric motor. It is also possible to transfer power without any wires.

The self reference method and device goes one step ahead. For power and signal applications there are benefits in using self referencing circuits and devices without the need to bring extra objects to dissipate the energy already in place or provide a DC return path to ground or an AC power source. With precautions to protect integrated circuits and low power electronic devices, it is possible to design efficient systems when the heat, energy and the error budgets are important. It is also possible to design solid state electric power transformers that can be used in place of magnetic transformers. By reducing the number of connections inside these systems, more efficient designs are possible. It is even conceivable to design portable systems without batteries. DC powered electronic devices require a magnetic transformer and rectification when powered with 120 volt or 240 volt AC power. Additionally, they typically require a drop in supply voltage. A transformer typically reduces the high voltage and rectifies it to DC current. Solid state LED lighting can be powered with AC or DC depending on the design on the device. If rectification is not required, resistors can be used in place of a transformer to drop higher voltages. The resistors generate heat and transformers can be cumbersome as well as generate heat.

One wire electric transmission is due to displacement currents. The dipoles in matter and in the electromagnetic vacuum can move back and forth in the presence of a

4

longitudinal alternating electric field. A positive charge moving in the direction of the electric field contributes equally to the current as a negative charge moving in the opposite direction. There does not have to be a net displacement of charge, from left to right say, to have an electric current. There is no need for a return path.

There is no fundamental need to return all charges to a common dump either. One has to be careful not to produce intense electric fields that break the stability of the material circuits, but beyond that, there is no need to return all charges to a big reservoir like the earth. For portable devices this is a good thing, otherwise they would be impossible to construct. To perform all the tasks required, it is enough to have either real dipoles in material substances, or virtual dipoles in the electromagnetic vacuum. Once the function has been satisfied, the device goes back to the state it had when the process started. Circuits according to the invention have one or more of the following attributes: circulation/symmetry breaking/dipoles; difference of time constant between charge and discharge; AC to DC rectification; tunable load to resonant frequency; frequency/voltage dependence; series inductance; series capacitance; and, an open system harnessing electromagnetic field energy.

SUMMARY OF THE INVENTION

According to one broad aspect of the invention a lighting system is provided having one or more LED circuits. Each LED circuit has at least two diodes connected to each other in opposing parallel relation, wherein at least one of which such diodes is an LED. As used throughout the application, the term diode may mean any type of diode capable of allowing current to pass in a single direction, including but not limited to, a standard diode, a schottky diode, a zener diode, and a current limiting diode. The circuits disclosed herein may include a laser diode. A driver is connected to the one or more LED circuits, the driver providing an AC voltage and current to the one or more LED circuits. The driver and the LED circuits form a driven circuit. The driver and the LED circuits are also configured such that LED circuits may be added to or subtracted (intentionally or by component failure) from the driven circuit:

(a) without significantly affecting the pre-determined desired output range of light from any individual LED; and,

(b) without the need to: (i) change the value of any discrete component; or, (ii) to add or subtract any discrete components, of any of the pre-existing driven circuit components which remain after the change.

In another embodiment of the invention at least one capacitor is connected to and part of each LED circuit. In yet another embodiment, at least one resistor is connected to and is part of each opposing parallel LED circuit noted above. The resistor is connected in series with the at least one capacitor.

According to another aspect of the invention an LED circuit (sometimes referred to as an "AC LED") can comprise two opposing parallel LEDs, an opposing parallel LED string or an opposing parallel LED matrix. These opposing parallel LEDs may have a capacitor in series connected to at least one junction of the connected opposing parallel configurations within a single chip, a single package, an assembly or a module.

When a real capacitor is connected in series in one or more lines between an LED and an AC power source, there is a displacement current through that capacity of magnitude: $I=2\Pi fcV$. The capacitor in the LED circuits of the invention regulates the amount of current and forward

US 11,019,697 B2

5       6

voltage delivered to the one or more opposing parallel LEDs based on the voltage and frequency provided by the AC driver. Based on the number of LEDs in the LED circuit the opposing parallel connections provide two or more junctions to which at least one series capacitor may be connected in series of at least one power connection lead. In some embodiments, LED circuits may also use a series resistor in addition to the capacitor providing an "RC" resistor capacitor network for certain LED circuit driver coupling that does not provide protection against surge currents to the LED circuits.

According to another aspect of the invention an LED circuit may comprise a single LED or a series string of diodes and/or LEDs connected to a full bridge rectifier capable of rectifying a provided AC voltage and current for use by the series string of diodes and/or LEDs. The rectifier may be formed as part of the LED circuit, or may be formed separately, having leads provided on both the output of the driver and the input of the LED circuit to allow the LED circuit to connect directly to the driver. In order to protect the LED circuit from voltage spikes a capacitor may be connected across the inputs of the bridge rectifier. The capacitor may also be used for smoothing the AC waveform to reduce ripple. A capacitor may likewise be connected between one rectifier input and the AC voltage and current source in order to limit the DC current flow to protect the LEDs. The bridge diode and LED circuit may be packaged separate or together, and may be configured within a single chip or two chips, a single package or two packages, an assembly, or a module.

According to another aspect of the invention, a single bridge rectifier may be used to drive parallel LEDs or series strings of diodes and/or LEDs. Alternatively, it is contemplated by the invention that each LED circuit requiring a bridge rectifier to utilize both the high and low phases of an AC power wave may include its own full bridge rectifier integrated or otherwise connected thereto. In embodiments where each LED circuit includes its own rectifier, additional LED circuits may be added in parallel across an AC voltage and current source to any existing LED circuits without concern of connecting to any existing bridge rectifiers or, where used, capacitors. Providing each LED circuit with its own bridge rectifier has the further advantage of scaling capacitors included in the circuit for voltage protection and/or current limiting to be matched to a particular LED or string of diodes and/or LEDs.

It should be noted that "package" or "packaged" is defined herein as an integrated unit meant to be used as a discrete component in either of the manufacture, assembly, installation, or modification of an LED lighting device or system. Such a package includes LED's of desired characteristics with capacitors and or resistors (when used) sized relative to the specifications of the chosen LED's to which they will be connected in series and with respect to a predetermined AC voltage and frequency.

Preferred embodiments of a package may include an insulating substrate whereon the LEDs, capacitors and/or resistors are formed or mounted. In such preferred embodiments of a package, the substrate will include electrodes or leads for uniform connection of the package to a device or system associated with an AC driver or power source or any individually packaged rectifiers used to rectify AC voltage and current. The electrodes, leads, and uniform connection may include any currently known means including mechanical fit, and/or soldering. The substrate may be such as sapphire, silicon carbide, galium nitride, ceramics, printed circuit board material, or other materials for hosting circuit components.

A package in certain applications may preferably also include a heat sink, a reflective material, a lens for directing light, phosphor, nano-chrystals or other light changing or enhancing substances. In sum, according to one aspect of the invention, the LED circuits and AC drivers of the present invention permit pre-packaging of the LED portion of a lighting system to be used with standardized drivers (and when necessary full wave rectifiers) of known specified voltage and frequency output. Such packages can be of varied make up and can be combined with each other to create desired systems given the scalable and compatible arrangements possible with, and resulting from, the invention.

According to one aspect of the invention, AC driven LED circuits (or "driven circuits") permit or enable lighting systems where LED circuits may be added to or subtracted (either by choice or by way of a failure of a diode) from the driven circuit without significantly affecting the pre-determined desired output range of light from any individual LED and, without the need to: (i) change the value of any discrete component; or, (ii) to add or subtract any discrete components, of any of the pre-existing driven circuit components which remain after the change. During design of a lighting system, one attribute of the LEDs chosen will be the amount of light provided during operation. In this context, it should be understood that depending on the operating parameters of the driver chosen, the stability or range of the voltage and frequency of the driver will vary from the nominal specification based upon various factors including but not limited to, the addition or subtraction of the LED circuits to which it becomes connected or disconnected. Accordingly, as sometimes referred to herein, drivers according to the invention are described as providing "relatively constant" or "fixed" voltage and frequency. The extent of this relative range may be considered in light of the acceptable range of light output desired from the resulting circuit at the before, during, or after a change has been made to the lighting system as a whole. Thus it will be expected that a pre-determined range of desired light output will be determined within which the driven LED circuits of the invention will perform whether or not additional or different LED circuits have been added or taken out of the driven circuit as a whole or whether additional or different LED circuits have been added proximate any existing LED circuits or positioned remotely.

According to another aspect of the invention an LED circuit may be at least one pre-packaged LED and one pre-packaged diode connected together opposing parallel of each other, two opposing parallel pre-packaged LEDs, an opposing parallel LED string of pre-packaged LEDs, an opposing parallel LED matrix of pre-packaged LEDs optionally having a capacitor in series of at least one junction of the connected LED circuits. It is contemplated that the LED circuit may also be at least one of a single LED or series string of diodes and/or LEDs having a bridge rectifier connected across the the single LED or string of diodes. In embodiments where a series string of diodes and/or LEDs and a rectifier is utilized, each LED may likewise be pre-packaged. The rectifier may optionally having a capacitor connected across the rectifier inputs and/or a capacitor connected between to an input of the rectifier for connection between the rectifier and a AC voltage and current source. In either embodiment, utilizing an LED circuit capacitor may allow for direct coupling of at least one LED circuit to the LED driver without additional series components such as capacitors and/or inductors between the LED circuit driver and the LED circuits. The LED circuit

US 11,019,697 B2

7

driver provides a relatively fixed voltage and relatively fixed frequency AC output even with changes to the load using feedback AC voltage regulator circuitry. The LED circuit's may be directly coupled and scaled in quantity to the LED circuit driver without affecting the other LED circuit's lumen output as long as the LED circuit driver maintains a relatively fixed voltage and relatively fixed frequency AC output.

According to an aspect of the invention, an LED circuit driver provides a relatively fixed voltage and relatively fixed frequency AC output such as mains power sources. The LED circuit driver output voltage and frequency delivered to the LED circuit may be higher than, lower than, or equal to mains power voltage and frequencies by using an LED circuit inverter driver. The LED circuit inverter driver providing higher frequencies is preferable for LED circuits that are integrated into small form LED packages that include integrated capacitors or resistor capacitor "RC" networks. The LED circuit inverter driver has feedback circuitry such as a resistor divider network or other means allowing it to sense changes to the load and re-adjust the frequency and/or voltage output of the LED circuit driver to a desired relatively fixed value. The LED circuit driver may also provide a soft-start feature that reduces or eliminates any surge current from being delivered to the LED circuit when the LED circuit driver is turned on. Higher frequency and lower voltage LED circuit inverter drivers are preferred enabling smaller package designs of LED circuits as the capacitor at higher frequencies would be reduced in size making it easier to integrate into a single LED circuit chip, package, assembly or module.

According to the invention LED circuits may have a resistor capacitor ("RC") network connected together in series or separate from the the LED circuits. The maximum resistor value needed is only that value of resistance needed to protect the one or more LEDs within the LED circuit from surge currents that may be delivered by LED circuit drivers that do not provide soft start or other anti surge current features. Direct mains power coupling would require RC network type LED circuits as the mains power source delivers surge currents when directly coupled to an LED circuit.

The higher frequency LED circuit inverter driver may be a halogen or high intensity discharge (HID) lamp type driver with design modifications for providing a relatively fixed voltage and relatively fixed frequency output as the LED circuit load changes. Meaning if the LED circuit inverter driver is designed to have an output voltage of 12V at a frequency of 50 Khz the LED circuit driver would provide this output as a relatively constant output to a load having one or more than one LED circuits up to the wattage limit of the LED circuit driver even if LED circuits were added to or removed from the output of the LED circuit driver.

The higher frequency inverter having a relatively fixed voltage and relatively fixed frequency output allows for smaller components to be used and provides a known output providing a standard reference High Frequency LED circuit driver enabling LED circuits to be manufactured in volume in existing or reasonably similar LED package sizes with integrated capacitors or RC networks based on the number of LEDs desired in the LED circuit package.

Patent publication number 20030122502 entitled Light Emitting Diode driver (Clauberg and Erhardt) does not disclose the use of a high frequency inverter driver having a means or keeping a relatively fixed voltage and relatively fixed frequency in response to changes in the load. According to the present invention described herein, by not having addi-

8

tional components such as an inductor or capacitor in series between the LED circuit and the LED circuit driver one LED circuit at a time may be added to or removed from the LED circuit driver output without having to change any components, the LED circuit driver or make adjustments to the LED circuit driver. Additionally, according to this invention the lumen output of the existing LED circuits stays relatively constant due to the self-regulating nature of each individual LED circuit when driven with the relatively fixed frequency and voltage of the LED circuit driver. This level of scalability, single chip LED circuit packaging and standardization is not possible with the prior art using an inductor or capacitor in series between the LEDs or other components due to the voltage or current increase or drop across the inductors and capacitors in response to changes in the load.

Prior art for single chip LED circuits, for example those disclosed in WO2004023568 and JP2004006582 do not provide a way to reduce the number of LEDs within the chip below the total forward voltage drop requirements of the source. The present invention however, enables an LED circuit to be made with any number of LEDs within a single chip, package or module by using, where desired, transformers, capacitors, or RC networks to reduce the number of LEDs needed to as few as one single LED. Improved reliability, integration, product and system scalability and solid state lighting design simplicity may be realized with LED circuits and the LED circuit drivers. Individual LED circuits being the same or different colors, each requiring different forward voltages and currents may be driven from a single source LED circuit driver. Each individual LED circuit can self-regulate current by matching the capacitor or RC network value of the LED circuit to the known relatively fixed voltage and frequency of the LED circuit driver whether the LED circuit driver is a mains power source, a high frequency LED circuit driver or other LED circuit driver capable of providing a relatively fixed voltage and relatively fixed frequency output.

When a real capacitor is connected in series in one or more lines between an LED and an AC power source, there is a displacement current through that capacity of magnitude: I=2fCV. This means that one can predetermine the amount of current to be delivered through a capacitance based upon a known voltage and frequency of an AC source, allowing for each LED circuit containing a series capacitor to have the specific or ideal current required to provide the desired amount of light from the LED circuit.

According to other aspects of the invention, the LED circuit driver may be coupled to a dimmer switch that regulates voltage or frequency or may have integrated circuitry that allows for adjustability of the otherwise relatively fixed voltage and/or relatively fixed frequency output of the LED circuit driver. The LED circuits get brighter as the voltage and/or frequency of the LED circuit driver output is increased to the LED circuits.

One form of the invention is at least one LED and one diode connected together opposing parallel of each other, two opposing parallel LEDs, an opposing parallel LED string and/or opposing parallel LED matrix having a capacitor in series of at least one connected junction of the connected opposing parallel LED configurations within a single chip, a single package, an assembly or a module. When desired, the LED circuit with capacitor may be placed on an insulating substrates such as but not necessarily ceramic or sapphire and/or within various LED package sizes; materials and designs based of product specifications or assembled on printed circuit board material. Any integrated LED circuit capacitors should be scaled to a prede-

Appx114

US 11,019,697 B2

9 10

termined value enabling the LED circuit to self-regulate a reasonably constant and specific current when coupled to an LED circuit driver that provides a relatively fixed voltage and frequency output. Utilized LED circuit capacitors may be of a value needed to provide the typical operating voltage and current of the LED circuit when designed for coupling to a specific LED circuit driver.

Another form of the invention is an LED circuit comprising at least one LED and one diode connected together opposing parallel of each other, two opposing parallel LEDs, an opposing parallel LED string and/or opposing parallel LED matrix having a series resistor capacitor ("RC") network connected together in series or independently in series between at least one connected junction of the opposing parallel LEDs and the respective power connection of the LED circuit. When desired, the opposing parallel LEDs and RC network may be placed on an insulating substrate such as but not necessarily ceramic or sapphire and/or within various LED package sizes; materials and designs based of product specifications or assembled on printed circuit board material. The LED circuit RC network may be of a value needed to provide the typical operating voltage and current of the LED circuit when designed for coupling to a specific LED circuit driver.

Another form of the invention is an LED circuit comprising a matrix of two opposing parallel LEDs connected together in parallel with every two opposing parallel LEDs having an individual capacitor in series to the power source connection if desired. The entire parallel array of opposing parallel LED circuits, including capacitors when used, may be may be placed on an insulating substrate such as but not necessarily ceramic or sapphire and/or within various LED package sizes; materials and designs based of product specifications or assembled on printed circuit board material. The opposing parallel matrix of LED circuits integrated in the LED circuit package may be RC network type LED circuits.

Another form of the invention is an LED circuit comprising a matrix of opposing parallel LEDs connected together in parallel with every set of opposing parallel LEDs having an individual RC network in series to the power connection lead if desired.

Another form of the invention is an LED circuit comprising a matrix of opposing parallel LEDs connected together in parallel, a capacitor connected in series to at least one side of the line going to the matrix of opposing parallel LEDs with every set of opposing parallel LEDs having an individual resistor in series to the power connection if desired.

Yet another form of the invention is an LED circuit comprising opposing parallel series strings of LEDs connected together and driven direct with a high frequency AC voltage equal to or less than to total series voltage drop of the opposing parallel series strings of LEDs within the LED circuit.

Yet another form of the invention is a LED circuit comprising a single LED or a series string of diodes and/or LEDs and a bridge rectifier connected across the LED or string of diodes and/or LEDs. The rectifier may optionally include a capacitor connected across the inputs of the rectifier. The rectifier may additionally, or alternatively, optionally include a capacitor connected in series with one input, the capacitor being capable of connecting the rectifier input to an AC voltage and current source.

Yet another form of the invention is an LED circuit comprising a single LEDs or a series strings of diodes and/or LEDs connected in parallel across the output of a bridge rectifier. The rectifier may optionally include a capacitor connected across the inputs of the rectifier. The rectifier may

additionally, or alternatively, optionally include a capacitor connected in series with one input, the capacitor being capable of connecting the rectifier input to an AC voltage and current source.

Another form of the invention comprises a method of driving LED circuits direct from an AC power source ("LED circuit driver") having a relatively fixed voltage and relatively fixed frequency. The LED circuit driver may be a mains power source, the output of a transformer, a generator or an inverter driver that provides a relatively fixed voltage and relatively fixed frequency as the load changes and may be a higher or lower frequency than the frequencies of mains power sources. The LED circuit driver provides a relatively fixed voltage and relatively fixed frequency output even when one or more LED circuits are added to or removed from the output of the LED circuit driver. Higher frequency inverters with lower output voltages are used as one LED circuit driver in order to reduce component size and simplify manufacturing and standardization of LED circuits through the availability of higher frequency LED circuit drivers. The LED circuit driver may also include circuitry that reduces or eliminates surge current offering a soft-start feature by using MOSFET transistors, IGBT transistors or other electronic means. The LED circuit driver may also be pulsed outputs at a higher or lower frequency than the primary frequency.

Another form of the invention is an LED lighting system comprising an LED circuit array having a plurality of different LED circuits each drawing the same or different currents, each having the same or different forward operating voltages, and each delivering the same or different lumen outputs that may be the same or different colors and an LED circuit driver coupled to the LED circuit array. The LED circuit driver delivering a relatively fixed t frequency and voltage output allows for mixing and matching of LED circuits requiring different forward voltages and drive currents. The LED circuits may be connected to the output of an LED circuit driver in parallel one LED circuit at a time within the limit of the wattage rating of the LED circuit driver with no need to change or adjust the LED circuit driver as would typically be required with DC drivers and LEDs when increasing or reducing the load with LEDs and other components. Never having to go back to the power source allows for more efficient integration and scalability of lighting systems designed with LED circuits and allows for a single driver to independently provide power to multiple independently controlled LED circuits in the system. Introducing an inductor and/or an additional capacitor such as the impedance circuit described in prior art between the LED circuit drive source and the LED circuits would require changes to the driver or components and prohibit scalability, standardization and mass production of AC-LEDs with integrated capacitors or RC networks.

With the LED circuit driver providing a known relatively constant AC voltage and frequency, mass production of various LED circuits with specific capacitor or RC network values would deliver 20 mA, 150 mA or 350 mA or any other desired current to the LED circuit based on the output of the specified LED circuit driver. The relatively fixed voltage and frequency allows for standardization of LED circuits through the standardization of LED circuit drivers.

In another aspect, a transistor is coupled to at least one power connection of the LED circuit or built into the LED circuit package in series between the power connection lead and the LED circuit with the transistor being operable to control (e.g., varying or diverting) the flow of the alternating current through the LED circuit through a capacitance within the transistor.

US 11,019,697 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

The foregoing forms as well as other forms, features and advantages of the present invention will become further apparent from the following detailed description of the presently preferred embodiments, read in conjunction with the accompanying drawings. The detailed description and drawings are merely illustrative of the present invention rather than limiting, the scope of the present invention being defined by the appended claims and equivalents thereof.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a schematic view of a preferred embodiment of the invention.

FIG. **2** shows a schematic view of a preferred embodiment of the invention.

FIG. **3** shows a schematic view of a preferred embodiment of the invention.

FIG. **4** shows a schematic view of a preferred embodiment of the invention.

FIG. **5** shows a schematic view of a preferred embodiment of the invention.

FIG. **6** shows a schematic view of a preferred embodiment of the invention.

FIG. **7** shows a schematic view of a preferred embodiment of the invention.

FIG. **8** shows a schematic view of a preferred embodiment of the invention.

FIG. **9** shows a schematic view of a preferred embodiment of the invention.

FIG. **10** shows a schematic view of a preferred embodiment of the invention.

FIG. **11** shows a schematic view of a preferred embodiment of the invention.

FIG. **12** shows a schematic view of a preferred embodiment of the invention.

FIG. **13** shows a schematic view of a preferred embodiment of the invention.

FIG. **14** shows a schematic view of a preferred embodiment of the invention.

FIG. **15** shows a schematic view of a preferred embodiment of the present invention.

FIG. **16** shows a schematic view of a preferred embodiment of the present invention.

FIG. **17** shows a schematic view of a preferred embodiment of the present invention.

FIG. **18** shows a schematic view of a preferred embodiment of the present invention.

FIG. **19** shows a schematic view of a preferred embodiment of the invention.

FIG. **20** shows a schematic view of a preferred embodiment of the invention.

FIG. **21** shows a schematic view of a preferred embodiment of the invention.

FIG. **22** shows a schematic view of a preferred embodiment of the invention.

FIG. **23** shows a schematic view of a preferred embodiment of the present invention.

FIG. **24** shows a schematic view of a preferred embodiment of the present invention.

FIG. **25** shows a schematic view of a preferred embodiment of the present invention.

FIG. **26** shows a schematic view of a preferred embodiment of the present invention.

FIG. **27** shows a schematic view of a preferred embodiment of the present invention.

FIG. **28** shows a schematic view of a preferred embodiment of the present invention.

FIG. **29** shows a schematic view of a preferred embodiment of the invention.

FIG. **30**A shows a schematic view of a preferred embodiment of the invention.

FIG. **30**B shows a schematic view of a preferred embodiment of the invention.

FIG. **30**C shows a schematic view of a preferred embodiment of the invention.

FIG. **30**D shows a schematic view of a preferred embodiment of the invention.

FIG. **30**E shows a schematic view of a preferred embodiment of the invention.

FIG. **31** shows a schematic view of a preferred embodiment of the invention.

FIG. **32** shows a schematic view of a preferred embodiment of the invention.

FIG. **33** shows a schematic view of a preferred embodiment of the invention.

FIG. **34** shows a schematic view of a preferred embodiment of the invention.

FIG. **35** shows a schematic view of a preferred embodiment of the invention.

FIG. **36** shows a schematic view of a preferred embodiment of the invention.

FIG. **37** shows a schematic view of a preferred embodiment of the invention.

FIG. **38** shows a schematic view of a preferred embodiment of the invention.

FIG. **39** shows a schematic view of a preferred embodiment of the invention.

FIG. **40** shows a schematic view of a preferred embodiment of the invention.

FIG. **41** shows a schematic view of a preferred embodiment of the invention.

FIG. **42** shows a schematic view of a preferred embodiment of the invention.

FIG. **43** shows a schematic view of a preferred embodiment of the invention.

FIG. **44** shows a schematic view of a preferred embodiment of the invention.

FIG. **45** shows a schematic view of a preferred embodiment of the invention.

FIG. **46** shows a schematic view of a preferred embodiment of the invention.

FIG. **47** shows a schematic view of a preferred embodiment of the invention.

FIG. **48** shows a schematic view of a preferred embodiment of the invention.

FIG. **49** shows a schematic view of a preferred embodiment of the invention.

FIG. **50** shows a schematic view of a preferred embodiment of the invention.

FIG. **51** shows a schematic view of a preferred embodiment of the invention.

FIG. **52** shows a schematic view of a preferred embodiment of the invention.

FIG. **53** shows a schematic view of a preferred embodiment of the invention.

FIG. **54** shows a schematic view of a preferred embodiment of the invention.

FIG. **55** shows a schematic view of a preferred embodiment of the invention.

FIG. **56** shows a schematic view of a preferred embodiment of the invention.

FIG. **57** shows a schematic view of a preferred embodiment of the invention.

US 11,019,697 B2

13

FIG. **58** shows a schematic view of a preferred embodiment of the invention.

FIG. **59** shows a schematic view of a preferred embodiment of the invention.

FIG. **60** shows a schematic view of a preferred embodiment of the invention.

FIG. **61** shows a schematic view of a preferred embodiment of the invention.

FIG. **62** shows a schematic view of a preferred embodiment of the invention.

FIG. **63** shows a schematic view of a preferred embodiment of the invention.

FIG. **64** shows a schematic view of a preferred embodiment of the invention.

FIG. **65** shows a schematic view of a preferred embodiment of the invention.

FIG. **66** shows a schematic view of a preferred embodiment of the invention.

FIG. **67** shows a schematic view of a preferred embodiment of the invention.

FIG. **68** shows a schematic view of a preferred embodiment of the invention.

FIG. **69** shows a schematic view of a preferred embodiment of the invention.

FIG. **70** shows a schematic view of a preferred embodiment of the invention.

FIG. **71** shows a schematic view of a preferred embodiment of the invention.

FIG. **72** shows a schematic view of a preferred embodiment of the invention.

FIG. **73** shows a schematic view of a preferred embodiment of the invention.

FIG. **74** shows a schematic view of a preferred embodiment of the invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

While this invention is susceptible to embodiments in many different forms, there is described in detail herein, preferred embodiments of the invention with the understanding that the present disclosures are to be considered as exemplifications of the principles of the invention and are not intended to limit the broad aspects of the invention to the embodiments illustrated.

The present invention is directed to an LED light emitting device and LED light system capable of operating during both the positive and negative phase of an AC power supply. In order to operate during both phases provided by an AC power, as is shown herein, the circuit must allow current to flow during both the positive and negative phases and LED light emitting devices may be configured such that at least one LED is capable of emitting light during one or both of the positive or negative phases. In order to accomplish this, the LED circuit itself may be configured so as to allow current to pass during both phases, or the device may include a bridge rectifier to rectify AC power for use by single LEDs, series strings of LEDs, and parallel series strings of LEDs. Rectification may be accomplished within the light emitting device, or prior to any power being provided to the same. Once integrated into a light system, the present invention further contemplates a driver having the ability to provide a substantially constant voltage at a substantially constant frequency, and that the driver be configured in a manner which will allow LED light emitting devices to be added to or subtracted from the system, regardless of configuration, without having to add, substract, or change the values of

14

discrete circuit components and without affecting the light output of any individual LED.

FIG. **1** discloses a schematic diagram of a light emitting device **10** for an AC driver according to one embodiment of the invention. The device **10** includes a first LED **12** connected to a second LED **14** in opposing parallel configuration, a capacitor **16** connected in series between a first junction **18** of the two opposing parallel LEDs, a first power connection **20** connected to the two opposing parallel LEDs, and a second power connection **22** connected to a second junction **24** of the two opposing parallel connected LEDs. A diode may be used in place of LED **12** or LED **14**.

FIG. **2** discloses a schematic diagram of a light emitting device **26** for an LED circuit driver according to an embodiment of the invention. The device **26** includes the device **10** as disclosed in FIG. **1** mounted on an insulating substrate **28** such as, but not necessarily, ceramic or sapphire, and integrated into an LED package **30** that may be various LED package sizes; materials and designs based of product specifications or on printed circuit board material. The device **26** provides power connection leads **32** and may have a first or additional lens **34** that may be made of a plastic, polymer or other material used for light dispersion and the lens may be coated or doped with a phosphor or nano-particle that would produce a change in the color or quality of light emitted from the device **10** through the lens **34**.

FIG. **3** discloses a schematic diagram of a device **36** having a schematic diagram of the embodiment shown as light emitting device **26** driven directly by an AC driver **38** that is connected to the power connections **32** of the device **26** without any additional components in series between the AC driver **38** and the device **26** such as a capacitor, inductor or resistor. The AC driver **38** provides a relatively constant AC voltage and frequency output to the device **26** no matter what the total load of the device **26** may be, or the number of devices **26** added or subtracted as long as the load does not exceed the wattage limitation of the AC driver **38**. The AC driver **38** may be a generator, a mains power source, or an inverter capable of providing a relatively fixed voltage and relatively fixed frequency output to different size loads. The AC driver may provide a low or high voltage and a low or high frequency to the device **26** according to the invention as long as the capacitor **16** is the proper value for the desired operation of the device **26**.

FIG. **4** discloses a schematic diagram of a light emitting device **40** for coupling to an LED circuit driver according to an embodiment of the invention. The device **40** includes a first LED **42** connected to a second LED **44** in opposing parallel configuration. A capacitor **46** is connected in series between a first junction **48** of the two opposing parallel LEDs and a first power connection **50**. A resistor **52** is connected in series between a second junction **54** of the two opposing parallel LEDs and a second power connection **56**. A diode may be used in place of LED **42** or LED **44** and the resistor **52** may be put in series on either end of the capacitor **46** as an alternate location.

FIG. **5** discloses a schematic diagram of a light emitting device **58** for LED circuit drivers according to an embodiment of the invention. The device **58** includes the device **40** as disclosed in FIG. **4** integrated into a package as disclosed in the device **26** in FIG. **2**. The device **58** provides power connection leads for connecting to an AC driver **38** as disclosed in FIG. **3**.

FIG. **6** discloses a diagram of a light emitting device **64** for coupling to an LED circuit driver according to an embodiment of the invention. The device **64** includes a first series string of LEDs **66** connected to a second series string

US 11,019,697 B2

15

of LEDs **68** in opposing parallel configuration, a capacitor **70** connected in series between a first junction **72** of the opposing parallel series string of LEDs and a first power connection **74**, and a second power connection **76** connected to a second junction **78** of the opposing parallel series string of LEDs. A diode may be used in place of one or more LEDs **66** and one or more of LEDs **68** and the LEDs **66** and **68** are integrated into a package **80** as described in the package **30** disclosed in FIG. **2** along with capacitor **70**.

FIG. **7** discloses a diagram of a light emitting device **82** for AC drive according to an embodiment of the invention. The device **82** includes a first series string of LEDs **84** connected to a second series string of LEDs **86** in opposing parallel configuration, a capacitor **88** connected in series between a first junction **90** of the opposing parallel series string of LEDs and a first power connection **92**, and a resistor **94** connected in series between a second junction **96** of the opposing parallel series string of LEDs and a second power connection **98**. A diode may be used in place of one or more LEDs **84** and one or more of LEDs **86** and the LEDs **84** and **86** are integrated into a package **100** as described in the package **30** disclosed in FIG. **2** along with capacitor **88** and resistor **94**. The resistor **94** may be put in series on either end of the capacitor **88** as an alternate location.

FIG. **8** discloses a diagram of a light emitting device **102** according to an embodiment of the invention. The device **102** includes a first series string of LEDs **104** connected to a second series string of LEDs **106** in opposing parallel configuration. A first power connection **108** is connected to a first junction **110** of the opposing parallel series string of LEDs and a second power connection **112** is connected to a second junction **114** of the opposing parallel series string of LEDs. A diode may be used in place of one or more LEDs **104** and one or more of LEDs **106** and the LEDs **104** and **106** are integrated into a package **118** as described in the package **30** disclosed in FIG. **2**.

FIG. **9** discloses a circuit diagram of a light emitting device **120** according to an embodiment of the invention. The device **120** is similar to the device disclosed in FIG. **5** and includes a second series resistor **122** that can be placed in series on either side of the first capacitor **46**.

FIG. **10** discloses a diagram of a light emitting device **124** according to an embodiment of the invention. The device **124** is similar to the device disclosed in FIG. **2** and includes a second series capacitor **126** connected in series between the junction **128** of the opposing parallel LEDs and a power connection **130**.

FIG. **11** discloses a diagram of a light emitting device **130** according to an embodiment of the invention. The device **130** has a matrix of individual light emitting devices **10** as described in FIG. **1** integrated into a package **132** similar to package **30** as described in FIG. **2**.

FIG. **12** discloses a diagram of a light emitting device **134** according to an embodiment of the invention. The device **134** has a matrix of individual light emitting devices **40** as described in FIG. **4** integrated into a package **136** similar to package **30** as described in FIG. **2**.

FIG. **13** discloses a diagram of a light emitting device **138** according to an embodiment of the invention. The device **138** has a matrix of individual sets of **2** opposing parallel light emitting devices **140** with each set having an individual series resistor to connect to a first power connection **140** and a capacitor **146** connected in series between a second power connection and the matrix of devices **140**. The capacitor **146** may alternately be in series between the first power connection **144** and all resistors **142**. The matrix of devices **140**,

16

resistors **142** and capacitor **146** are integrated into a package **150** similar to package **30** as described in FIG. **2**.

FIG. **14** discloses a diagram of a light emitting device **152** according to an embodiment of the invention. The device **152** includes another version of a series opposing parallel LED matrix **154** and a capacitor **156** connected in series between a first junction **158** of the opposing parallel LED matrix **154** and a first power connection, and a second power connection **162** connected to a second junction **164** of the opposing parallel LED matrix. A first power connection **108** is connected to a first junction **110** of the opposing parallel series string of LEDs and a second power connection **112** is connected to a second junction **114** of the opposing parallel series string of LEDs. A diode may be used in place of one or more LEDs **104** and one or more of LEDs **106** and the LEDs **104** and **106** are integrated into a package **118** as described in the package **30** disclosed in FIG. **2**.

FIG. **15** discloses a schematic diagram of a light emitting device **300** according to an embodiment of the invention. Device **300** includes bridge rectifier circuit **302** having diodes **304a-304d** with at least one LED connected across the output of the rectifier circuit, shown as LED **306**. While inputs **308** and **310** of the bridge rectifier may be provided for direct connection to an AC power supply, it is contemplated by the invention that one input, shown as input **310**, may have a capacitor (shown as capacitor **312**) or a resistor (shown in FIG. **18** as resistor **313**) connected in series in order to control and limit the current passing through the at least one LED. Additionally, capacitor **314** may be connected across the rectifier inputs to protect against voltage spikes.

FIGS. **16** and **18** each disclose a schematic diagram of a light emitting device **316** and **332** for an LED circuit driver according to an embodiment of the invention. The device **316** includes the device **300** as disclosed in FIG. **15** (with additional LEDs **306** added in series) mounted on an insulating substrate **318** such as, but not necessarily, ceramic or sapphire, and forming an LED package **320** that may be various sizes; materials and designs based of product specifications or on printed circuit board material. As shown in FIG. **16**, The device **316**, **332** provides power connection leads **322** and **323** and may have a first or additional lens that may be made of a plastic, polymer or other material used for light dispersion and the lens may be coated or doped with a phosphor or nano-particle that would produce a change in the color or quality of light emitted from device **300** through the lens. LED package **320** may include rectifier **302** to drive LEDs **306**. Rectifier **306** may be mounted on insulating substrate **318** along with any LEDs. As should be appreciated by those having ordinary skill in the art, it is contemplated by the invention that any diode or LED may be swapped for the other within the package so long as the package includes at least one LED to emit light when in operation. Any capacitors **312**, **314** or resistors **313** included in the light emitting devices may like wise be mounted on substrate **318** and included in LED package **320**.

Rather than be packaged together and mounted on a single substrate, and no matter whether the LEDs and diodes are integrated into a single package or are discrete individual LEDs and/or diodes wire-bonded together, as disclosed in FIG. **17** rectifier **302** may be discretely packaged separate from any discrete LED packages **324** where discrete LED package **324** includes one LED **306** or multiple LEDs connected in series or parallel. Rectifier **302** may be packaged onto rectifier package **326** for plug and use into a light system, or alternatively may be included as part of a driver used to drive the series LEDs. When packaged separate,

Appx118

US 11,019,697 B2

17 18

package 326 may be provided with input power connections 328 and 329 which to connect the inputs of the rectifier to an AC power supply. In order to connect to one (or more) single or series LEDs and provide power thereto, package 326 may also be provided with output power connections 330 and 331 which may connect to LED package inputs 334 and 335. Any capacitors 312, 314 or resistors 313 included in the light emitting devices may like wise be mounted on substrate 316 and included in rectifier package 326.

Regardless of whether rectifier 302 and LEDs 306 are integrated or mounted in a single package or are discretely packaged and connected, in order to drop higher voltages any number of LEDs may be connected in series or parallel in a device to match a desired voltage and light output. For example, in a lighting device that is run off of a 120 V source and contains LEDs having a forward operating voltage of 3V each connected to a bridge rectifier having diodes also having a forward operating voltage of 3V each, approximately 38 LEDs may be placed in series to drop the required voltage.

FIG. 19 discloses an embodiment of an LED lighting device encapsulated in a housing. As shown in FIG. 19, LED device 336 may include a housing 338 encapsulating at least one bridge rectifier 340, at least one LED circuit 342 connected across the output of the bridge rectifier. Device 334 includes first power connection lead connected 344 to a first input of the rectifier 346 and a second power connection lead 348 connected to a second input of the rectifier 350. At least a portion of each power connection is contained within the housing while at least a portion of each power connection extends beyond the housing to allow device 336 to connect to an AC power source. Rectifier 340 and LED circuit 342 may be connected, assembled, and/or packaged within housing 336 using any of the methods described in conjunction with FIGS. 15-18 or any other means known in the art. It should be appreciated by those having ordinary skill in the art that the devices and packages described in FIGS. 2, 3, and 5-14 may likewise incorporate a housing to encapsulate any device and/or package therein.

FIG. 20 discloses a schematic diagram of a lighting system 168 according to an embodiment of the invention. The device 168 includes a plurality of devices 26 as described in FIG. 2 connected to a high frequency inverter AC drive Method 170 as described in FIG. 3 which in this example provides a relatively constant 12V AC source at a relatively constant frequency of 50 Khz to the devices 26. Each or some of the devices 26 may have integrated capacitors 172 of equal or different values enabling the devices 26 to operate at different drive currents 174 from a single source AC drive Method.

FIG. 21 discloses a schematic diagram of a lighting system 176 according to an embodiment of the invention. The lighting system 176 includes a plurality of devices 178, 180 and 182 each able to have operate at different currents and lumens output while connected directly to the transformer 184 output of a fixed high frequency AC drive Method 186.

Any of the aforementioned AC drive methods may likewise be used with the devices embodied in FIGS. 15-19.

For example, FIG. 22 discloses a schematic diagram of a lighting system 400 according to an embodiment of the invention. System 400 includes a plurality of devices 316, 332 as described in FIGS. 16 and 18 connected to a high frequency inverter AC drive Method 170 similar to that described in FIGS. 3 and 20 which provides a relatively constant 12V AC source at a relatively constant frequency of 50 Khz to the devices 316, 332. Each or some of the devices

316, 332 may have integrated capacitors 312, 314 and resistors 313 of equal or different values enabling the devices 300 to operate at different drive currents from a single source AC drive Method. As should be appreciated by those having ordinary skill in the art, while the example of 12V AC at 50 Khz is given herein, it is contemplated by the invention that any voltage at substantially any frequency may be provided by the driver by utilizing a proper transformer and/or inverter circuit.

Similarly, AC drive Method 186 may be utilized may be used with a single or plurality of devices 214 as disclosed in FIG. 23. As with the embodiment shown in FIG. 21, each device 316, 332 may be connected directly to transformer 184 output to receive a substantially fixed frequency voltage.

FIG. 24 discloses an embodiment of the invention where AC drive Method 186 is provided to a rectifier and LED series strings are discretely packaged. As previously disclosed, rectifier 302 may be discretely packaged in a rectifier package 326, separate from both AC drive Method 186 (or alternatively AC drive Method 170) and discrete LED packages 324, or alternatively may be included in AC drive Method 186.

FIG. 25 discloses another schematic view diagram of a light emitting device 188 identical to the device 130 disclosed in FIG. 11 and integrated into a package 30 as described in FIG. 2 for an AC drive Method according to an embodiment of the invention. The device 188 includes the device 130 as disclosed in FIG. 11 mounted on an insulating substrate 28 such as but not necessarily ceramic or sapphire and integrated into an LED package 30 that may be various LED package sizes; materials and designs based of product specifications or on printed circuit board material. The device 188 provides power connection leads 190 and 192 and may have a first or additional lens 194 that may be made of a plastic, polymer or other material used for light dispersion and the lens may be coated or doped with a phosphor or nano-crystals that would produce a change in the color or quality of light emitted from the device 130 through the lens 194. The device 130 has a matrix of devices 10. The power connection opposite the capacitors 16 within the device 130 and part of each device 10 is connected to a power connection 196 that is connected to a solderable heat sinking material 198 and integrated into the package 30. The power connection 196 connected to the heat sink 198 may be of a heavier gauge within the device 130 or 188 than other conductors. The schematic view of the device 188 provides a side view of the package 30 and an overhead view of the device 130 in this FIG. 25.

FIG. 26 discloses another schematic view diagram of a light emitting device 198 similar to the device 188 described in FIG. 25 with a different light emitting device 200 identical to the device 136 disclosed in FIG. 12 and integrated into a package 30 as described in FIG. 2 for an AC drive Method according to an embodiment of the invention. The device 198 includes a reflective device integrated into the package 30 for optimized light dispersion. The light emitting device 200 may be facing down towards the reflector 202 and opposite direction of light output from the lens 194 if the reflector 202 is integrated into the package 30 properly for such a design.

FIG. 27 discloses another schematic view diagram of a light emitting device 500 similar to that shown in FIG. 24 according to an embodiment of the invention. The device 500 includes the devices 316, 332 similar to those disclosed in FIGS. 16 and 18, mounted on an insulating substrate 318 such as but not necessarily ceramic or sapphire and inte-

Appx119

US 11,019,697 B2

19                                         20

grated into an LED package **320** that may be various LED package sizes; materials and designs based of product specifications or on printed circuit board material. The device **500** provides power connection leads **502** and **503** which connect to package power connect leads **322** and **323** and may have a first or additional lens **504** that may be made of a plastic, polymer or other material used for light dispersion and the lens may be coated or doped with a phosphor or nano-crystals that would produce a change in the color or quality of light emitted from the device through the lens **504**. Power connection **322** may be connected to heat sink **506** and may be of a heavier gauge within the device than other conductors.

FIG. **28** discloses another schematic view diagram of a light emitting device **508** similar to that shown in FIG. **26**. Device **508** is contemplated for use in embodiments where the rectifier is discretely packaged or included as part of AC drive Method **170** or **186**. In device **508**, power connection leads **510** and **511** connect to the outputs of rectifier **302** (not shown) to provide power to LED packages **324**.

FIG. **29** shows a block diagram of an LED circuit driver **204** having a high frequency inverter **206** stage that provides a relatively constant voltage and relatively constant frequency output. The high frequency inverter **206** stage has an internal dual half bridge driver with an internal or external voltage controlled oscillator that can be set to a voltage that fixes the frequency. A resistor or center tapped series resistor diode network within the high frequency inverter **206** stage feeds back a voltage signal to the set terminal input of the oscillator. An AC regulator **208** senses changes to the load at the output lines **210** and **212** of the inverter **206** and feeds back a voltage signal to the inverter **208** in response changes in the load which makes adjustments accordingly to maintain a relatively constant voltage output with the relatively constant frequency output.

FIG. **30** shows a schematic diagram of an LED circuit driver **214** having a voltage source stage **216**, a fixed/adjustable frequency stage **218**, an AC voltage regulator and measurement stage **220**, an AC level response control stage **222**, an AC regulator output control stage **224** and a driver output stage **226**.

FIG. **31** shows a schematic diagram of the voltage source stage **216** described in FIG. **20**. The voltage source stage **216** provides universal AC mains inputs **228** that drive a diode bridge **230** used to deliver DC to the LED circuit driver system **214**. Direct DC could eliminate the need for the universal AC input **228**. Power factor correction means **232** may be integrated into the LED circuit driver **216** as part of the circuit. The voltage source stage **216** includes a low voltage source circuit **234** that may include more than one voltage and polarity.

FIG. **32** shows a schematic diagram of the fixed/adjustable frequency stage **218** as described in FIG. **20**. The fixed/adjustable frequency stage **218** includes a bridge driver **236** that may include an integrated or external voltage controlled oscillator **238**. The oscillator **238** has a set input pin **240** that sets the frequency of the oscillator to a fixed frequency through the use of a resistor or adjustable resistor **242** to ground. The adjustable resistor **242** allows for adjusting the fixed frequency to a different desired value through manual or digital control but keeps the frequency relatively constant based on the voltage at the set terminal **240**.

FIG. **33** is a schematic diagram of the AC voltage regulator with voltage measurement stage **220** as described in FIG. **20**. The AC voltage regulator with voltage measurement circuit **220** monitors the voltage at the driver output

**226** as shown in FIG. **20** and sends a voltage level signal to the AC level response control stage **222** as shown in FIG. **20**.

FIG. **34** is a schematic diagram of the AC level response control stage **228** stage. The AC level response control stage **228** receives a voltage level signal from the AC voltage regulator with voltage measurement circuit **220** as shown in FIG. **23** and drives the AC regulator output control stage **224** as shown in FIG. **20**.

FIG. **35** is a schematic diagram of the AC regulator output control stage **230**. The AC regulator output control stage **230** varies the resistance between the driver of the drive transistors **232** and the transformer input pin **234** of the driver output **226** as shown in FIG. **26**. The AC regulator output control stage **230** is a circuit or component such as but not necessarily a resistor, a voltage dependent resistor or a current dependent resistor circuit having a means of varying its resistance in response to the voltage or current delivered to it.

FIG. **36** is a schematic diagram of the driver output stage **226**. The driver output stage **226** includes drive transistors **232** and the transformer **236** that delivers an AC voltage output **238** to LED circuits at a relatively constant voltage and frequency.

FIGS. **37** and **38** discloses a circuit **1104** to illustrate another aspect of the invention. Accordingly, an alternating electric field is provided to a first transmission conductor by a signal generator **1102** and a second transmission conductor is provided by an antenna **1108** (see FIG. **37**) or wire **1124** (see FIG. **38**) that is connected to a relatively less positive side **1114-1122** within the directional circuit **1110**. A difference in DC potential between a relatively more positive side **1112** within the directional circuit, and relatively less positive side **1114-1122** is provided. Another aspect of the invention is sensing proximity with impedance changes within the directional circuits described herein (as it could be with any embodiment disclosed herein) by approaching any of the directional circuits or transmission conductors (also any of which are described herein), for example approaching **1108** (shown in FIG. **37**) and/or **1124** (as shown in FIG. **38**) with a conductive substance such as a person, including the touch of a person (human touch), or metallic material thereby changing the circulation of current flow within the directional circuit by changes in impedance through the capacitance of the conductive substance.

FIGS. **39**, and **40-41** disclose another embodiment of the invention having a directional organic light emitting diode ("OLEO") circuit **1154** that includes a first diode D1 **1156**, a second diode D2 **1158**, and an OLED **1157**. The first diode D1 **1156** has an anode and the second diode D2 **1158** has a cathode, which are commonly connected to a input transmission conductor **1160**. The cathode of diode D1 **1156** is connected to the relatively more positive side **1162** anode of an OLED **1157** while the anode of diode D2 **11** is connected to the relatively less positive side cathode **1164** of the OLED **1157** to form the loop circuit **1154** among the diodes D1, D2 and the OLED **1157**. The directional OLEO circuit **154** is a loop circuit which includes one or more circuit elements (e.g. diodes or OLEDs **1156**, **1157** and **1158**) causing the loop circuit to be asymmetric to current flow. Circuit element **1157** is an OLED. The directional OLEO circuit **1154** does not have a continuous conductive path to earth ground, or battery ground. The directional OLEO circuit **1154** develops a DC potential in response to a alternating electric field imposed on input **1160**. The directional OLEO circuit **1154** is self referencing between a relatively high potential output and a relatively lower potential output. The directional OLEO circuit **1154** has a resistance, inductance and capaci-

Appx120

US 11,019,697 B2

21

tance that is responsive to the voltage and frequency of the alternating electric field. The directional OLEO circuit **1154** has transmission conductors **1166,1168** connected to the directional OLEO circuit **1154**.

FIG. **40** discloses a circuit **1182** with the same embodiment of the invention shown in FIG. **39** (see FIG. **39**) encasing the directional OLEO circuit **1154** within a package **1163**.

FIG. **41** discloses a circuit **1184** with the same embodiment of the invention shown in FIG. **39** (see FIG. 39) with a second transmission conductor **1185** providing an input within the directional circuit **1184** at a point other than the input of the first transmission conductor input of **1160**. The transmission conductors **1160** and **1185** (or any transmission conductors described herein) can act as an antenna and cause the directional OLEO circuit **1184** to react to the proximity of conductive substances near the transmission conductors **1160** and **1185**. In preferred embodiments, the circuits disclosed in FIGS. **39-41** and **43** below may be connected to ground through capacitance at a point within the directional circuit such as transmission conductor **1185** (e.g. FIG. **41**). This ground connection seems to provide increased circulation current, as it is noted that the OLEDs get brighter for a given alternating electromagnetic source.

FIG. **42** discloses a circuit **1226** identical to circuit **1210** but that the circuit has a first transmission conductor **1228** and a second transmission conductor **1230**. Each transmission conductor **1228,230** can be driven with an alternating electric field and can cause the circuit **1226** to react to the proximity of a conductive substance that approaches the transmission conductors **1228** and **1230** with only one or both conductors being driven.

FIG. **43** discloses another embodiment of the invention having a directional organic light emitting diode ("OLEO") circuit **1170** that includes a first OLEO **1172**, a second OLEO **1174**, and a third OLEO **1176**. The first OLEO **1172** has an anode and the third OLEO **1176** has a cathode, which are commonly connected to an input transmission conductor **1178** having AC signal source from a signal generator **1180**. The cathode of the first OLEO **1172** is connected to the anode of the second OLEO **1174** while the cathode of the second OLEO **1174** is connected to the anode of the third OLEO **1176** to form the loop circuit **1170** among the OLEDs **1, 2** and **3** (**1172-1176**). The directional OLEO circuit **1170** can be designed with more than 3 OLEDs.

FIG. **44** discloses a preferred circuit **2010** according to the invention. The circuit **2010** includes a first source for providing an alternating electric field. The source may be 120V or 240V line power, RF energy or the output of a standard AC signal source such as generator **2012** of FIG. **44**. This generator **2012** may produce its signal with reference to ground as indicated in FIG. **44**. Circuit **2010** also discloses a directional circuit **2014** connected to the generator **2012** by a transmission conductor **2016**. According to the invention the conductor **2016** may be any form of conventional conductive path whether twisted wire bundles, single wires, etc. The point is that the transmission conductor **2016** provides a single transmission path to the directional circuit **2014**. Important to the invention is the fact that there is no conductive return path provided back from the directional circuit **2016** to the generator **2012**.

In the broad sense, the directional circuit **2014** is a loop circuit which includes one or more circuit elements causing the loop circuit to be asymmetric to current flow. Again it is important that the directional circuit **2014** has no continuous conductive path to earth ground, or a battery ground. As such, and as disclosed in FIG. **44** the directional circuit **2014**

22

develops a DC potential across a load, such as resistor R1 in response to the alternating electric field. This DC potential is not referenced to ground but merely to the potential differences created by the circulation of current (see FIG. **45**) in the loop across the load (resistor R1 of FIG. **44**). Accordingly, the DC potential is self referencing. As far as the resistor R1 is concerned, circuit **2010** presents it with a relatively higher DC potential output at **2020** and a relatively lower potential output at **2022**.

FIG. **45** discloses circuit **2010** with the load represented as a generic load **2024** (rather than resistor R1) to show the circulation path of current flow (indicated by the arrows) in any generic load circuit utilizing the DC potential of circuit **2010**.

FIGS. **44** and **45** disclose that the loads connected to the directional circuit **2014** do not have a continuous conductive path to earth ground or a battery ground. They also disclose that the directional circuit **2014** has circuit elements causing the directional circuit to be asymmetric to current flow. In the preferred embodiment disclosed, these circuit elements are diodes D1 and D2. However, it is contemplated that numerous other circuit elements could provide the same functionality, in particular, semiconductors with "pn" junctions; electrets, plasma, organic; or combinations thereof.

The circuit **2010** is preferably used for delivering power and sensing proximity. The circuit **2010** is also preferably useful in TTL logic applications as disclosed in FIG. **46** showing a standard TTL logic output circuit **2026** powered by circuit **2010**. In that application, the DC voltages necessary range from 0V to +/−5V.

FIGS. **44-46** each disclose that directional circuit **2014** includes first and second diodes D1 and D2, with D1 having an anode and diode D2 having a cathode which are commonly connected to the transmission conductor **2016**. the cathode of the first diode D1 is connected to the relatively more positive side of the load **2020** while the anode of the second diode is connected to the relatively less positive side load **2022** to form the directional loop circuit among the diodes and the load.

FIG. **47** discloses a circuit **2024** according to the invention having a standard AC signal generator **2026** and a directional circuit **2028** includes first and second light emitting diodes (LEDs), the first LED **1** has an anode and the second LED **2** has a cathode, which are commonly connected to the conductor **2030** from the generator **2026**. The cathode of LED **1** is connected to the relatively more positive voltage side **2032** of the load **2036** while the anode of LED **2** is connected to the relatively less positive side **2034** of the load **2036** to form the loop circuit **2028** among the LEDs **1** and **2**. In this embodiment the load is configured to optimize the lumen produced by the directional circuit, for example the LEDs **1, 2** used to deliver power to the load **2036** which can be a third LED as shown in FIG. **48**.

FIG. **48** discloses a circuit **2038** according to the invention. In this embodiment, a generator **2040** produces an alternating electric field on transmission conductor **2040**. The conductor **2041** is connected to a directional circuit **2042** having circuit elements causing an asymmetrical response to the alternating field and current flow. In particular, circuit **2042** includes three LEDs **1, 2, 3**, configured to provide circulation according to the direction of the arrows (see FIG. **48**). In this embodiment, all three LEDs **1-3** provide light as an output that can be considered as a load. This shows that relative nature of the positioning of elements in the various directional circuits disclosed herein according to the invention. If light is desired, then each of the diodes may be considered both loads and circuit ele-

US 11,019,697 B2

23

ments which cause asymmetrical current flow. For example, FIG. **49** discloses the same circuit **2038** with only the substitution of LEDs **1** and **3** by diodes D1 and D2. In this circuit, optimization of the light emitted by LED **2** is of paramount concern, whereas the diodes **1**, **2** provide directionality and a DC offset to the AC signal source as will be disclosed in more detail below. In preferred embodiments, the directional circuits, including directional circuit **2014**, disclosed herein throughout this invention may be connected to ground through capacitance **2039** at a point within the directional circuit other than the AC signal input point **40** as shown in FIG. **49**. This ground connection seems to provide increased circulation current, as it is noted that the LEDs get brighter for a given alternating electromagnetic source. The capacitor **2039** may alternatively be placed on the other side of the AC line **2041**. The capacitor is used to drop the voltage from the AC source.

FIG. **50** discloses a circuit **2042** having an AC signal generator **2044** inducing an alternating electric field onto transmission conductor **2046** which is connected to a first directional circuit **2048** having LEDs **1-3**. LED **2** acting as a load to circuit **2048**, provides the relatively high DC potential at point **2050** and a relatively lower DC potential at point **2052** to another directional circuit **2054** comprised of LEDs **4-6**. This is repeated for another directional circuit **2056** and LEDs **7-9**. Again, the circuit components LEDs **1-9** provide both directionality and useful work as a load in the form of producing light. According to another aspect of the invention, the circuit **2042** discloses the multiplexing possibilities of the directional circuits **2048**, **2052**, **2056**. According to another aspect of the invention, the circuit **2042** discloses a parallel LED directional circuit.

FIG. **51** discloses a circuit **2058** to illustrate another aspect of the invention, in particular the transmission of information or data as one may use the terms. Accordingly, the alternating electric field is provided (as it could be with any embodiment disclosed herein) by either an antenna **2060** or a signal generator **2061**. The alternating signal source is imposed on transmission conductor **2062**. A directional circuit **2064** is comprised of a load **2066** and two diodes D1 and D2. The circuit **2058** discloses the directional DC current flow as well as an AC plus DC current flow and potential indicated by "AC+DC" in FIG. **51**. This DC plus AC component is important to the transmission of information or data signals from the generators **2060**, **2061**.

In particular, FIG. **52** discloses a circuit **2068** having a signal generator **2070**, a transmission conductor **2072**, and a directional circuit **2074**. The directional circuit has asymmetrical diode elements D1 and D2 and a load R1. In this and the other embodiment disclosed herein (see FIG. **51**), the directional circuit **2074** is constructed to permit a DC voltage level to accrue on the transmission conductor **2072** along with the AC signal to provide an offset to the signal. This offset is preferential to the signal as the signal is ungrounded. It is believed that this may prevent noise in the system to be added to the line **2072** as a second alternating field but with reference to ground. Accordingly the noise adds to the DC level but not to the signal level in the same proportions.

Also as disclosed in FIG. **52**, an output **2076** is provided which will transmit the AC signals from transmission line **2072** to an information or data signal receiver **2078** which will detect the signal riding the DC level. The circuit can easily be distinguished and handled by such a receiver as is conventional. It should be understood that the signal receiver **2078** may be of any conventional type of TTL logic device, modem, or telecommunications receiver and is

24

believed to operate best with the preferred systems of the invention when it is not connected to earth ground or a battery ground, or a current sink or charge collector (as is the case for the working loads disclosed through out this disclosure).

According to another embodiment, FIG. **53** discloses another information or data communication circuit **2080**. The circuit **2080** includes a signal generator **2082**, a transmission conductor **2084**, a directional circuit **2086**, a data receiver **2088**, and a ground switch **2090**. In this embodiment, the directional circuit **2086** provides both the DC power for the receiver **2088**, and a data signal through output **2092** connected between the receiver input and the common connection between the conductor **2084** and directional circuit input to anode of diode D1 and cathode D2. In the meantime, the receiver is powered on the DC potential difference between D1 the relatively more positive side **2094** and D2 the relatively less positive side **2096** of the directional circuit. In this embodiment, resistor R1 is provided according to another aspect of the invention to regulate or select as desired the level of DC offset the AC data signal will have at line **2092**.

According to another aspect of the invention, the ground switch **2090** is provided to provide a non-continuous connection to a circuit, such as the ground circuit disclosed in FIG. **53**, to dissipate excessive accumulations of charge or voltage potentials in the circuit **2080**. It is contemplated that the switch **2090** be actuated based upon a timing (such as a pre-selected clock pulse) criteria, or by a sensor (not shown) of an undesirable DC level developing in the circuit **2080**. Once engaged, the circuit **2090** would dissipate the excess energy to a ground, ground, plane, capacitor, battery ground, or the like.

FIG. **54** discloses a circuit **2092** wherein directional circuits **2094-2100** are connected through a common bus conductor **2102** to provide DC power and signals from generator **2104** as described previously herein.

FIGS. **55** and **56** disclose a circuit **2104** to illustrate another aspect of the invention. Accordingly, an alternating electric field is provided to a first transmission conductor by a signal generator **2102** and a second transmission conductor is provided by an antenna **2108** (see FIG. **55**) or wire **2124** (see FIG. **56**) that is connected to a relatively less positive side **2114-2122** within the directional circuit **2110**. A difference in DC potential between a relatively more positive side **2112** within the directional circuit, and relatively less positive side **2114-2122** is provided. Another aspect of the invention is sensing proximity with impedance changes within the directional circuits described herein (as it could be with any embodiment disclosed herein) by approaching any of the directional circuits or transmission conductors (also any of which are described herein), for example approaching **2108** (shown in FIG. **55**) and/or **2124** (as shown in FIG. **56**) with a conductive substance such as a person, including the touch of a person (human touch), or metallic material thereby changing the circulation of current flow within the directional circuit by changes in impedance through the capacitance of the conductive substance.

FIG. **57** discloses a circuit **2126** to illustrate another aspect of the invention. Accordingly, an alternating electric field is provided to a transmission conductor **2132** by a signal generator **2128** that provides a first voltage level output equal to that provided by the signal generator **2128**. A lump inductance **2130** is provided in series of the transmission conductor **2132** between the signal generator **2128** and directional circuit **2134**. The lump inductance **2130** provides an increased voltage level from the relatively lower

US 11,019,697 B2

25                                                          26

voltage on the transmission conductor **2132** at the point **2136** between the signal generator **2128** and lump inductance **2136** and a relatively higher voltage level on the transmission conductor **2132** at the point **2138** between the lump inductance **2130** and the directional circuit **2134** thereby providing an increase in current flow within the directional circuit **2134** or electromagnetic field energy radiating from the circuit **2126**. The amount of current flow within the directional circuits described herein and electromagnetic field energy external of the directional circuits described herein is dependent on the frequency of an AC signal provided to the transmission conductor **2132** (or any of which are described herein). In preferred embodiments, the circuits disclosed in FIGS. **44-57** may be connected to ground through capacitance. This ground connection seems to provide increased circulation current, as it is noted that the LEDs get brighter for a given alternating electromagnetic source.

FIG. **58** discloses a circuit **2140** according to the invention having a standard AC signal generator **2142** and a directional circuit **2144** that includes first and second diodes D1, D2, the first diode D1 has an anode and the second diode D2 has a cathode, which are commonly connected to the transmission conductor **2146** from the generator **2142**. The cathode of diode D1 is connected to the relatively more positive side **2148** of an organic light emitting diode (OLED) **2152** while the anode of diode D2 is connected to the relatively less positive side **150** of the OLED **2152** to form the loop circuit **2144** among the diodes D1, D2 and the OLED **2152**.

FIGS. **59**, and **61-62** disclose another embodiment of the invention having a directional organic light emitting diode ("OLED") circuit **2154** that includes a first diode D1 **2156**, a second diode D2 **2158**, and an OLED **2157**. The first diode D1 **2156** has an anode and the second diode D2 **2158** has a cathode, which are commonly connected to an input transmission conductor **2160**. The cathode of diode D1 **2156** is connected to the relatively more positive side **2162** anode of an OLED **2157** while the anode of diode D2 **2158** is connected to the relatively less positive side cathode **2164** of the OLED **2157** to form the loop circuit **2154** among the diodes D1, D2 and the OLED **2157**. The directional OLED circuit **2154** is a loop circuit which includes one or more circuit elements (e.g. diodes or OLEDs **2156**, **2157** and **2158**) causing the loop circuit to be asymmetric to current flow. Circuit element **2157** is an OLED. The directional OLED circuit **2154** does not have a continuous conductive path to earth ground, or battery ground. The directional OLED circuit **2154** develops a DC potential in response to an alternating electric field imposed on input **2160**. The directional OLED circuit **2154** is self referencing between a relatively high potential output and a relatively lower potential output. The directional OLED circuit **2154** has a resistance, inductance and capacitance that is responsive to the voltage and frequency of the alternating electric field. The directional OLED circuit **2154** has transmission conductors **2166**, **2168** connected to the directional OLED circuit **2154**.

FIG. **60** discloses another embodiment of the invention having a directional organic light emitting diode ("OLED") circuit **2170** that includes a first OLED **2172**, a second OLED **2174**, and a third OLED **2176**. The first OLED **2172** has an anode and the third OLED **2176** has a cathode, which are commonly connected to an input transmission conductor **2178** having AC signal source from a signal generator **2180**. The cathode of the first OLED **2172** is connected to the anode of the second OLED **2174** while the cathode of the second OLED **2174** is connected to the anode of the third

OLED **2176** to form the loop circuit **2170** among the OLEDs **1**, **2** and **3** (**2172-2176**). The directional OLED circuit **2170** can be designed with more than 3 OLEDs.

FIG. **61** discloses a circuit **2182** with the same embodiment of the invention shown in FIG. **59** (see FIG. **59**) encasing the directional OLED circuit **2154** within a package **2163**.

FIG. **62** discloses a circuit **2184** with the same embodiment of the invention shown in FIG. **59** (see FIG. **59**) with a second transmission conductor **2185** providing an input within the directional circuit **2184** at a point other than the input of the first transmission conductor input of **2160**. The transmission conductors **2160** and **2185** (or any transmission conductors described herein) can act as an antenna and cause the directional OLED circuit **2184** to react to the proximity of conductive substances near the transmission conductors **2160** and **2185**. In preferred embodiments, the circuits disclosed in FIGS. **59-66** may be connected to ground through capacitance at a point within the directional circuit such as transmission conductor **2185** (e.g. FIG. **62**). This ground connection seems to provide increased circulation current, as it is noted that the OLEDs get brighter for a given alternating electromagnetic source.

FIG. **63** discloses a matrix circuit **2186** comprised of twelve circuits **2154** (e.g. FIG. **61**). The circuits in the matrix **2186** are connected commonly to a transmission conductor **2188**.

FIG. **64** discloses a matrix circuit **2190** identical to matrix circuit **2186** but that the circuits **2191** employ only LEDs or optionally OLEDs.

FIG. **65** discloses a matrix circuit **2192** identical to matrix circuit **2186** but that the circuits **2193** in the matrix **2192** are connected commonly to one end of a lump inductance **2196** placed in series of the transmission conductor **2194** between the signal generator **2198** and the matrix circuit.

FIG. **66** discloses a matrix circuit **2200** identical to matrix circuit **2192** but that the circuits in the matrix **2200** are connected to individual lump inductances **2201-2206** which can be of equal or different values.

FIG. **67** discloses a circuit **2210** having a directional light emitting diode ("LED") circuit **212** that includes a first diode D1 **2214**, a second diode D2 **2216**, and an LED **2218**. The first diode D1 **2214** has an anode and the second diode **2216** has a cathode, which are commonly connected to an input transmission conductor **2220**. The cathode of diode D1 **2214** is connected to the relatively more positive side **2222** anode of an LED **2218** while the anode of diode D2 **2216** is connected to the relatively less positive side cathode **2224** of the LED **2218** to form the loop circuit **2212** among the diodes D1, D2, and the LED **2218**. The directional LED circuit **2212** is a loop circuit which includes one or more circuit elements (e.g. diodes or LEDs **214**, **2216** and **2218**) causing the loop circuit to be asymmetric to current flow. The directional LED circuit **2212** is encased in a package **2225** and has no continuous conductive path to earth ground, or battery ground. The directional LED circuit **2212** develops a DC potential in response to an alternating electric field imposed on input **2220**. The directional LED circuit **2212** is self referencing between a relatively high potential output and a relatively lower potential output. The directional LED circuit **2212** has a resistance, inductance and capacitance that is responsive to the voltage and frequency of the alternating electric field.

FIG. **68** discloses a circuit **2226** identical to circuit **2210** but that the circuit has a first transmission conductor **2228** and a second transmission conductor **2230**. Each transmission conductor **2228**,**2230** can be driven with an alternating

Appx123

US 11,019,697 B2

27

electric field and can cause the circuit **2226** to react to the proximity of a conductive substance that approaches the transmission conductors **2228** and **2230** with only one or both conductors being driven.

FIG. **69** discloses a matrix circuit **2232** comprised of four circuits **2212** (e.g. FIG. **67**). The circuits in the matrix **2232** are connected commonly to the input **2236**.

FIG. **70** discloses a circuit **2240** identical to circuit **2210** but that the circuit has a more than one LEDs **2218** forming a directional circuit within a single package **2225**.

FIG. **71** discloses a circuit **2242** identical to circuit **126** (e.g. FIG. **57**) but that the circuit has a capacitance added in series within the directional circuit thereby adding to the inherent capacitance of the directional circuit. Another aspect of the invention is to have the added capacitance **2244** adjustable so that the directional circuit **2242** is tuned to resonance by adjusting the capacitance **2244**.

FIG. **72** discloses a circuit **2246** identical to circuit **2126** (e.g. FIG. **57**) but that the circuit has a capacitance **2248** added in parallel to the inductor **2130** thereby adding to the inherent capacitance of the transmission conductor and inductor **2130**. Another aspect of the invention is to have the added capacitance **2248** adjustable so that the directional circuit **2242** is tuned to resonance by adjusting the capacitance **2244**.

FIG. **73** shows a device **2482** comprising individual light emitting diode circuits **2484** on a flexible printed circuit board having a mirror like reflective material or coating **2488** designed into or on the flexible printed circuit board in an area at least near the light emitting diodes for providing more efficient light output from the circuit board areas surrounding the light emitting diodes by having the flexible printed circuit board reflect light rather than absorb it. Power connection points **2490** and **2492** are provided to the board.

FIG. **74** shows a device **2494** comprising a device **2496** identical to the device shown in FIG. **73** adhered to a device **2498** having a cylindrical shape for providing improved uniformity and increased angle of light output from device **2496**.

A circuit includes a first source for providing an alternating electric field, a directional circuit is connected to the first source for providing an alternating electric field by a transmission conductor there being no conductive DC path is provided back from the directional circuit to the first source for providing an alternating electric field. The directional circuit being a loop circuit which includes one or more circuit elements causing the loop circuit to be asymmetric to current flow; the directional circuit having no continuous conductive path to earth ground, or battery ground, the directional circuit thereby developing a DC potential in response to the alternating electric field which is self referencing between a relatively high potential output and a relatively lower potential output. One or more loads connected to the directional circuit, the one or more loads also not having a continuous conductive path to earth ground or a battery ground. The load is not provided with a continuous connection to earth ground, or battery ground. The load may be provided with a capacitive connection to earth ground, or battery ground. The DC current flow within the directional circuit is adjustable by tuning the directional circuit to different frequencies of an alternating electric field thereby causing the directional circuit to reach a resonant state. The current flow increases within the directional circuit and the electromagnetic field is concentrated within the directional circuit when the directional circuit is tuned to a resonant frequency. The directional circuit being tuned out of its resonant frequency and providing a larger electromagnetic

28

field surrounding the exterior of the directional circuit enables the directional circuit to be responsive to the proximity of objects having a capacitance that enter the electromagnetic field. The directional circuit is tuned towards resonance as conductive objects enter the electromagnetic field of the directional circuit.

The above-described embodiments of the present invention are intended to be examples only. Alterations, modifications and variations may be effected to the particular embodiments by those of ordinary skill in the art without departing from the scope of the invention, which is defined by the claims appended hereto.

What is claimed is:

**1**. An apparatus comprising:

at least one LED;

a semiconductor device configured to emit a laser;

a data receiver including an antenna, wherein the data receiver is configured to transmit and receive data;

a circuit configured to detect human touch via capacitive sensing; and

a battery ground capacitively coupled to at least one of the data receiver, the circuit, the at least one LED, or the semiconductor device via a conductor,

wherein the apparatus is portable, and

wherein the at least one LED, the semiconductor device, the data receiver, the circuit, and the battery ground are contained within a package and connected to at least one circuit board within the package.

**2**. The apparatus of claim **1**, wherein the at least one LED includes an organic light emitting diode.

**3**. The apparatus of claim **1**, wherein the semiconductor device is a laser diode.

**4**. The apparatus of claim **1**, further comprising a three-way switch.

**5**. The apparatus of claim **1**, further comprising a power supply configured to increase power supplied to the at least one LED when the circuit detects a touch.

**6**. The apparatus of claim **1**, wherein the at least one LED is mounted on a glass substrate.

**7**. An apparatus comprising:

an LED circuit comprising at least one LED;

a first transmission conductor configured to receive first power and first data;

a second transmission conductor configured to wirelessly receive second power and second data from an alternating electromagnetic field;

at least one data receiver configured to receive the first and second data respectively from the first and second transmission conductor, or receive third data via an antenna; and

a battery ground capacitively coupled to at least one of the at least one data receiver, the LED circuit, the first transmission conductor, or the second transmission conductor via a conductor,

wherein the apparatus is portable, and

wherein the LED circuit, the first transmission conductor, the second transmission conductor, the at least one data receiver, and the battery ground are contained within a package and connected to at least one circuit board within the package.

**8**. The apparatus of claim **7**, wherein the at least one data receiver further comprises digital logic circuitry.

**9**. The apparatus of claim **8**, wherein the digital logic circuitry includes transistor-transistor logic ("TTL") circuitry.

**10**. The apparatus of claim **7**, further comprising a semiconductor device configured to emit a laser.

US 11,019,697 B2

29    30

**11**. The apparatus of claim **10**, wherein the semiconductor device comprises a laser diode.

**12**. The apparatus of claim **10**, further comprising a circuit configured to detect human touch via capacitive sensing.

**13**. The apparatus of claim **12**, further comprising a power supply configured to increase power supplied to the at least one LED when the circuit detects a touch.

**14**. An apparatus comprising:

an LED circuit comprising at least one LED;

a transmission conductor configured to wirelessly receive power and data from an alternating electromagnetic field;

a data receiver configured to receive the data from at least one of the transmission conductor or an antenna;

a battery ground capacitively coupled to at least one of the data receiver, the transmission conductor, or the LED circuit via a conductor,

wherein the apparatus is portable, and

wherein the LED circuit, the transmission conductor, the at least one data receiver, and the battery ground are connected to at least one circuit board within a package.

**15**. The apparatus of claim **14**, further comprising an inductor coupled to the transmission conductor.

**16**. The apparatus of claim **15**, further comprising a capacitor coupled to the inductor.

**17**. The apparatus of claim **16**, further comprising a circuit configured to detect human touch via capacitive sensing.

**18**. The apparatus of claim **17**, further comprising a power supply configured to increase power supplied to the at least one LED when the circuit detects a touch.

**19**. The apparatus of claim **14**, wherein the data receiver comprises digital logic circuitry.

**20**. The apparatus of claim **19**, wherein the digital logic circuitry includes TTL circuitry.

**21**. The apparatus of claim **7**, wherein the data receiver includes DC offset circuitry.

**22**. The apparatus of claim **14**, wherein DC offset circuitry is coupled to the transmission conductor.

* * * * *

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of September, I caused this Brief

of Appellant to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

> Naveen Modi
> Mark Consilvio
> Joseph Palys
> PAUL HASTINGS, LLP
> 2050 M Street, NW
> Washington, DC 20036
> (202) 551-1700
> naveenmodi@paulhastings.com
> markconsilvio@paulhastings.com
> josephpalys@paulhastings.com

*/s/ Stephen T. Schreiner*
Stephen T. Schreiner

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [12,785] words.

[     ] this brief uses a monospaced type and contains [state the number of] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [14pt Times New Roman]; or

[     ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].


*/s/ Stephen T. Schreiner*
Stephen T. Schreiner

September 22, 2023                    *Counsel for Appellant*